No. 21-1379

# In the United States Court of Appeals for the Fourth Circuit

———————————

ANTHRY RAUL MILLA,

*Plaintiff-Appellant,*

v.

PFC D. BROWN, ET AL.

*Defendants-Appellees.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
THE HONORABLE ANTHONY J. TRENGA, NO. 1:20-CV-00694-AJT-MSN

———————————

**JOINT APPENDIX
VOLUME I OF I**

———————————

CHARLES CARDINAL
KIBLER FOWLER & CAVE LLP
11100 Santa Monica Blvd.
Suite 360
Los Angeles, CA 90025
(310) 409-0400
ccardinal@kfc.law

STEPHEN F. RAIOLA
*Counsel of Record*
KIBLER FOWLER & CAVE LLP
301 Grant Street, Suite 270
Pittsburgh, PA 15219
(917)-909-6313
sraiola@kfc.law

**Court-Appointed Amicus Curiae Supporting Appellant**

January 29, 2024

# TABLE OF CONTENTS

| Document | File Date | Docket Number | Joint Appendix Page No. |
|---|---|---|---|
| Docket Report | - | - | JA001 |
| Complaint for Violation of Civil Rights | 06/18/2020 | 1 | JA005 |
| Joint Discovery Plan | 09/01/2020 | 13 | JA012 |
| Rule 16(B) Scheduling Order | 09/08/2020 | 14 | JA015 |
| Plaintiff's Letter to Court Re Application for Subpoenas | 01/21/2021 | 21 | JA019 |
| Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56(b) | 02/03/2021 | 22 | JA022 |
| Memorandum in Support of Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56(b) | 02/03/2021 | 23 | JA024 |
| Motion for Summary Judgment Exhibit 1 - Affidavit of Angela Kang | 02/03/2021 | 23-1 | JA051 |
| Motion for Summary Judgment Exhibit 3 - Affidavit of Office Adam Ater | 02/03/2021 | 23-2 | JA054 |
| Motion for Summary Judgment Exhibit 4 - Affidavit of MPO Tammy Russell | 02/03/2021 | 23-3 | JA057 |
| Motion for Summary Judgment Exhibit 5 – Helicopter Video Recording | 02/03/2021 | 23-4 | JA061 |
| Motion for Summary Judgment Exhibit 6 - Affidavit of Officer Derek Brown | 02/03/2021 | 23-5 | JA063 |
| Motion for Summary Judgment Exhibit 7 - Affidavit of Officer Shane McComas | 02/03/2021 | 23-6 | JA069 |

| | | | |
|---|---|---|---|
| Motion for Summary Judgment Exhibit 8 – Brown Vehicle Video Recording | 02/03/2021 | 23-7 | JA075 |
| Motion for Summary Judgment Exhibit 9 – Map depicting location of Shell Gas Station in relation to 1021 Dranesville Road, Herndon, VA 20170 | 02/03/2021 | 23-8 | JA077 |
| Motion for Summary Judgment Exhibit 10 – Affidavit of Michael Hood | 02/03/2021 | 23-9 | JA078 |
| Motion for Summary Judgment Exhibit 2 – Background Event Chronology | 02/03/2021 | 23-10 | JA084 |
| Notice of Hearing Date | 02/03/2021 | 24 | JA090 |
| Plaintiff's Opposition to Defendants' Motion for Summary Judgment | 02/24/2021 | 27 | JA092 |
| Cover Letter to Clerk re: Plaintiff's Opposition to Defendants' Motion for Summary Judgment | 02/24/2021 | 27-1 | JA105 |
| Defendants' Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment | 02/25/2021 | 28 | JA106 |
| Order re: Defendants' Motion for Summary Judgment Hearing Cancellation | 03/01/2021 | 29 | JA117 |
| Order Granting Defendants' Motion for Summary Judgment | 03/29/2021 | 30 | JA118 |
| Plaintiff's Notice of Appeal | 04/05/2021 | 31 | JA140 |

Query    Reports    Utilities    Help    Log Out

APPEAL,CLOSED,PRO SE

# U.S. District Court
# Eastern District of Virginia - (Alexandria)
# CIVIL DOCKET FOR CASE #: 1:20-cv-00694-AJT-MSN

Milla v. PFC D. Brown et al

Assigned to: District Judge Anthony J Trenga

Referred to: Magistrate Judge Michael S. (MJ)Nachmanoff

Demand: $50,000

Case in other court: FOURTH CIRCUIT, 21-01379

Cause: 42:1983 Civil Rights Act

Date Filed: 06/19/2020

Date Terminated: 03/29/2021

Jury Demand: None

Nature of Suit: 440 Civil Rights: Other

Jurisdiction: Federal Question

**Plaintiff**

**Anthry Raul Milla**                    represented by    **Anthry Raul Milla**
1201 Dranesville Road
Herndon, VA 21070
571-455-9248
PRO SE

**Defendant**

**PFC D. Brown**                         represented by    **Kimberly Pace Baucom**
*ID #331973, Badge #4108*                                 Fairfax County Office of the County
Attorney
12000 Government Center Parkway
Suite 549
Fairfax, VA 22035
703-324-2421
Fax: 703-324-2665
Email:
Kimberly.Baucom@fairfaxcounty.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**PFC McComas**                          represented by    **Kimberly Pace Baucom**
*ID # 340298, Badge # 4319*                               (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/18/2020 | 1 | COMPLAINT against PFC D. Brown, PFC McComas, filed by Anthry Raul Milla.(lcre, ) (Entered: 06/19/2020) |
| 06/18/2020 | 2 | Proposed Summons Brown by Anthry Raul Milla. (Attachments: # 1 Proposed Summons McComas)(lcre, ) (Entered: 06/19/2020) |

| 06/18/2020 | 3 | MOTION for Leave to Proceed in forma pauperis by Anthry Raul Milla. (lcre, ) (Entered: 06/19/2020) |
|---|---|---|
| 06/19/2020 | 4 | Acknowledgment of Receipt. (lcre, )(c/s) (Entered: 06/19/2020) |
| 06/26/2020 | 5 | ORDERED that the plaintiffs re 3 application under 28 U.S.C. § 1915 to proceed without prepaying fees or costs is conditionally granted. Upon receipt of the completed summons and USM-285 form for each defendant, the clerk will issue a summons. If the completed summons and USM-285 forms are not submitted as directed, the complaint may be dismissed. Signed by Magistrate Judge Michael S. Nachmanoff on 6/26/2020. (lcre, )(c/s) (Entered: 06/26/2020) |
| 06/29/2020 | 6 | Mail Returned as Undeliverable. Mail sent to Anthry Raul Milla (lcre, ) (Entered: 06/29/2020) |
| 07/06/2020 | 7 | NOTICE of Submission: Proposed Summons and USM 285 Form by Anthry Raul Milla (Attachments: # 1 Letter, # 2 Envelope)(lcre, ) (Entered: 07/07/2020) |
| 07/07/2020 | 8 | Summons Issued (to be served by SPS) as to PFC D. Brown, PFC McComas. NOTICE TO ATTORNEY: Print out two electronically issued summons and one copy of the attachments for each defendant to be served with the complaint. (lcre, ) (Entered: 07/07/2020) |
| 07/29/2020 | 9 | SUMMONS Returned Executed PFC D. Brown served on 7/28/2020, answer due 8/18/2020; PFC McComas served on 7/28/2020, answer due 8/18/2020 (lcre, ) (Entered: 07/29/2020) |
| 08/17/2020 | 10 | ANSWER to 1 Complaint by PFC D. Brown.(Baucom, Kimberly) (Entered: 08/17/2020) |
| 08/17/2020 | 11 | ANSWER to 1 Complaint by PFC McComas.(Baucom, Kimberly) (Entered: 08/17/2020) |
| 08/17/2020 | 12 | SCHEDULING ORDER: Initial Pretrial Conference set for 9/9/2020 at 11:00 AM in Alexandria Courtroom 400 before Magistrate Judge Michael S. Nachmanoff. Final Pretrial Conference set for 1/21/2021 at 10:00 AM in Alexandria Courtroom 701 before District Judge Anthony J. Trenga. Discovery due by 1/15/2021. Signed by District Judge Anthony J. Trenga on 8/17/2020. (Attachments: # 1 Magistrate Consent, # 2 Pretrial Notice)(dzir) (Entered: 08/17/2020) |
| 09/01/2020 | 13 | *Agreed Joint* Discovery Plan by PFC D. Brown, PFC McComas.(Baucom, Kimberly) (Entered: 09/01/2020) |
| 09/08/2020 | | Deadline terminated - Initial Pretrial Conference set for 9/9/2020 terminated per MSN chambers. (cmar, ) (Entered: 09/08/2020) |
| 09/08/2020 | 14 | Rule 16(b) Scheduling Order - Based on the parties' representations in their discovery plan, the Fed. R. Civ. P. 16(b) Pretrial Conference scheduled for September 9, 2020 shall be canceled. Upon review of the pleadings and the record, the court makes the following rulings: 1. The Rule 26(f) report (Dkt. No. 13 ) filed by the parties is approved unless modified by the court herein or hereafter. (SEE ORDER FOR FURTHER DETAILS.) Signed by Magistrate Judge Michael S. Nachmanoff on 09/08/20. (cmar, ) (Entered: 09/08/2020) |
| 09/08/2020 | 15 | Mail Returned as Undeliverable. Mail sent to Anthry Raul Milla (lcre, ) (Entered: 09/08/2020) |
| 10/16/2020 | 16 | NOTICE of Submission: Proposed Subpoenas by Anthry Raul Milla (lcre, ) (Entered: 10/16/2020) |

| | | |
|---|---|---|
| 10/16/2020 | | Notice of Correction: Filer has been notified to submit a motion and notice of hearing/waiver of oral argument re 16 NOTICE (lcre, ) (c/s) (Entered: 10/16/2020) |
| 01/14/2021 | | Set/Reset Hearings: Final Pretrial Conference reset for 1/21/2021 at **10:15 AM** in **Alexandria Telephonically** before District Judge Anthony J. Trenga. (dzir) (Entered: 01/14/2021) |
| 01/20/2021 | 17 | Exhibit List by PFC D. Brown, PFC McComas.. (Baucom, Kimberly) (Entered: 01/20/2021) |
| 01/20/2021 | 18 | Witness List by PFC D. Brown, PFC McComas. (Baucom, Kimberly) (Entered: 01/20/2021) |
| 01/21/2021 | 19 | Minute Entry for proceedings held before District Judge Anthony J. Trenga: Telephonic Final Pretrial Conference held on 1/21/2021. *Pro se* Plaintiff and Counsel for Defendant appeared telephonically. Summary Judgment Motions are to be submitted by 2/12/2021. Summary Judgment Hearing set for 3/3/2021 at 10:00 AM in Alexandria Courtroom 701 before District Judge Anthony J. Trenga. **Jury Trial** set for **5/10/2021 at 10:00 AM** in Alexandria Courtroom 701 before District Judge Anthony J. Trenga. **Status Conference before Trial** set for **5/10/2021 at 09:00 AM** before District Judge Anthony J. Trenga. Parties are directed to schedule a Settlement Conference with Magistrate Judge Nachmanoff. Order to follow. (dzir) (Entered: 01/21/2021) |
| 01/21/2021 | 20 | ORDER with respect to Jury Trial instructions. Signed by District Judge Anthony J. Trenga on 1/21/2021. (Copy mailed to Pro Se Plaintiff at his address of record on 1/21/2021)(dzir) (Entered: 01/21/2021) |
| 01/21/2021 | 21 | Letter to the Court re Requests for Subpoena and E Notice Registration. (lcre, )(e notice registration request mailed) (Entered: 01/21/2021) |
| 02/03/2021 | 22 | MOTION for Summary Judgment with Roseboro,. by PFC D. Brown, PFC McComas. (Baucom, Kimberly) (Entered: 02/03/2021) |
| 02/03/2021 | 23 | Memorandum in Support re 22 MOTION for Summary Judgment with Roseboro,. filed by PFC D. Brown, PFC McComas. (Attachments: # 1 Exhibit 1, # 2 Exhibit 3, # 3 Exhibit 4, # 4 Exhibit 5, # 5 Exhibit 6, # 6 Exhibit 7, # 7 Exhibit 8, # 8 Exhibit 9, # 9 Exhibit 10, # 10 Exhibit 2)(Baucom, Kimberly) (Entered: 02/03/2021) |
| 02/03/2021 | 24 | Notice of Hearing Date re 22 MOTION for Summary Judgment with Roseboro,., 23 Memorandum in Support, (Baucom, Kimberly) (Entered: 02/03/2021) |
| 02/05/2021 | | Settlement Conference set for 3/17/2021 at 01:00 PM in Alexandria Remote before Magistrate Judge Michael S. Nachmanoff. (lcre, ) (Entered: 02/05/2021) |
| 02/05/2021 | | Set Deadlines as to 22 MOTION for Summary Judgment with Roseboro. Motion Hearing set for 3/3/2021 at 10:00 AM in Alexandria Courtroom 701 before District Judge Anthony J Trenga. (clar, ) (Entered: 02/05/2021) |
| 02/11/2021 | 25 | MOTION to Amend Damages filed by, Anthry Raul Milla. (Attachments: # 1 Amended Complaint, # 2 Letter to Court) (lber) (Entered: 02/16/2021) |
| 02/22/2021 | 26 | Opposition to 25 MOTION to Amend Damages filed by PFC D. Brown, PFC McComas. (Baucom, Kimberly) (Entered: 02/22/2021) |
| 02/24/2021 | | Set/Reset Deadlines as to 22 MOTION for Summary Judgment with Roseboro. Motion Hearing reset for **3/3/2021 at 11:30 AM** in Alexandria Remote (via Zoom) before District Judge Anthony J. Trenga. (dzir) (Entered: 02/24/2021) |
| 02/24/2021 | 27 | RESPONSE in Opposition re 22 MOTION for Summary Judgment filed by Anthry Raul |

| | | Milla. (Attachments: # 1 Envelope)(lber) (Entered: 02/24/2021) |
|---|---|---|
| 02/25/2021 | 28 | REPLY to Response to Motion re 22 MOTION for Summary Judgment with Roseboro,. filed by PFC D. Brown, PFC McComas. (Baucom, Kimberly) (Entered: 02/25/2021) |
| 03/01/2021 | 29 | ORDERED that the hearing on Defendants Motion for Summary Judgment [Doc. No. 22], presently scheduled for Wednesday, March 3, 2021 be, and the same hereby is, CANCELLED, and the Court will consider the Motion upon the briefs without a hearing and schedule a hearing on the Motion if it deems necessary to the decisional process. Signed by District Judge Anthony J. Trenga on 03/01/2021. (c/s 3/1/21) (lber) (Entered: 03/01/2021) |
| 03/01/2021 | | ***Motion Hearing terminated. (lber) (Entered: 03/01/2021) |
| 03/17/2021 | | Minute Order. Proceedings held before Magistrate Judge Michael S. Nachmanoff via Zoom: Settlement Conference held on 3/29/2021.There were three (3) attendees. Conference lasted approximately 1 hour and 43 minutes. Case not settled. (lcre, ) (Entered: 03/29/2021) |
| 03/29/2021 | 30 | ORDERED that Defendant Officers, Derek Brown and Shane McComas, Motion for Summary Judgment 22 be, and the same hereby is, GRANTED; and this action is DISMISSED. Signed by District Judge Anthony J. Trenga on 03/29/2021. (c/s to plaintiff) (lber) (Entered: 03/30/2021) |
| 04/05/2021 | 31 | NOTICE OF APPEAL as to 30 Order, Order Dismissing Case filed by Anthry Raul Milla. Filing fee not received. (lber) (Entered: 04/05/2021) |
| 04/05/2021 | 32 | Transmission of Notice of Appeal to US Court of Appeals re 31 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (lber) (Main Document 32 replaced on 4/5/2021) (lber, ). (Entered: 04/05/2021) |
| 04/05/2021 | | Assembled INITIAL Electronic Record Transmitted to 4CCA re 31 Notice of Appeal (lber) (Entered: 04/05/2021) |
| 04/07/2021 | 33 | USCA Case Number 21-1379 FOURTH CIRCUIT case manager C. Herb for 31 Notice of Appeal filed by Anthry Raul Milla. (c/s to plaintiff) (lber) (Entered: 04/07/2021) |
| 04/08/2021 | 34 | Mail Returned as Undeliverable, sent to Anthry Raul Milla. (lber) (Entered: 04/08/2021) |
| 05/06/2021 | 35 | ORDER of USCA as to 31 Notice of Appeal filed by Anthry Raul Milla. The court grants leave to proceed in forma pauperis. (lber) (Entered: 05/06/2021) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 11/27/2023 17:30:59 | | |
| **PACER Login:** | mattcave280704 | **Client Code:** | 263-118 |
| **Description:** | Docket Report | **Search Criteria:** | 1:20-cv-00694-AJT-MSN |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

# UNITED STATES DISTRICT COURT

for the



Eastern District of Virginia

Alexandria Division

Case No. 1:20-CV-0094- AJT/MSN

*(to be filled in by the Clerk's Office)*

|  |  |
|---|---|
| Anthry Raul Milla | ) |
| | ) |
| *Plaintiff(s)* | ) |
| *(Write the full name of each plaintiff who is filing this complaint.* | ) |
| *If the names of all the plaintiffs cannot fit in the space above,* | ) |
| *please write "see attached" in the space and attach an additional* | ) |
| *page with the full list of names.)* | ) |
| **-v-** | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| PFC D. Brown, ID#331973,  Badge#4108 | ) |
| PFC McComas, ID#340298, Badge#4319 | ) |
| | ) |
| *Defendant(s)* | |
| *(Write the full name of each defendant who is being sued.  If the* | |
| *names of all the defendants cannot fit in the space above, please* | |
| *write "see attached" in the space and attach an additional page* | |
| *with the full list of names.  Do not include addresses here.)* | |

Jury Trial: *(check one)*   ☑ Yes    No

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

### (Non–Prisoner Complaint)

JA005

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

---

| NOTICE |
|---|
| Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files.  Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number.  A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. |
| Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint. |
| In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis. |

## I.    The Parties to This Complaint

### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | Anthry Raul Milla |
| Address | 1021 Dranesville Road |

| | | |
|---|---|---|
| Herndon | VA | 20170 |
| *City* | *State* | *Zip Code* |

| | |
|---|---|
| County | Fairfax |
| Telephone Number | 703-430-006 |
| E-Mail Address | andremilla7@gmail.com |

### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both.  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | PFC D. Brown, ID#331973,  Badge#4108 |
| Job or Title *(if known)* | Fairfax County Police Officer |
| Address | 12099 Government Center Parkway |

| | | |
|---|---|---|
| Fairfax | VA | 22035 |
| *City* | *State* | *Zip Code* |

JA006

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

| | |
|---|---|
| County | Fairfax |
| Telephone Number | 7036912131 |
| E-Mail Address *(if known)* | chief@FairfaxCounty.Gov |

Individual capacity          Official capacity

**Defendant No. 2**

| | |
|---|---|
| Name | PFC McComas, ID#340298, Badge#4319 |
| Job or Title *(if known)* | Fairfax County Police Officer |
| Address | 12099 Government Center Parkway |

| | | |
|---|---|---|
| Fairfax | VA | 22035 |
| *City* | *State* | *Zip Code* |

| | |
|---|---|
| County | Fairfax |
| Telephone Number | 7036912131 |
| E-Mail Address *(if known)* | chief@FairfaxCounty.Gov |

Individual capacity          Official capacity

**Defendant No. 3**

Name

Job or Title *(if known)*

Address

| | | |
|---|---|---|
| | | |
| *City* | *State* | *Zip Code* |

County

Telephone Number

E-Mail Address *(if known)*

Individual capacity          Official capacity

**Defendant No. 4**

Name

**JA007**

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non-Prisoner)

Job or Title *(if known)*

Address

| | City | State | Zip Code |
|---|---|---|---|

County

Telephone Number

E-Mail Address *(if known)*

Individual capacity          Official capacity

## II.    Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]."  Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*, you may sue federal officials for the violation of certain constitutional rights.

A.      Are you bringing suit against *(check all that apply)*:

Federal officials (a *Bivens* claim)

State or local officials (a § 1983 claim)

B.      Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983.  If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

Fourth Amendment

C.      Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights.  If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

D.      Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983.  If you are suing under section 1983, explain how each defendant acted under color of state or local law.  If you are suing under *Bivens*, explain how each defendant acted under color of federal law.  Attach additional pages if needed.   Defendants were uniformed

Fairfax County Police Officer acting under authority to venforce the code of VA.

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

---

### III.    Statement of Claim

State as briefly as possible the facts of your case.  Describe how each defendant was personally involved in the
alleged wrongful action, along with the dates and locations of all relevant events.  You may wish to include
further details such as the names of other persons involved in the events giving rise to your claims.  Do not cite
any cases or statutes.  If more than one claim is asserted, number each claim and write a short and plain
statement of each claim in a separate paragraph.  Attach additional pages if needed.

A.       Where did the events giving rise to your claim(s) occur?

1021 Dranesville Road Herndon, VA 20170 (Private Residence)

B.       What date and approximate time did the events giving rise to your claim(s) occur?

06/07/2019 Approximately 3am to 4 am

C.       What are the facts underlying your claim(s)?  *(For example:  What happened to you?  Who did what?
Was anyone else involved?  Who else saw what happened?)*

I exited my residence to retrieve my headphones from my car. While inside my vehicle searching for
my headphones, I was accosted by both defendants. One of the defendants ordered me to exit my
vehicle with my hands above my head and walk backwards towards the sound of his voice. That
defendant placed me in handcuffs and placed me inside of a patrol car.

One of the defendants opened the driver's side door of my vehicle and began searching while the other
defendant opened my trunk and began searching. Defendants closed my car door and trunk, released
me from the handcuffs, and abruptly left my property without incident.

The defendants detained and frisked me without reasonable suspicion and searched my vehicle without
probable cause.

### IV.    Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical
treatment, if any, you required and did or did not receive.

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

## V.    Relief

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged.  Explain the basis for these claims.

Per defendant:

$1.00 in nominal damages

$50,000 in punitive damages

## VI.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non-Prisoner)

**A.**     **For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:   06/18/2020

Signature of Plaintiff

Printed Name of Plaintiff   Anthny Raul Milla

**B.**     **For Attorneys**

Date of signing:


Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Address


|  | *City* | *State* | *Zip Code* |

Telephone Number

E-mail Address

**JA011**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **ANTHRY RAUL MILLA,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No. 1:20cv694 (AJT/MSN)** |
| | : | |
| **PFC D. BROWN, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

<u>**JOINT DISCOVERY PLAN**</u>

Pursuant to the Rule 26(f) of the Federal Rules of Civil Procedure and the Local Rules of this Court and the Order of this Court dated August 17, 2020, the parties submit this Joint Discovery Plan.

1.    The parties have conferred to consider the nature and basis of their claims and defenses and the possibilities for settlement or resolution of this case.

2.    The parties agree that the disclosures required by Rule 26(a)(1) will be made on or before September 23, 2020.

3.    The parties agree that on or before September 23, 2020, they will seek the Court's permission if they intend to request leave to file an amended complaint or to join additional parties.

4.    All discovery shall be completed by January 15, 2021. The parties agree that all discovery requests must be served so that responses are timely due on or before January 15, 2021.

5.      Counsel agree that the disclosures of expert testimony as required by Rule 26 (a)(2) shall be made as follows:

a.      Plaintiff's disclosure of expert testimony in accordance with Rule 26(a)(2) shall be made on or before October 28, 2020;

b.      Defendant's disclosure of expert testimony in accordance with Rule 26(a)(2) shall be made on or before November 30, 2020;

c.      Plaintiff's disclosure of expert testimony that is solely contradictory to or in rebuttal of Defendant's disclosure shall be made on or before December 14, 2020.

6.      The parties have agreed that the disclosure of expert testimony pursuant to paragraph 5 above, as well as service of discovery documents, will be accomplished either by hand-delivery, first-class mail, or by fax.

7.      The parties do not agree to trial by a magistrate judge.

8.      The parties agree to seek an Order of the Court in the event that confidential and/or proprietary information is disclosed during discovery.

9.      The parties have discussed issues relating to the preservation of discoverable information as required by Fed. R. Civ. P. 26(f).

10.     The parties have discussed discovery of electronically stored information as required by Fed. R. Civ. P. 26(f)(3).

11.     The parties have discussed issues relating to claims of privilege or protection of trial preparation materials as required by Fed. R. Civ. P. 26(f)(4).

Respectfully submitted,


_____**/s/**_____
Anthry Milla
1021 Dranesville Road
Herndon, Virginia 20170
Plaintiff


ELIZABETH D. TEARE
COUNTY ATTORNEY


By _____/s/_____
   Kimberly P. Baucom, Senior Assistant County Attorney
   Virginia Bar Number 44419
   Office of the County Attorney
   12000 Government Center Parkway, Suite 549
   Fairfax, VA  22035-0064
   Phone: 703-324-2421
   Fax: 703-324-2665
   Kimberly.Baucom@fairfaxcounty.gov
   *Counsel for Defendants*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ANTHRY RAUL MILLA,<br><br>    Plaintiff,<br><br> v.<br><br>PFC D. BROWN, et al.,<br><br>    Defendants. | Civil No. 1:20-cv-00694-AJT-MSN |

RULE 16(B) SCHEDULING ORDER

This matter comes before the Court on the parties' Rule 26(f) report (Dkt. No. 13). Based on the parties' representations in their discovery plan, the Fed. R. Civ. P. 16(b) Pretrial Conference scheduled for September 9, 2020 shall be canceled. Upon review of the pleadings and the record, the court makes the following rulings:

1. The Rule 26(f) report (Dkt. No. 13) filed by the parties is approved unless modified by the court herein or hereafter.

2. Rule 26(a) disclosures, depositions, interrogatories, requests for documents and admissions, and answers thereto shall not be filed except on order of the court, or for use in a motion or at trial.

3. No "general objection" may be asserted in response to any discovery demand except to preserve the attorney-client privilege and work product protection.

4. To the extent any party intends to assert a claim of privilege or protection as to trial preparation material, any such claim must be made in a timely manner and in accordance with Fed. R. Civ. P. 26(b)(5).

The following provisions shall apply to the filing and noticing of all motions:

1.      All motions must contain a statement that a good-faith effort to narrow the area of disagreement has been made in accordance with Local Civil Rule 7(E) and Local Civil Rule 37(E) for discovery motions. All motions must adhere to the page limits and font requirements set in Local Civil Rule 7(F)(3). An appropriate number of paper copies of any motion and all pleadings relating to that motion shall be **delivered to the Clerk's Office addressed to the chambers of the judge** within one day of the electronic filing. *See* "Civil and Criminal Motions Procedures and other Alexandria Specific Information" on the Alexandria page of the Court's website located at www.vaed.uscourts.gov.

2.      All motions, except for summary judgment and consent motions, shall be noticed for a hearing on the earliest possible Friday consistent with the briefing schedules discussed below. Such motions must be noticed before the Final Pretrial Conference. A consent motion should be filed in accordance with the procedures provided on the Alexandria page of the Court's website referenced above.

3.      Any motion to amend the pleadings or to join a party must be made as soon as possible after counsel or the party becomes aware of the grounds for the motion.

4.      In order to provide for the prompt resolution of non-dispositive matters, a non-dispositive motion may be filed no later than 5:00 p.m. on a Friday and noticed for a hearing at 10:00 a.m. on the following Friday. Under this expedited schedule, a response must be filed no later than 5:00 p.m. on the following Wednesday, and any reply should be filed as early as possible on Thursday to give the Court time to review all pleadings before the hearing. This expedited schedule shall apply for non-dispositive motions noticed for a hearing with less than two weeks' notice.  If a non-dispositive motion is noticed for a hearing between two and three weeks from the

filing date, any response brief must be filed 7 days after service and any reply brief may be filed 3

days after service of the response. At the moving party's discretion, a non-dispositive motion may

also be filed and noticed for a hearing with three weeks' notice and the briefing schedule provided

in Local Civil Rule 7(F)(1) providing for 14 days for a response brief and 6 days for a reply would

apply.  If a non-dispositive motion is filed and oral argument is waived, any response brief must

be filed within 7 days after service and any reply brief within 3 days after service of the response.

5.      Dispositive motions shall be filed and briefed in accordance with the schedule set

forth in Local Civil Rule 7(F)(1) and (K). Local Civil Rule 7(F)(1) provides that a response brief

is due 14 days after service of the motion and a reply brief may be filed 6 days after service of the

response. The periods for filing a response brief and a reply shall apply without regard to the mode

of service used for those briefs, notwithstanding the provisions of Fed. R. Civ. P. 6(d).

6.      Any dispositive motion against a *pro se* party must contain the notice set forth in

Local Civil Rule 7(K) and provide the *pro se* party with at least 21 days to file a response opposing

the motion.

7.      All summary judgment issues shall be presented in the same pleading unless leave

of court is first obtained.

8.      As required by Local Civil Rule 56, each brief in support of a motion for summary

judgment must include a separately captioned section within the brief listing, in numbered-

paragraph form, each material fact that the movant contends is undisputed with appropriate

citations to the record. A brief in opposition to a motion for summary judgment must include a

separately captioned section within the brief addressing, in numbered-paragraph form

corresponding to the movant's section, each of the movant's enumerated facts and indicating

whether the non-movant admits or disputes the fact with appropriate citations to the record. The

Court may assume that any fact identified by the movant as undisputed in the movant's brief that is not refuted in the non-movant's brief is admitted for the purpose of deciding the motion for summary judgment.

9.    Any motion to file a document under seal, including a motion for entry of a protective order containing provisions for filing documents under seal, must comply with Local Civil Rule 5. **Local Civil Rule 5 has been amended. The amended version of Local Civil Rule 5 alleviates the need to file a notice of hearing.** The motion must state sufficient facts supporting the action sought, and each proposed order must include specific findings. Where a party moves to file material under seal because the opposing party has designated that material as confidential, the opposing party must file a response to the motion and a proposed order that meet the requirements of Local Civil Rule 5. Filings under seal are disfavored and discouraged. *See Va. Dep't of State Police v. Washington Post*, 386 F.3d 567, 575–76 (4th Cir. 2004). Only the particular material found to meet the required standard may be sealed, with the remainder filed in the public record. An unsealed, redacted version of the filing in issue shall be filed with the motion to seal. In non-jury cases, counsel shall file with the clerk written proposed findings of fact and conclusions of law prior to the beginning of trial.  In jury cases, instructions shall be filed five (5) days prior to trial in accordance with Local Civil Rule 51. Violation of this Rule will constitute a waiver of objections to any instructions given.

It is so ORDERED.

/s/
Michael S. Nachmanoff
United States Magistrate Judge

September 8, 2020
Alexandria, Virginia

4

JA018

# Anthry Raul Milla
*Pro Se*
1021 Dranesville Road, Herndon, VA 20170
(571) 455-9248
andremilla7@gmail.com



Clerk of Court
United States District Court
Eastern District of Virginia
Alexandria Division
401 Courthouse Square
Alexandria, VA 22314

January 18, 2021

Civil Action No. 1:20-cv-00694

Dear Clerk,

Enclosed is an application for subpoenas. Will you please refer the matter to a judge?

Will you please mail me an e-notice registration form or hereby process my e-notice request?


Sincerely,


Anthry Raul Milla

**JA019**



**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

ANTHRY RAUL MILLA,

    Plaintiff,

v.                                                    Civil Action No. 1:20-cv-694 (AJT/MSN)

PFC D. BROWN, et. al.,

    Defendants.

**<u>APPLICATION FOR SUBPOENAS</u>**

I received two Rule 26(a)(1) disclosures from defense counsel listing individuals likely to have discoverable material. The names of the individuals and the discoverable material they are likely to possess are as follows:

OFFICER DEREK BROWN
Discoverable material: body-cam, dash-cam, radio traffic of stabbing incident and encounter with Milla

OFFICER SHANE MCCOMAS
Discoverable material: body-cam, dash-cam, radio traffic of stabbing incident and encounter with Milla

ADAM ATER
Discoverable material: body-cam, dash-cam, radio traffic of stabbing incident

CLAIRE BUFFS
Discoverable material: body-cam, dash-cam, radio traffic of stabbing incident

WILLIAM HAUPTMAN
Discoverable material: body-cam, dash-cam, radio traffic of stabbing incident

ROBERT NYLANDER
Discoverable material: body-cam, dash-cam, radio traffic of stabbing incident

**JA020**

TAMMY RUSSELL
Discoverable material: body-cam, dash-cam, heli-cam, thermal-cam of stabbing incident and encounter with Milla

JOSEPH WOLOSZYN
Discoverable material: body-cam, dash-cam, heli-cam, thermal-cam of stabbing incident and encounter with Milla

All of the individuals listed are Fairfax County Police Officers at the following address:

Fairfax County Police Department
12099 Government Center Parkway
Fairfax, VA 22035

## CERTIFICATION

I declare under penalty of perjury that no attorney has prepared or assisted in the preparation of this document.

_Andre Milla_
Name of Pro Se party

_Andre Milla_                           _1/18/2021_
Signature of Pro Se party              Date

**JA021**

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| **ANTHRY RAUL MILLA,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No. 1:20cv694 (AJT/MSN)** |
| | : | |
| **PFC D. BROWN, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(b)

Defendants PFC D. Brown and PFC McComas (Defendants), by counsel, move for

summary judgment pursuant to Fed. R. Civ. P. 56(b), for the reasons set forth in the

accompanying memorandum of points and authorities. [1]

Respectfully submitted,

PFC D. BROWN
PFC MCCOMAS
By Counsel

---

1 Pursuant to Local Rule 7(K), the following notice is provided to the *pro se* plaintiff:  The *pro se* party is entitled to file a response opposing the motion and any such response must be filed within twenty-one (21) days of the date on which the dispositive or partially dispositive motion is filed.  The Court could dismiss this action on the basis of the moving party's papers if the *pro se* party does not file a response.  The *pro se* party must identify all facts stated by the moving party with which the *pro se* party disagrees and must set forth the *pro se* party's version of the facts by offering affidavits (written statements signed before a notary public and under oath) or by filing sworn statements (bearing a certificate that is signed under penalty of perjury).  The *pro se* party is also entitled to file a legal brief in opposition to the one filed by the moving party.

**JA022**

ELIZABETH D. TEARE
COUNTY ATTORNEY


By _____/s/_____
     Kimberly P. Baucom, Senior Assistant County Attorney
     Virginia Bar Number 44419
     Counsel for Defendants
     Office of the County Attorney
     12000 Government Center Parkway, Suite 549
     Fairfax, VA  22035-0064
     Phone: 703-324-2421
     Fax: 703-324-2665
     kimberly.baucom@fairfaxcounty.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 3rd day of February, 2021, the foregoing was sent overnight via Federal Express to the following:

Anthry Milla
1021 Dranesville Road
Herndon, Virginia 20170
Plaintiff


_____/s/_____
Kimberly P. Baucom

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| **ANTHRY RAUL MILLA,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No. 1:20cv694 (AJT/MSN)** |
| | : | |
| **PFC D. BROWN, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants PFC D. Brown (Officer Brown) and PFC McComas (Officer McComas), by counsel, have moved the Court for summary judgment pursuant to Fed. R. Civ. P. 56(b). In support of their motion, the Defendants state as follows:

## BACKGROUND

On July 8, 2020, the Plaintiff, Anthry Milla (Milla) filed a Complaint in this Court alleging a violation of his Fourth Amendment rights by Officers Brown and McComas as a result of an incident that occurred on June 7, 2019, at approximately 4:20 a.m. On that date, a man later identified as Milla was detained by Officers Brown and McComas while they were investigating a stabbing that had occurred nearby. In an effort to locate possible suspects in the stabbing case, officers in the Fairfax County Police Department (FCPD) helicopter unit utilized a Forward-Looking Infrared (FLIR) camera in an attempt to identify any nearby people or vehicles that could have been involved in the incident. Milla was sitting in a vehicle two-tenths of a mile from the stabbing event in the driveway of a residence. The FLIR camera indicated that the vehicle had recently been operated, as evidenced by its white appearance on the FLIR camera.

1

The front driver's door of the vehicle was open, and Milla was crouched inside. As Officers Brown and McComas approached the vehicle, Milla suddenly pulled the door shut.

Officers Brown and McComas provided commands for Milla to exit the vehicle and detained him. The officers conducted a cursory search of the vehicle to ascertain whether there were any weapons, blood, or additional suspects or victims within the vehicle. Finding none, the officers released Milla from custody and left the scene.

Milla's Complaint alleges that the officers committed a Fourth Amendment violation by detaining and frisking him without reasonable articulable suspicion, and by searching his vehicle. (Compl. ¶ III(C).) Milla requests $1 in nominal damages as a result of this violation, as well as $50,000 in punitive damages. (Compl. ¶ V.)

**LIST OF MATERIAL FACTS NOT GENUINELY IN DISPUTE**

1.      On June 7, 2019, at approximately 4:20 a.m., the Fairfax County Department of Public Safety Communications (DPSC) was contacted via the County's emergency 911 system by a citizen. The caller reported that a man who had been stabbed was banging on the doors of a Shell gas station. The caller advised that the man was bleeding heavily. (SJ Ex. 1, ¶ 7.)[1]

2.      DPSC is the County agency responsible for all emergency communications for the Fairfax County Police Department (FCPD) and the Fairfax County Fire and Rescue Department (Fire Department). DPSC dispatchers man phones in the DPSC call center, enabling them to respond to any emergency call from citizens, the FCPD, or the Fire Department, that requires the dispatch of emergency personnel. All emergency communications within the County that involve DPSC are created and maintained by the Computer Aided Dispatch system (CAD). (SJ Ex. 1, ¶ 2.)

---

[1] SJ Ex. 1 is an affidavit signed by Angela Kang, the DPSC custodian of records.

2

**JA025**

3.      Each time an emergency 911 call is made to the DPSC call center, the call is assigned a specific event number, and all records of the emergency call are maintained within the CAD system by that event number.  All calls, whether from a citizen's telephone or from an emergency responder's radio, are recorded in audio format and maintained by DPSC in the normal course of business.  Computerized records specific to each event number are also maintained by DPSC in the normal course of business.  (SJ Ex. 1, ¶ 4.)

4.      At 4:20:32 a.m., a dispatch operator created an event for the stabbing call which caused an event number to be assigned, Event Number E191580276, and which triggered the DPSC computer system to record the event in electronic format.  Based upon the information provided by the caller, the dispatch operator created the event as a stabbing incident at the Shell gas station at 12219 Leesburg Pike, Herndon, Virginia, 20170.  (SJ Ex. 1, ¶ 8; SJ Ex. 2.)[2]

5.      The dispatch operator provided information from the 911 call to officers in the Reston District, which is the police district that includes the location of the Shell gas station.  This dispatch notification was captured in the CAD Background Event Chronology.  (SJ Ex. 1, ¶ 9; SJ Ex. 2.)

6.      Fairfax County police officers communicate with DPSC through their police radio or through a computer terminal in their police cruisers.  Officers receive CAD information from DPSC on their in-car computer terminal, and they receive information by listening to their police radio.  (SJ Ex. 1, ¶ 5.)

7.      On June 7, 2019, Officer Adam Ater (Officer Ater) was on duty at the Reston District Police Station and was designated as unit 501A.  At approximately 4:20 a.m., Officer Ater

---

[2] SJ Ex. 2 is the DPSC Background Event Chronology for Event Number E191580276.

responded to the DPSC dispatch for the individual who had been stabbed and who was at the Shell gas station.  (SJ Ex. 3, ¶ 2.)[3]

8.      Officer Ater responded to the Shell gas station and saw a man standing in front of the gas station covered in blood.  Officer Ater also observed blood all over the gas station window.  The victim had wrapped a makeshift tourniquet around his arm, and Officer Ater observed that he had a deep slash wound on his arm.  When Officer Ater arrived on scene the victim was screaming and cursing at the lone female gas station attendant, who was inside the gas station with the door locked.  (SJ Ex. 3, ¶ 3.)

9.      Officer Ater made contact with the victim and attempted to talk to him to ascertain what had happened, but the victim would not speak to Officer Ater, he only continued yelling at the gas station attendant.  When Officer Ater approached the victim, he detected that the victim smelled heavily of the odor of alcoholic beverages.  (SJ Ex. 3, ¶ 4.)

10.     A Fire Department medic unit arrived on scene and applied a tourniquet to the victim's arm and placed him in the ambulance.  Officer Ater entered the ambulance and continued to try to speak with the victim to find out what had happened to him.  The victim was completely uncooperative with Officer Ater and refused to provide any information that would assist police in the investigation of who had hurt him, or what had occurred.  (SJ Ex. 3, ¶ 5.)

11.     During this time, additional FCPD officers were in the area searching for suspects, and also searching for the location where the crime had occurred, as it appeared that the Shell gas station was not the scene of the crime, but merely the location where the victim went to seek help after the crime occurred.  (SJ Ex. 3, ¶ 6.)

---

[3] SJ Ex. 3 is an affidavit signed by Officer Adam Ater.

12.     The FCPD helicopter unit was also involved in the search for suspects in the stabbing

case.  The helicopter was returning to base after assisting with a robbery incident, and was

advised by the DPSC of the stabbing incident.  Initially, the report was that the victim may have

been stabbed in the chest, and the helicopter proceeded to the area in the event that an

aeromedical evacuation was necessary.  (SJ Ex. 4, ¶ 3.)[4]

13.     As the helicopter was arriving on scene, officers advised that the victim was stabbed in

the arm, not the chest, and that he was alert and oriented.  The helicopter remained on scene to be

prepared for a possible aeromedical evacuation, but transitioned into a role of law enforcement

support as well.  (SJ Ex. 4, ¶ 4.)

14.     Officers in the helicopter, including MPO Tammy Russell (MPO Russell), were made

aware via radio communications that the victim was uncooperative with officers on scene and

refused to provide any information regarding what had occurred, or where the stabbing incident

had taken place.  The helicopter officers began to utilize the helicopter's Forward-Looking

Infrared (FLIR) camera in an attempt to identify any nearby suspicious people or vehicles that

could have been involved in the incident.  MPO Russell observed a monitor that projected the

camera's images while her co-worker in the helicopter manipulated the camera equipment.

(SJ Ex. 4, ¶ 5; SJ. Ex. 5.)[5]

15.     A FLIR camera detects infrared radiation and creates an image from that radiation, which

typically appears as a light image against a darker, cooler, background.  As such, warmer objects

appear distinctly from cooler objects in video output images.  The warmer the object, the more

infrared radiation emitting from that object, and the whiter the image.  (SJ Ex. 4, ¶ 6.)

---

[4] SJ Ex. 4 is an affidavit signed by MPO Tammy Russell.

[5] SJ Ex. 5 is the video recording of the event captured on the helicopter FLIR camera.  The video
file, titled "camera_N212FX_20190607_042756_05" is included on a CD that is being provided
to the court via courier.

16.     After MPO Russell identified for the on-scene officers which of the vehicles in the Shell gas station parking lot were warm, the officers asked whether there were any people in the surrounding area.  The helicopter officers began to use the FLIR camera in the surrounding area in an attempt to identify any suspicious individuals nearby who may have been involved in the incident.  (SJ Ex. 4, ¶ 7; SJ Ex. 5.)

17.     MPO Russell soon observed a hot vehicle parked outside of a closed gate at 1021 Dranesville Road close to the Shell gas station.  The vehicle was stationary, and the driver's door was standing open.  The vehicle's taillights were lit and the headlights off.  Upon closer observation, MPO Russell could see that there appeared to be a person inside the vehicle, and the person appeared to be slouched down in the driver's seat.  MPO Russell informed the on-scene officers of what she observed via the police radio.  (SJ Ex. 4, ¶ 8; SJ Ex. 5.)

18.     The helicopter remained on scene as officers were dispatched to respond to the vehicle location at 1021 Dranesville Road to investigate whether the vehicle, or its occupants, were possibly involved in the stabbing incident.  The encounter was captured and recorded on the helicopter's FLIR camera.  (SJ Ex. 4, ¶ 9; SJ Ex. 5.)

19.     FCPD Officer Derek Brown (Officer Brown) and FCPD Officer Shane McComas (Officer McComas) were the two officers who responded to the residence at 1021 Dranesville Road to investigate the vehicle stopped in the driveway with the door open.  The officers had been employed FCPD as sworn law enforcement officers for six years and five years, respectively.  (SJ Ex. 6, ¶ 1; SJ Ex. 7, ¶ 1.)[6]

20.     On June 7, 2019, both Officer Brown and Officer McComas worked at the Reston District Police Station, and both were on duty that night.  Officer Brown was designated as unit

---

[6] SJ Ex. 6 is an affidavit signed by Officer Derek Brown.  SJ Ex. 7 is an affidavit signed by Officer Shane McComas.

6

**JA029**

950A, and Officer McComas was unit 530A.  At approximately 4:20 a.m., both officers became aware of the incident involving the stabbing victim.  (SJ Ex. 6, ¶ 2; SJ Ex. 7, ¶ 2.)

21.    Both officers responded to the stabbing incident and began driving toward the area in their separate FCPD cruisers to provide law enforcement assistance.  Officer Brown activated his cruiser's emergency lights and siren, which also caused his cruiser's In-Car Video (ICV) system to begin recording.  Officer Brown's ICV captured the entirety of the officers' involvement in responding to the stabbing event, including their interaction with Milla.  (SJ Ex. 6, ¶ 3; SJ Ex. 7, ¶ 2; SJ Ex. 8.)[7]

22.    While they were driving to the area, both officers monitored the CAD information on their in-car computer monitors, and listened to their police-issued radios so that they would be aware of the information that was being conveyed from the officers at the Shell gas station, the DPSC dispatcher, and the officers who were responding to the incident in the FCPD helicopter.  Audio of the radio traffic is captured on Officer Brown's ICV recording.  (SJ Ex. 6, ¶ 4; SJ Ex. 7, ¶ 3; SJ Ex. 8.)

23.    While responding to the area of the Shell gas station, Officers Brown and McComas were aware from listening to the helicopter officers that they were operating their FLIR camera in the area to look for suspicious people or vehicles that could have been involved in the stabbing incident.  Both officers were aware that if a vehicle had been recently operated, it would radiate heat, and the vehicle would appear white on the FLIR camera.  They were aware that the helicopter officers would refer to those vehicles as being "hot" to indicate that they had recently been operated.  (SJ Ex. 6, ¶ 5; SJ Ex. 7, ¶ 4.)

---

[7] SJ Ex. 8 is the video recording of the event captured on Officer Brown's In-Car Video system. The video file, titled "082659_01_000" is included on a CD that is being provided to the court via courier.

7

24.     While responding to the area of the Shell gas station, Officers Brown and McComas

gathered the following additional information from listening to their police radios:  officers

responded to the Shell gas station and observed a male victim in front of the gas station covered

in blood.  The victim had wrapped a makeshift tourniquet around his arm, and had a deep slash

wound on his arm.  Based on the helicopter officers' use of the FLIR, there were no "hot cars" in

the parking lot of the Shell gas station other than two vehicles that were at the pumps.  One of

the officers at the Shell gas station asked the helicopter officers whether there were any people

walking or running in the area surrounding the Shell gas station.  The helicopter officer did not

find any people walking or running but did find a "hot" car in the driveway of 1021 Dranesville

Road.  According to the helicopter officers, there appeared to be a person in the vehicle, and the

driver's door was open.  (SJ Ex. 6, ¶ 6; SJ Ex. 7, ¶ 5.)

25.     Both Officer Brown and McComas separately voiced over the radios that they would

respond to the location of 1021 Dranesville Road to investigate whether the vehicle that the

helicopter had located was involved in the stabbing incident.  (SJ Ex. 6, ¶ 7; SJ Ex. 7, ¶ 6;

SJ Ex. 8.)

26.     Prior to voicing over the radio that they were responding, Officers Brown and McComas

heard an instruction over the radio for responding officers to "slow it down."  To them, this

phrase meant that they were to deactivate their emergency lights and sirens.  Both officers turned

off their lights and sirens.  (SJ Ex. 6, ¶ 8; SJ Ex. 7, ¶ 7; SJ Ex. 8.)

27.     1021 Dranesville Road is 2/10 of a mile from the Shell gas station where the stabbing

victim was discovered.  After the helicopter officers first observed the vehicle at 1021

Dranesville Road, the FLIR camera captured the vehicle with no interruption until Officers

Brown and McComas arrived at the location.  The FLIR camera recorded the vehicle for a total

of over three minutes prior to the officers' arrival, during which time the vehicle did not move and the driver's door remained open.  (SJ Ex. 5; SJ Ex. 9.)[8]

28.     While en route to 1021 Dranesville Road, Officers Brown and McComas received additional information from the helicopter officers who were observing the vehicle on the FLIR. The vehicle's headlights were not illuminated, but the taillights were lit and the driver's door was standing open.  The helicopter officer stated on the radio that it appeared that there could be someone in the driver's seat of the vehicle.  (SJ Ex. 6, ¶ 10; SJ Ex. 7, ¶ 9; SJ Ex. 8.)

29.     Officer Brown arrived at 1021 Dranesville Road at the 5:13 timestamp on his ICV.  As he pulled into the driveway, Officer McComas pulled up behind and to the right of Officer Brown's cruiser.  Because his cruiser was still in the highway, Officer McComas activated his rear emergency lights so that vehicles approaching from behind his cruiser could see the vehicle. Both officers could see the vehicle stopped outside of a gate that separated the main portion of the driveway from the residence, and the gate was closed.  (SJ Ex. 6, ¶ 11; SJ Ex. 7, ¶ 10; SJ Ex. 8.)[9]

30.     As Officer Brown pulled into the driveway, his cruiser's headlights illuminated Milla's vehicle.  Officer Brown could see Milla's legs in the driver's seat, however, he could not see the rest of Milla's body, and it appeared to him that Milla was ducked down in the seat.  Within seconds of the officers' arrival, Milla reached out of the driver's side of the vehicle and pulled the driver's side door shut.  (SJ Ex. 6, ¶ 12; SJ Ex. 8.)

---

[8] SJ Ex. 9 is a map of the area, including the distance between the Shell gas station and 1021 Dranesville Road.
[9] It is undisputed that the vehicle in the driveway belonged to Milla and that Milla was the individual in the driver's seat.  Although the officers did not identify Milla until the end of their encounter with him, his name will be used hereafter for ease of reference.

31.    Based upon the information that they had regarding the stabbing investigation occurring nearby, in addition to the position of the vehicle at 1021 Dranesville Road and Milla's behavior when they arrived on scene, Officers Brown and McComas determined that they would detain any individuals in the vehicle to investigate whether they were involved in the incident. (SJ Ex. 6, ¶ 13; SJ Ex. 7, ¶ 12-13.)

32.    Officer Brown exited his cruiser and stood behind his open driver's side door for protection and, working with Officer McComas, provided commands for Milla to exit the vehicle.  (SJ Ex. 5; SJ Ex. 6, ¶ 14; SJ Ex. 7, ¶ 14; SJ Ex. 8.)

33.    Milla opened the driver's door, raised his hands in the air and swung his legs out of the vehicle.  Milla did not have shoes on, and reached into the driver's side floorboard of the vehicle to retrieve his shoes and put them on.  Milla exited the vehicle and followed the officers' commands to walk backwards toward them with his hands in the air.  When Milla reached the officers, Officer McComas placed him in handcuffs and placed him in the rear seat of Officer Brown's cruiser.  (SJ Ex. 5; SJ Ex. 6, ¶ 15; SJ Ex. 7, ¶ 15; SJ Ex. 8.)

34.    Officer Brown voiced over the radio that they had an individual detained.  This is captured at the 7:04 timestamp of the ICV recording.  The DPSC documentation establishes that Milla's detention began at 4:34:09 a.m., which was a total of 14 minutes after the initial 911 call was entered into the DPSC Background Event Chronology.  (SJ Ex. 2; SJ Ex. 6, ¶ 16; SJ Ex. 8.)

35.    Officer McComas asked Milla whether there was anyone else in the vehicle and he responded, "No, just me."  (SJ Ex. 6, ¶ 17; SJ Ex. 7, ¶ 16; SJ Ex. 8.)

36.    Officer McComas provided commands for any passengers in the vehicle to exit the

vehicle, but nothing happened.  Both officers then approached the vehicle to ensure that there were no weapons, or additional suspects or victims, in the vehicle.  (SJ Ex. 6, ¶ 18; SJ Ex. 7, ¶ 17; SJ Ex. 8.)

37.    The officers reached the vehicle at the 8:02 timestamp on the ICV video.  Upon approach to the vehicle, Officer Brown noticed that it had front end damage.  After making a visual inspection of the outside of the vehicle, Officer Brown opened the driver's side door to find the trunk latch so that they could clear the trunk of any additional suspects or victims.  (SJ Ex. 6, ¶ 19; SJ Ex. 7, ¶ 18; SJ Ex. 8.)

38.    While Officer Brown looked for the trunk latch, Officer McComas stood at the rear of the vehicle off to the right side of the trunk.  Officer McComas bladed his body and held his firearm at a "low ready" position, meaning that his firearm was pointed towards the ground.  The reason that he did this was to prepare for the possibility that when Officer Brown pulled the latch to open the trunk, there could be an individual inside who could harm him.  Officer McComas was also concerned that there could be an additional stabbing victim in the vehicle.  (SJ Ex. 6, ¶ 19; SJ Ex. 7, ¶ 18; SJ Ex. 8.)

39.    After Officer Brown initially had difficulty finding the trunk release, Officer McComas located it and opened the trunk.  Officer McComas lifted the trunk of the vehicle, conducted a visual check to make sure no individuals were in the trunk, and closed the trunk.  Officer McComas opened the trunk at the 9:02 timestamp on the ICV and closed it four seconds later at the 9:06 timestamp on the ICV video.  The trunk was filled with items, but neither officer touched or searched anything inside the trunk.  (SJ Ex. 6, ¶ 19; SJ Ex. 7, ¶ 18-19; SJ Ex. 8.)

40.    Officer Brown opened the passenger side door to the vehicle as Officer McComas was clearing the trunk.  He did not see any weapons in the passenger compartment of the vehicle,

11

communicated this to Officer McComas, stating "Yeah, no I don't see any weapons or anything," and shut the passenger door.  (SJ Ex. 6, ¶ 20; SJ Ex. 7, ¶ 20; SJ Ex. 8.)

41.    After confirming that there were no additional people in the vehicle, and no weapons or blood in the passenger compartment of the vehicle, Officers Brown and McComas returned to the cruiser and removed Milla from the cruiser.  Milla was removed at the 9:41 timestamp on the ICV.  (SJ Ex. 6, ¶ 21; SJ Ex. 7, ¶ 21; SJ Ex. 8.)

42.    Officer McComas conducted a pat-down of Milla's outer clothing to ensure that he was not in possession of a knife and found no weapons.  (SJ Ex. 7, ¶ 21.)

43.    Officer Brown asked Milla whether he was involved in the stabbing incident, to which he responded in the negative.  Officer Brown asked Milla about the front-end damage to his vehicle, and Milla responded that it was old damage resulting from someone hitting his vehicle.  Officer Brown had a conversation with Milla regarding whether he lived at the location and asked for his name so that he could document the subject stop in an incident report.  Milla repeatedly refused to provide his name to Officer Brown.  Officer Brown explained to Milla why he had been detained.  (SJ Ex. 6, ¶ 21; SJ Ex. 8.)

44.    As Officer Brown was speaking with Milla, two individuals walked into the driveway, and Officer McComas made contact with them.  Milla informed the officers that the two individuals were his parents.  Officer McComas confirmed with Milla's parents that Milla was their son and that he lived in the residence.  Officer McComas asked Milla's parents about the front end damage on the vehicle to confirm that the damage was not recent.  Officer McComas asked Milla's parents for Milla's name and date of birth, and they provided that information. (SJ Ex. 7, ¶ 21.)

45.     As soon as the officers ascertained Milla's name and confirmed that he lived at the residence, he was released from the handcuffs. Milla was released at the 12:40 timestamp on the ICV. (SJ Ex. 6, ¶ 22; SJ Ex. 7, ¶ 22; SJ Ex. 8.)

46.     At the time Milla was released from detention, no other suspects had been located by any of the officers investigating the stabbing incident, and officers had not yet located the scene of the stabbing. (SJ Ex. 6, ¶ 22.)

47.     After releasing Milla from investigative detention, Officers Brown and McComas left the Milla residence and drove to the Shell gas station. As they were leaving the residence, they could hear radio traffic between the helicopter and a canine unit regarding a large pool of blood they had located in a McDonald's parking lot across the street from the Shell gas station. (SJ Ex. 6, ¶ 23; SJ Ex. 7, ¶ 23; SJ Ex. 8.)

48.     It took Officer Brown less than one minute to travel from the Milla residence to the Shell gas station, including a brief stop at a stoplight. As Officer Brown was stopped at the stoplight the Fire Department ambulance left the Shell gas station with its lights and siren activated. (SJ Ex. 6, ¶ 24; SJ Ex. 8.)

49.     Ultimately, officers concluded that the McDonald's parking lot was the scene of the stabbing. The McDonald's parking lot is located in Loudoun County, Virginia. Because the crime occurred in Loudoun County, the Loudoun County Sheriff's Department took over the investigation into the stabbing. (SJ Ex. 3, ¶ 9; SJ Ex. 4, ¶ 11-12; SJ Ex. 5.)

50.     Michael Hood (Hood), the officers' subject matter expert, is employed by the FCPD and is currently assigned to the Fairfax County Criminal Justice Academy as an Instructor. He has been certified in Virginia as a law enforcement officer since 2000. Prior to 2000, he served eight years' active duty in the United States Army as a Military Police Officer. During those eight

13

JA036

years, he worked a combination of garrison duty, which is similar to law enforcement work, and field duty which is a combination of law enforcement and combat operations. In 2000, he was hired as a law enforcement officer by Virginia State Police, and he worked as a Trooper until transferring to the FCPD in 2003. He has remained employed by the FCPD continually since 2003. He has been a Certified Instructor, through the Virginia Department of Criminal Justice Services (DCJS) certification process, since 2001, and has served in that capacity while employed by both the Virginia State Police and the FCPD. (SJ Ex. 10, ¶ 1.)[10]

51.     Hood has been assigned as a full-time Instructor to the Fairfax County Criminal Justice Academy since 2015. In his current position, he is responsible for instructing police officer recruits and incumbent officers regarding an array of law enforcement tactics and ensuring that recruits and officers are aware of the legal requirements for law enforcement officers' actions. His responsibilities as an Instructor specifically include teaching, evaluating and testing recruits on investigatory detentions and felony vehicle stops. DCJS, the state overseeing authority on Law Enforcement Certifications, mandates the training objectives that are required to be instructed in the classroom and tested as practical exercises or written test for all law enforcement officers in Virginia. These training objectives are developed in accordance with current legal requirements for law enforcement officers. (SJ Ex. 10, ¶ 2.)

52.     Based on his training, experience, and review of the materials in this case, Hood has developed the following opinions to a reasonable degree of professional certainty as a sworn law enforcement officer who has been involved in training of law enforcement officers for nearly 20 years:

---

[10] SJ Ex. 10 is an affidavit signed by Michael Hood.

a. Both Officer Brown and Officer McComas conducted a proper felony vehicle stop and detention of Milla, which was based upon reasonable articulable suspicion that Milla was possibly involved in the stabbing that had occurred nearby, in accordance with accepted practices for law enforcement officers.

b. Both officers conducted Milla's detention, and their visual observation and search of the interior of the vehicle, in accordance with accepted practices for law enforcement officers.

c. Both officers ensured that Milla's detention was brief, and at all times was designed to ascertain whether Milla was involved in the stabbing offense, whether there were additional individuals who might need law enforcement assistance inside Milla's vehicle, and whether there was a knife that could have been utilized in the stabbing inside Milla's vehicle or on his person.  When the officers concluded that Milla was not involved in criminal activity, he was released from custody.  (SJ Ex. 10, ¶ 6.)

## **LEGAL STANDARD**

Summary judgment under Fed. R. Civ. P. 56 is appropriate when there are no material facts genuinely in dispute and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  There is no issue for trial unless there exists sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  The court must construe the facts in the light most favorable to the nonmoving party, and may not make credibility determinations or weigh the evidence.  *Id*. at 255; *Howard v. Winter*, 446 F.3d 559, 565 (4th Cir. 2006); *Edell & Assocs., P.C. v. Law Offices of Peter G. Angelos*, 264 F.3d 424, 435 (4th Cir. 2001).  A court should enter

summary judgment "against a party who fails to make [an evidentiary] showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. The existence of a scintilla of evidence in support of the nonmoving party's position fails to defeat summary judgment. *Anderson,* 477 U.S. at 252.

## I.    SUMMARY JUDGMENT IS PROPER BECAUSE MILLA CANNOT ESTABLISH THAT THE OFFICERS VIOLATED HIS CONSTITUTIONAL RIGHTS.

Milla contends that Officer Brown and Officer McComas violated his Fourth Amendment rights when they detained and frisked him and searched his vehicle. (Compl. ¶ III(C).) Summary judgment is appropriate, however, because Officers Brown and McComas had reasonable, articulable suspicion to detain Milla during their investigation of the stabbing incident that had occurred nearby. Furthermore, Officers Brown and McComas had the legal authority to conduct a cursory search of Milla and his vehicle for the knife used in the stabbing incident, and to ensure that there were no additional suspects or victims in Milla's vehicle.

### A.    Reasonable, Articulable Suspicion Existed for Officers Brown and McComas to detain Milla.

The Fourth Amendment proscribes unreasonable searches and seizures by law enforcement officers. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). The "test of reasonableness under the Fourth Amendment is an objective one." *Los Angeles Cty., California v. Rettele*, 550 U.S. 609, 614 (2007) (citing *Graham*, 490 U.S. at 397). In making a determination as to the reasonableness of a particular law enforcement action related to search or seizure, the court must balance "the public interest" against "the individual's right to personal security free from arbitrary interference by law officers." *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)).

16

JA039

Searches and seizures that are carried out absent a warrant are *per se* unreasonable, however, they are permissible subject to several well-established exceptions. *Katz v. United States*, 389 U.S. 347, 357 (1967). One such prominent exception is the brief detention on the basis of reasonable articulable suspicion. *Terry v. Ohio*, 392 U.S. 1 (1968). The legal authority developed by *Terry v. Ohio* and the cases that followed permit a police officer to stop and detain an individual without a warrant if the officer has "specific and articulable facts which, taken together with rational inferences from those facts," create reasonable suspicion that the person has been or is about to engage in criminal activity. *Terry*, 392 U.S. at 21; *United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause") (citation omitted).

The detention must be brief, and it must be "justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981); *see also Sokolow*, 490 U.S at 7; *United States v. Massenburg*, 654 F.3d 480, 485 (4th Cir. 2011). An officer engaged in such an investigative detention must quickly confirm or dispel their suspicion that criminal activity is afoot. *Terry*, 392 U.S. at 22-23, 30. The standard for what information is necessary to equate to "reasonable, articulable suspicion" in support of an investigatory detention has been described by the United States Supreme Court as a "commonsense, nontechnical" standard that relies on the judgment of experienced law enforcement officers, "not legal technicians." *Ornelas v. United States*, 517 U.S. 690, 695 (1996). *See also United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011) (holding that a law enforcement officer initiating an investigatory detention must "be able to either articulate why a particular behavior is suspicious or logically demonstrate, given the

surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance").  Significantly, the Supreme Court has recognized that the standard for establishing reasonable articulable suspicion is not only "a less demanding standard than probable cause," but that it "requires a showing considerably less than preponderance of the evidence."  *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  *See also United States v. Mason*, 628 F.3d 123, 128 (4th Cir. 2010) (noting that the concept of reasonable, articulable suspicion "is not readily, or even usefully, reduced to a neat set of legal rules, but, rather, entails commonsense, nontechnical conceptions that deal with factual and practical considerations of everyday life.")  In determining whether an officer has met this standard in a particular case, the court is required to examine the totality of the circumstances that faced the officer prior to the detention.  *United States v. Pittman*, 102 F. App'x 315, *4 (4th Cir. 2004.)

There are many facts that can contribute to a finding of reasonable articulable suspicion, including "the context of the stop, the crime rate in the area, and the nervous or evasive behavior of the suspect." *United States v. George*, 732 F.3d 296, 299 (4th Cir. 2013).  Furthermore, even lawful conduct can add up to reasonable articulable suspicion in the context of a particular investigation.  *Reid v. Georgia*, 448 U.S. 438, 441 (1980) ("there could, of course be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot").  In determining whether an officer possessed the appropriate legal justification to effect an investigatory detention, the court must "give due weight to commonsense judgments reached by officers in light of their experience and training." *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004).  *See also United States v. Lender*, 985 F.2d 151, 154 ("Courts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street.").  "In sum, *post hoc* judicial review of police action should not serve as

18

JA041

a platform for 'unrealistic second-guessing' of law enforcement judgment calls." *United States*

*v. Branch*, 537 F.3d 328, 336–37 (4th Cir. 2008), *quoting United States v. Sharpe,* 470 U.S. 675,

686 (1985).

      The factors before the Court herein establish that Officers Brown and McComas had

reasonable articulable suspicion to detain Milla.  The officers were responding to a call for a

stabbing that had just occurred, with a heavily bleeding and uncooperative victim a mere two-

tenths of a mile from Milla's location.  It was approximately 4:00 in the morning, and there were

no individuals in the area and a limited number of vehicles.  Milla's vehicle was stopped outside

of the closed gate to a residence that, at the time, was not known to be his.  His vehicle appeared

"hot" on the FLIR camera, which established that it had recently been driven.  Milla was in the

driver's seat for a sustained period of time, at least for the three minutes that he was observed by

the helicopter officers, with his taillights illuminated and his driver's side door standing wide

open.  When Officers Brown and McComas pulled into the driveway to investigate, Milla

appeared to be crouched down in the passenger compartment, and upon the officers' arrival,

Milla immediately pulled his door shut.  These factors are precisely the types of factors that have

been found by the court to justify a brief detention so that the officers could confirm or dispel

their suspicion that Milla may have been involved in the stabbing.  *See, e.g.*, *United States v.*

*Ruffin*, 814 F. App'x 741, 747 (4th Cir. 2020) (suspect moving in an evasive manner supports

reasonable suspicion); *United States v. Foster*, 824 F.3d 84, 95 (4th Cir. 2016) (finding

articulable suspicion when the individual detained was the only person that police encountered

near the scene of a crime); *United States v. Smith*, 396 F.3d 579, 585 (4th Cir. 2005) (holding

that a suspect's presence in a driveway, "more than 200 feet from the public road but still some

distance from the residence" led to the reasonable conclusion that the suspect was hiding in the

driveway); *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993) (the "lateness of the hour" is a factor that can contribute to articulable suspicion). Furthermore, the officers' detention lasted less than six minutes, during which time the officers pursued avenues of investigation directly related to confirming or dispelling their suspicions regarding Milla and his possible involvement in the stabbing. *See Harbin v. City of Alexandria*, 712 F. Supp. 67, 71 (E. D. Va. 1989), aff'd, 908 F.2d 967 (4th Cir. 1990) (finding that an encounter between officers investigating a brandishing and a suspect was constitutional because it lasted "no more than five minutes" during which time the officers "ask[ed] the plaintiff questions concerning his identity, request some form of identification and inquire whether plaintiff had been" at the scene of the crime). The officers' detention was supported by reasonable, articulable suspicion, and it therefore did not violate Milla's constitutional rights.

### B. Reasonable, articulable suspicion existed for Officer Brown to frisk Milla for weapons.

"An officer making a lawful investigatory stop may protect himself by conducting a search for concealed weapons whenever 'he has reason to believe that the suspect is armed and dangerous.'" *United States v. Moore*, 817 F.2d 1105, 1107 (4th Cir. 1987) *quoting Adams v. Williams*, 407 U.S. 143, 146 (1972). The factors that support an officer's reasonable, articulable suspicion to conduct a *Terry* detention can also support such a frisk for weapons. *See Moore*, 817 F.2d at 1107 ("The circumstances surrounding the stop support the officer's belief that a further frisk for weapons was warranted."). When officers are investigating a crime that involves weapons, or is associated generally with the possession of weapons, officers are permitted to rely on that information when determining whether to conduct a *Terry* frisk. *See Pittman*, 102 F. App'x at 320 (finding that officers "responding to a call that shots had been fired in the area" where their detention occurred were "thus on the lookout for an armed individual"); *Moore*, 817

20

JA043

F.2d at 1107 (upholding a *Terry* detention and frisk for weapons when "the hour was late, the street was dark, the officer was alone, and the suspected crime was a burglary, a felony that often involves the use of weapons").

      Officer McComas' decision to pat Milla down for weapons is supported by the entirety of the factors that supported the officers' decision to detain Milla, as outlined *supra*.  Furthermore, the officers were searching for an individual who had just stabbed someone within the vicinity of the area where they encountered Milla, a crime that necessarily involved the use of a weapon. Milla appeared to be hiding in the passenger compartment of the vehicle, and upon perceiving the officers' arrival, immediately shut his door.  These facts only further heightened the officers' suspicion that Milla could be armed and dangerous.  *See United States v. Spearman*, 254 F. App'x 178, *3 (4th Cir. 2007) (finding reasonable, articulable suspicion to conduct a pat down when "the circumstances evolved to present a more suspicious and dangerous climate when the detectives saw defendant observing them approach his vehicle and ducking his left shoulder, apparently reaching under his driver's seat").  Based upon the foregoing, Officer McComas' pat down was supported by reasonable articulable suspicion that Milla was armed and dangerous, and it did not violate Milla's rights.

      **C.  Officers Brown and McComas validly searched Milla's vehicle.**

      The Supreme Court in *Michigan v. Long* determined the constitutional parameters of a "protective sweep" of an automobile:  "[T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons."

*Michigan v. Long*, 463 U.S. 1032, 1049 (1983) (quoting *Terry*, 392 U.S. at 21). "'[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *Michigan*, 463 U.S. at 1050 (quoting *Terry*, 392 U.S. at 27).

In *United States v. Calloway*, the court upheld a *Terry* detention, pat down, and vehicle search for weapons in a case involving an officer investigating gunshots that he heard in the high crime area that he was patrolling. *United States v. Calloway*, 2010 WL 445905 (W.D. Va. 2010). There, the officer encountered Calloway while en route to the sound of the gunshots. *Id*. at *1. Calloway's vehicle turned onto a side street and abruptly pulled to the side of the road. *Id*. When the officer pulled in behind Calloway's vehicle, the officer could see Calloway making movements inside the vehicle that were consistent with the driver placing something underneath his seat. *Id*. The officer asked Calloway to exit the vehicle, patted him down, placed him in handcuffs, and conducted a search of the vehicle for firearms after a second officer noted what appeared to be the butt of a firearm under the driver's seat. *Id*. In finding that the officer did not violate Calloway's constitutional rights, the court concluded that the officer had reasonable, articulable suspicion to conduct a *Terry* detention of Calloway and to frisk him for weapons. *Id*. at *2. Furthermore, the court found that the evidence supported the officer's "protective sweep or search for weapons in the passenger compartment of Calloway's vehicle." *Id*. *See also Spearman*, 254 F. App'x at 182 (finding that an officer was justified in conducting a protective sweep of a vehicle for weapons when, among other facts, the suspect "made furtive movements under the driver's seat when he saw the detectives approaching his vehicle").

Here, Officers Brown and McComas worked together during Milla's detention to conduct a protective sweep of the passenger compartment of Milla's vehicle to ensure that the vehicle did

not contain the knife that had been used in the nearby stabbing.  The video, which captures the protective sweep in its entirety, shows Officer Brown opening both the driver's door and the passenger door, and making a cursory visual inspection of the interior of the passenger compartment.  At the conclusion of Officer Brown's inspection of the passenger side of the vehicle, the video captures Officers Brown and McComas discussing that there were no weapons visible in the passenger compartment.  Upon confirming this to be the case, the vehicle's door was shut, and no further inspection of the passenger compartment occurred.

In addition to the protective sweep of Milla's passenger compartment, Officers Brown and McComas ensured that there were no additional suspects or victims in the trunk of the vehicle.  The Fourth Circuit Court of Appeals has upheld the constitutionality of a trunk search under similar circumstances in *United States v. Mobley*, 699 F.2d 172 (4th Cir. 1983).  There, officers were investigating a bank robbery.  *Id.* at 173.  Immediately prior to the robbery, a bank customer reported to police that she had seen a maroon vehicle with four individuals pull into the bank parking lot at a high rate of speed.  *Id.*  Moments later, two or three individuals entered the bank and committed the robbery.  *Id.*  Officers searching for the maroon vehicle soon located it abandoned les than one mile from the bank.  *Id.*  An FBI agent who heard the broadcast for the robbery over his police radio suspected that the robbery had been carried out by a group of individuals who had committed a bank robbery ten months earlier in a white Lincoln and communicated as such to the responding officers.  *Id.*  An officer located a white Lincoln, but it only appeared to have a single occupant, the driver.  *Id.* at 174.  Two officers stopped the vehicle and approached the vehicle with their weapons drawn.  *Id.*  As they approached the vehicle, one officer saw an individual in the right front passenger seat peer over the dash.  *Id.*  The officers provided commands for all of the vehicle's occupants to exit the vehicle, and three individuals

23

**JA046**

exited, one of whom had a stocking mask around his neck. *Id.* One officer opened the vehicle's

trunk because "[h]e was concerned that the fourth robber might be hiding in the trunk." *Id.* In

plain view in the trunk were several guns and a pillowcase stuffed with currency wrapped in

bank straps. *Id.* The court held that the facts and circumstances facing the officers justified the

search of the trunk. *Id.* at 176, *citing United States v. Muhammad*, 658 F.2d 249, 253 (4th Cir.

1981) ("we find no error in the district court's conclusion that the search was justified by the

agents' professed concern that Muhammad's accomplice might still be in the car's trunk").

        Here, Officers Brown and McComas had limited information regarding the perpetrators

of the stabbing, as the victim was uncooperative with the officers on scene at the Shell gas

station who attempted to gather information about the crime. The ICV recording clearly

establishes that the officers' search of the vehicle's trunk was a search for people, and not for

objects. First, when Officer McComas prepared for the trunk to open, he bladed his body and

stood to the side of the trunk in preparation for the possibility that a person could be inside.

Second, the scope of the officers' trunk search evidences that the search was for a person, as the

ICV establishes that the trunk was full of items, but neither officer touched or searched those

items, but immediately closed the trunk. In total, the trunk was open for a mere four seconds.

As such, the search of the trunk was proper, and did not violate Milla's constitutional rights.

**II.     SUMMARY JUDGMENT IS PROPER BECAUSE THE DEFENDANT OFFICERS
          ARE ENTITLED TO QUALIFIED IMMUNITY.**

        Qualified immunity shields Officers Brown and McComas from liability not only

because their actions during their encounter with Milla did not violate Milla's constitutional

rights, but also because the right at issue in Milla's claim is not firmly established. *See Pearson

v. Callahan*, 555 U.S. 223, 232 (2009). Government officials engaged in the exercise of

discretionary functions, being sued in their individual capacities, are entitled to the defense of

qualified immunity. *Butz v. Economou*, 438 U.S. 478, 479 (1978). In *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), the U.S. Supreme Court held that government officials are immune from suit if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known" at the time of the conduct. "Officials have qualified immunity either if the facts do not make out a violation of a constitutional right or if the right was not clearly established at the time." *Snider v. Seung Lee*, 584 F.3d 193, 198 (4th Cir. 2009) (citing *Pearson*, 129 S. Ct. at 815-16, 818-19). "In other words, courts ask 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Gandy v. Robey*, 520 F. App'x 134, 140 (4th Cir. 2013) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

At the time of the officer's actions, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). "[A]lthough the exact conduct at issue need not have been held to be unlawful in order for the law governing an officer's actions to be clearly established, the existing authority must be such that the unlawfulness of the conduct is manifest." *Beasley v. Brown*, No. 3:12-cv-00006-JAG, 2013 WL 1288030, *6 (E.D. Va. 2013), aff'd, 539 F. App'x 288 (4th Cir. 2013) (quoting *Wilson v. Layne,* 141 F.3d 111, 113 (4th Cir. 1998). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). "When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id*., quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"The individual who brings suit against a public official bears the burden of clearly establishing the law (and corresponding rights) allegedly violated." *Mitchell v. Rice*,

JA048

954 F.2d 187, 190 (4th Cir. 1992). "A right is clearly established when it has been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state in which the action arose." *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999).

As outlined *supra*, both Officer Brown and Officer McComas reasonably detained and searched both Milla and his vehicle during their investigation into the stabbing incident that had taken place nearby, and as such, both are entitled to qualified immunity. They are also entitled to immunity from suit because it is not firmly established in the Fourth Circuit that an officer's brief detention and protective search of an individual and his property, when that individual is near the scene of a violent crime under unusual circumstances, and attempts to hide from the responding officers, is a violation of that suspect's Fourth Amendment rights. Indeed, as outlined *supra*, cases that address factually similar circumstances state just the opposite - that an officer who encounters an individual in the middle of the night acting suspiciously and evasively near the scene of a violent crime that has just taken place may briefly detain that individual and make a cursory search of his person and his vehicle for weapons and additional suspects or victims. As such, no reasonable officer on scene would have understood that the action taken was unreasonable. Assuming for purposes of summary judgment that either Officer Brown or Officer McComas could be liable to Milla associated with his detention, they are entitled to qualified immunity.

## **CONCLUSION**

In consideration of the foregoing, Officers Brown and McComas request that this Court grant them summary judgment and dismiss the Complaint with prejudice.

Respectfully submitted,

PFC D. BROWN
PFC MCCOMAS
By Counsel

ELIZABETH D. TEARE
COUNTY ATTORNEY

By _____/s/_____
    Kimberly P. Baucom, Senior Assistant County Attorney
    Virginia Bar Number 44419
    Counsel for Defendants
    Office of the County Attorney
    12000 Government Center Parkway, Suite 549
    Fairfax, VA  22035-0064
    Phone: 703-324-2421
    Fax: 703-324-2665
    kimberly.baucom@fairfaxcounty.gov

## CERTIFICATE OF SERVICE

    I hereby certify that on the 3rd day of February, 2021, the foregoing was sent overnight via Federal Express to the following:

Anthry Milla
1021 Dranesville Road
Herndon, Virginia 20170
Plaintiff

_____/s/_____
Kimberly P. Baucom

27

**JA050**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **ANTHRY RAUL MILLA,** | : |
| **Plaintiff,** | : |
| | : |
| **v.** | :     **Civil Action No. 1:20cv694 (AJT/MSN)** |
| | : |
| **PFC D. BROWN, et al.,** | : |
| | : |
| **Defendants.** | : |

## AFFIDAVIT OF ANGELA KANG

THIS DAY, I, Angela Kang, personally appeared before the undersigned notary public in the state and county aforesaid and being duly sworn according to law, swear under penalty of law that the following information is true and accurate based upon my personal knowledge:

1.      I am currently employed by the Fairfax County Department of Public Safety Communications (DPSC) as custodian of records for the agency.  I have worked for Fairfax County for the past 2 1/2 years.  Prior to coming to Fairfax County, I worked as a dispatcher for Prince William County Public Safety Communications.  I was certified as a dispatcher in Prince William County, and I still hold that certification.

2.      DPSC is the County agency responsible for all emergency communications for the Fairfax County Police Department (FCPD) and the Fairfax County Fire and Rescue Department (Fire Department).  DPSC dispatchers man phones in the DPSC call center, enabling them to respond to any emergency call from citizens, the FCPD, or the Fire Department, that requires the dispatch of emergency personnel.  All emergency communications within the County that involve DPSC are created and maintained by the Computer Aided Dispatch system (CAD).

3.      I have received extensive training on dispatch duties and the CAD system, and am familiar with the CAD event documentation and interpretation.

EXHIBIT

4.    Each time an emergency 911 call is made to the DPSC call center, the call is assigned a specific event number, and all records of the emergency call are maintained within the CAD system by that event number. All calls, whether from a citizen's telephone or from an emergency responder's radio, are recorded in audio format and maintained by DPSC in the normal course of business. Computerized records specific to each event number are also maintained by DPSC in the normal course of business.

5.    Fairfax County police officers can contact DPSC through their personal radio or through a computer terminal in their police cruiser. Officers receive information from DPSC as well through listening to the police radio or utilizing their in-car computer terminal.

6.    In response to a request related to the above referenced court action, DPSC provided a copy of the radio traffic and all CAD documents associated with the event involving a stabbing incident, on June 7, 2019, at the Shell gas station at 12219 Leesburg Pike, Herndon, Virginia, 20170. The items produced included the dispatch audio file of the event, and the DPSC Display Event and Background Event Chronology. I am able to interpret these records as part of my normal job duties with DPSC.

7.    On June 7, 2019, at approximately 4:20 a.m., DPSC was contacted via the County's emergency 911 system by a citizen at the Shell. The caller notified DPSC that there was a man who had been stabbed banging on the doors. The caller advised that the man was bleeding heavily.

8.    At 4:20:32 a.m., a dispatch operator created an event which caused an event number to be assigned, Event Number E191580276, and which triggered the DPSC computer system to record the event in electronic format.

9.     The dispatch operator provided information from the call to DPSC to officers in the Reston District, which is the police district that includes the location of the Shell station.  This dispatch notification was captured in both the Display Event and Background Event Chronology.

10.    Several FCPD officers responded to the stabbing call, and the activity of the officers in addressing that call is contained in both the Display Event and Background Event Chronology.

_____
Angela Kang

STATE OF VIRGINIA :
: to wit
COUNTY OF FAIRFAX        :

Subscribed and sworn to before me, a Notary Public in and for the county and state aforesaid, this 26th day of ~~November~~ 2021.
January

_____
Notary Public

My Commission expires on: 4/30/2024 .

DEBORAH LYNN HAMMER
NOTARY
PUBLIC
REG. #255810
MY COMMISSION
EXPIRES
04/20/2024
COMMONWEALTH OF VIRGINIA

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

ANTHRY RAUL MILLA,   :
          :
  Plaintiff,     :
          :
v.          :  Civil Action No. 1:20cv694 (AJT/MSN)
          :
PFC D. BROWN, et al.,   :
          :
  Defendants.    :

<u>**AFFIDAVIT OF OFFICER ADAM ATER**</u>

   THIS DAY, I, Officer Adam Ater, personally appeared before the undersigned notary public in the state and county aforesaid and being duly sworn according to law, made oath that:

1.  I am currently employed by the Fairfax County Police Department (FCPD) as a sworn law enforcement officer. I have been employed by the FCPD for 4 years.

2.  On June 7, 2019, I was on duty at the Reston District Police Station and was designated as unit 501A. At approximately 4:20 a.m., I was dispatched by the Fairfax County Department of Public Safety Communications (DPSC) for a report of an individual who had been stabbed and who was then at the Shell gas station at 12219 Leesburg Pike, Herndon, Virginia, 20170.

3.  I responded to the gas station and saw a man standing in front of the gas station covered in blood. I also observed blood all over the gas station window. The victim had wrapped a makeshift tourniquet around his arm, and I observed that he had a deep slash wound on his arm. When I arrived on scene the victim was screaming and cursing at the lone female gas station attendant, who was inside the gas station with the door locked.

4.  I made contact with the victim and attempted to talk to him to ascertain what had happened, but he would not speak to me, he only continued yelling at the gas station attendant.

1

&#x2610; <u>EXHIBIT</u> &#x2610;

When I approached the victim, I detected that he smelled heavily of the odor of alcoholic beverages.

5.      A Fairfax County Fire and Rescue Department medic unit arrived on scene and applied a tourniquet to the victim's arm and placed him in the ambulance. I entered the ambulance and continued to try to speak with the victim to find out what had happened to him. He was completely uncooperative with me and refused to provide me with any information that would assist me in my investigation of who had hurt him, or what had occurred.

6.      During this time, I was aware that additional FCPD officers were in the area searching for suspects, and also searching for the location where the crime had occurred, as it appeared that the Shell gas station was not the scene of the crime, but merely the location where the victim went to seek help after the crime occurred.

7.      Also during this time, I was aware that Officer Derek Brown and Officer Shane McComas had initiated a subject stop on a man in a vehicle near the Shell gas station, and that they released him after confirming that he was likely not the suspect that we were searching for.

8.      The victim was transported to Reston Hospital via ambulance, and I followed the ambulance to the hospital. At the hospital, I continued to speak with the victim in an effort to obtain his cooperation in determining who had hurt him. Eventually, the victim provided me with a description of the man who stabbed him and told me that the stabbing had occurred at a location in Loudoun County, which borders Fairfax County near the Shell gas station.

9.      Because the crime occurred in Loudoun County, that jurisdiction took over the investigation into the stabbing.

Officer Adam Ater

2

STATE OF VIRGINIA        :
CITY          WINCHESTER  : to wit
~~COUNTY~~ OF ~~FAIRFAX~~  :

Subscribed and sworn to before me, a Notary Public in and for the county and state aforesaid, this _28_ day of January 2021.

CYNTHIA N KEEFER
NOTARY PUBLIC
REGISTRATION # 7536791
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES
11/30/2021

_____
Notary Public

My Commission expires on: ___11/30/2021___ .

3

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ANTHRY RAUL MILLA,                              :
                                                :
          Plaintiff,                            :
                                                :
v.                                              :        Civil Action No. 1:20cv694 (AJT/MSN)
                                                :
PFC D. BROWN, et al.,                           :
                                                :
          Defendants.                           :

## AFFIDAVIT OF MPO TAMMY RUSSELL

THIS DAY, I, Master Police Officer Tammy Russell, personally appeared before the

undersigned notary public in the state and county aforesaid and being duly sworn according to

law, made oath that:

1.     I am currently employed by the Fairfax County Police Department (FCPD) as a sworn

law enforcement officer. I have been employed by the FCPD for 22 years. My current rank is

Master Police Officer.

2.     In June 2019 I was assigned to the FCPD's helicopter division. The helicopter division

provides tactical helicopter support for law enforcement operations and conducts aeromedical

evacuation to area hospitals for critically injured patients.

3.     On June 7, 2019, I was on duty with the helicopter division. At approximately 4:20 a.m.,

the helicopter was returning to base after assisting with a robbery incident when we were advised

by the Fairfax County Department of Public Safety Communications (DPSC) of an individual

who had been stabbed and who was then at the Shell gas station at 12219 Leesburg Pike,

Herndon, Virginia, 20170. Initially, the report was that the victim may have been stabbed in the

1

EXHIBIT

chest, and the helicopter proceeded to the area in the event that an aeromedical evacuation was necessary.

4.    As the helicopter was arriving on scene, we were advised that the victim was stabbed in the arm, not the chest, and that he was alert and oriented. The helicopter remained on scene to be prepared for a possible aeromedical evacuation, but transitioned into a role of law enforcement support as well.

5.    We were made aware via radio communications that the victim was uncooperative with officers on scene and refused to provide any information regarding what had occurred, or where the stabbing incident had taken place. We began to utilize the helicopter's Forward-Looking Infrared (FLIR) camera in an attempt to identify any nearby suspicious people or vehicles that could have been involved in the incident. The video recording of the event is captured in a video file titled "camera_N212FX_20190607_042756_05". My co-worker in the helicopter manipulated the camera equipment while I observed a monitor that projected the camera's images so that I could view them.

6.    A FLIR camera detects infrared radiation and creates an image from that radiation, which typically appears as a light image against a darker, cooler, background. As such, warmer objects will appear distinctly from cooler objects in video output images. The warmer the object, the more infrared radiation emitting from that object, and the whiter the image.

7.    After I identified for the on-scene officers which of the vehicles in the Shell gas station parking lot were warm, the officers asked whether there were any people in the surrounding area. We began to use the FLIR camera in the surrounding area in an attempt to identify any suspicious individuals nearby who may have been involved in the incident.

2

8.    I soon observed a hot vehicle parked outside of the closed gate at 1021 Dranesville Road close to the Shell gas station. The vehicle was stationary, and the driver's door was standing open. The vehicle's taillights were lit and the headlights off. Upon closer observation, I could see that there was possibly a person inside the vehicle, and the person appeared to be slouched down in the driver's seat. I informed the on-scene officers of what I observed via the police radio.

9.    The helicopter remained on scene as officers were dispatched to respond to the vehicle location at 1021 Dranesville Road to investigate whether the vehicle, or its occupants, were possibly involved in the stabbing incident. The entire encounter, which was a brief subject stop, was captured and recorded on the helicopter's FLIR camera.

10.    After the officers at 1021 Dranesville Road voiced on their radio that they did not believe that the person they had detained was the stabbing suspect, we transitioned the FLIR camera to the area across the street from the Shell gas station, which included a large parking lot that served multiple commercial businesses, including a McDonalds and a large grocery store. Officers were in the parking lot searching for evidence as a result of a citizen who reported to law enforcement that they had seen the victim in that area.

11.    We assisted the officers searching the parking lot by scanning the lot for heat signatures that would indicate the recent presence of a vehicle. Officers eventually located a large pool of blood in the parking lot. Ultimately, officers concluded that the parking lot was the probable scene of the stabbing event.

12.    The McDonalds parking lot is located in Loudoun County, Virginia. Because the crime occurred in Loudoun County, the Loudoun County Sheriff's Department took over the investigation into the stabbing.

3

_____

MPO Tammy Russell

**STATE OF VIRGINIA**          :

                              : to wit

**COUNTY OF FAIRFAX**          :

     Subscribed and sworn to before me, a Notary Public in and for the county and state aforesaid, this 26 day of January 2021.



VIRDIANA CUEVAS
NOTARY PUBLIC 7770818
COMMONWEALTH OF VIRGINIA

MY COMMISSION EXPIRES OCTOBER 31, 2022

_____

Notary Public

My Commission expires on: _OcT. 31, 2022._

VIRDIANA CUEVAS
NOTARY PUBLIC 7770818
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES OCTOBER 31, 2022

4

**JA060**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **ANTHRY RAUL MILLA,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No. 1:20cv694 (AJT/MSN)** |
| | : | |
| **PFC D. BROWN, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

# EXHIBIT 5

Case 1:20-cv-00694-AJT-MSN   Document 23-4   Filed 02/03/21   Page 2 of 2 PageID# 152

**Courtesy Copy for:**
**The Honorable Anthony J. Trenga**
**Judge, U.S. District Court**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **ANTHRY RAUL MILLA,** : | |
| : | |
| **Plaintiff,** : | |
| : | |
| **v.** : | **Civil Action No. 1:20cv694 (AJT/MSN)** |
| : | |
| **PFC D. BROWN, et al.,** : | |
| : | |
| **Defendants.** : | |

**AFFIDAVIT OF OFFICER DEREK BROWN**

THIS DAY, I, Officer Derek Brown, personally appeared before the undersigned notary

public in the state and county aforesaid and being duly sworn according to law, made oath that:

1.    I am currently employed by the Fairfax County Police Department (FCPD) as a sworn

law enforcement officer.  I have been employed by the FCPD for six years.

2.    On June 7, 2019, I was on duty at the Reston District Police Station and was designated

as unit 950A.  At approximately 4:20 a.m., I became aware of an incident involving a stabbing

victim who was banging on the windows of the Shell gas station at 12219 Leesburg Pike,

Herndon, Virginia, 20170, and that the gas station attendant had called 911 to report the incident.

3.    I began driving toward the area in my FCPD cruiser to provide law enforcement

assistance.  Due to the urgency of the situation, I activated my cruiser's emergency lights and

siren, which also caused my cruiser's In-Car Video (ICV) system to begin recording.  My ICV

captured the entirety of my involvement in responding to the stabbing event, including my later

interaction with the Plaintiff, Anthry Milla (Milla).

4.    While I was driving to the area, I monitored my Computer Aided Dispatch (CAD)

monitor in the cruiser, and I listened to my police-issued radio so that I could hear the

1

EXHIBIT

information that was being conveyed regarding the incident from the officers at the Shell gas station, the Department of Public Safety Communications (DPSC) dispatcher, and the officers who were responding to the incident in the FCPD helicopter. The audio of the radio traffic is captured on my ICV recording.

5.      While I was responding to the area of the Shell gas station, I was aware from listening to the helicopter officers that they were operating their Forward-Looking Infrared (FLIR) camera in the area to look for suspicious vehicles that could have been involved in the incident. I was aware that if a vehicle had been recently operated, which would make it radiate heat, the vehicle would appear white on the FLIR camera. I was aware that the helicopter officers would refer to those vehicles as being "hot" to indicate that they had recently been operated. People also radiate heat, and as such, they appear white on the FLIR camera.

6.      While I was responding to the area of the Shell gas station, I gathered the following additional information from listening to my police radio: officers responded to the Shell gas station and observed a male victim in front of the gas station covered in blood. The victim had wrapped a makeshift tourniquet around his arm, and had a deep slash wound on his arm. Based on the helicopter officers' use of the FLIR, there were no "hot cars" in the parking lot of the Shell gas station other than two vehicles that were at the pumps. One of the officers who was on scene at the Shell gas station asked the helicopter officers whether there were any people walking or running in the area surrounding the Shell gas station. The helicopter officer did not find any people walking or running but did find a "hot" car in the driveway of 1021 Dranesville Road.

7.      I activated my radio and voiced that I would respond to the location of 1021 Dranesville Road to investigate the vehicle that the helicopter had located to see if it was involved in the

2

stabbing incident. I heard over the radio that Unit 530A was also responding to the residence. I

knew that Unit 530A was Officer Shane McComas (Officer McComas).

8.      Prior to voicing over the radio that I was responding, I heard an instruction over the radio

for responding officers to "slow it down." To me, this phrase means that I am to deactivate my

emergency lights and siren. I turned off my lights and siren and did not turn them back on for

the duration of this event.

9.      1021 Dranesville Road is close to the location of the Shell gas station where the stabbing

victim was discovered.

10.     While en route to 1021 Dranesville Road, I received additional information from the

helicopter officers who were observing the vehicle on the FLIR. The officers reported on the

radio that the headlights were not illuminated, but the taillights were lit and the driver's door was

standing open. I heard the helicopter officer state on the radio that it appeared that there could be

someone in the driver's seat of the vehicle.

11.     I arrived at 1021 Dranesville Road at the 5:13 timestamp on my ICV. As I pulled into the

driveway, Officer McComas pulled up behind my cruiser and to the right. I could see Milla's

vehicle stopped outside of a gate that separated the main portion of the driveway from the

residence, and the gate was closed.

12.     As I pulled into the driveway, my cruiser's headlights illuminated the vehicle. I could

see the legs of an individual in the driver's seat, however, I could not see the rest of the

individual's body, and it appeared to me that the individual was ducked down in the seat. Within

seconds of my arrival, the individual reached out of the driver's side of the vehicle and pulled the

driver's side door shut.

3

**JA065**

13.     Based upon the information that I had regarding the stabbing investigation occurring nearby, in addition to the position of the vehicle at 1021 Dranesville Road and the behavior of the occupant of the vehicle when I arrived on scene, I determined that I would detain any individuals in the vehicle to investigate whether they were involved in the incident, and whether there were any additional victims, weapons, or blood in the vehicle.

14.     I exited my cruiser and stood behind my open driver's side door for protection and, working with Officer McComas, provided commands for the driver of the vehicle to exit the vehicle. The driver of the vehicle was ultimately identified as Milla.

15.     As Officer McComas and I provided commands for Milla to exit the vehicle, he raised his hands in the air and swung his legs out of the vehicle. Milla did not have shoes on, and reached into the driver's side floorboard of the vehicle to retrieve his shoes and put them on. Milla exited the vehicle and followed our commands to walk backwards toward us with his hands in the air. When Milla reached my cruiser, Officer McComas placed him in handcuffs and placed him in the rear seat of my cruiser.

16.     I voiced over the radio that we had an individual detained. This is captured at the 7:04 timestamp of the ICV recording. The DPSC documentation establishes that Milla's detention began at 4:34:09 a.m., which was a total of 14 minutes after the initial 911 call was entered into the DPSC Event Chronology.

17.     Officer McComas asked Milla whether there was anyone else in the vehicle and he responded, "No, just me."

18.     Officer McComas provided commands for any passengers in the vehicle to exit the vehicle, but nothing happened. We approached the vehicle to ensure that there were no additional suspects or victims in the vehicle.

4

**JA066**

19.    Upon approach to the vehicle, I noticed that it had front end damage.  Officer McComas and I reached the vehicle at the 8:02 timestamp on the ICV video.  We made a visual inspection of the outside of the vehicle and then I opened the driver's side door to find the trunk latch so that we could clear the vehicle of any additional suspects or victims.  After initially having some difficulty finding the trunk release, Officer McComas located it and opened the trunk.  Officer McComas lifted the trunk of the vehicle, conducted a check to make sure no individuals were in the trunk, and closed the trunk.  Officer McComas opened the trunk at the 9:02 timestamp on the ICV video and closed it four seconds later at the 9:06 timestamp on the ICV video.  The trunk was filled with items, but neither myself nor Officer McComas touched or searched anything inside the trunk.

20.    I opened the passenger side door to the vehicle as Officer McComas was opening the trunk.  I did not see any weapons or blood in the passenger compartment of the vehicle, communicated this to Officer McComas, and I shut the passenger side door.

21.    Officer McComas and I returned to my cruiser and removed Milla from the vehicle.  The timestamp on the ICV video is 9:41 when Milla was removed.  I asked him whether he was in possession of any weapons and whether he was involved in the stabbing incident.  I asked Milla about the front-end damage to his vehicle, and he stated that the damage was old damage resulting from someone hitting his vehicle.  I had a conversation with Milla regarding whether he lived at the location and tried to ascertain his name so that I could document the subject stop in an incident report.  Milla refused to provide his name to me, but Officer McComas learned his name from his parents, who walked outside of the house and spoke to Officer McComas while we were on scene.

5

**JA067**

22.    As soon as we ascertained Milla's name and confirmed that he lived at the residence, he was released from the handcuffs. The ICV recording shows Milla being released at the 12:40 timestamp. At the time that I released Milla from detention, no other suspects or possible suspects had been located by any of the responding officers.

23.    After releasing Milla from investigative detention, I left the Milla residence and drove to the Shell gas station. As I was leaving the residence, I could hear radio traffic between the helicopter and a canine unit regarding a large pool of blood that the officers had located in the parking lot across the street from the Shell gas station.

24.    It took me less than one minute to travel from the Milla residence to the Shell gas station, including a brief stop at a stoplight. As I was stopped at the stoplight I saw the Fire and Rescue Department (FRD) medic unit leave the Shell gas station with its lights and siren activated.


_____
Officer Derek Brown


**STATE OF VIRGINIA**        :
                             : to wit
**COUNTY OF FAIRFAX**        :

        Subscribed and sworn to before me, a Notary Public in and for the county and state aforesaid, this _2nd_ day of ~~January~~ 2021.
                        *February*

                        _____
                        Notary Public


My Commission expires on: _4/30/2024_ .

6

**JA068**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ANTHRY RAUL MILLA,                    :
                                      :
      Plaintiff,                      :
                                      :
v.                                    :        Civil Action No. 1:20cv694 (AJT/MSN)
                                      :
PFC D. BROWN, et al.,                 :
                                      :
      Defendants.                     :

<u>AFFIDAVIT OF OFFICER SHANE MCCOMAS</u>

THIS DAY, I, Officer Shane McComas, personally appeared before the undersigned

notary public in the state and county aforesaid and being duly sworn according to law, made oath

that:

1.      I am currently employed by the Fairfax County Police Department (FCPD) as a sworn

law enforcement officer.  I have been employed by the FCPD for five years.

2.      On June 7, 2019, I was on duty at the Reston District Police Station and was designated

as unit 530A.  At approximately 4:20 a.m., I became aware of an incident involving a stabbing

victim who was banging on the windows of the Shell gas station at 12219 Leesburg Pike,

Herndon, Virginia, 20170, and that the gas station attendant had called 911 to report the incident.

I began driving toward the area in my FCPD cruiser to provide law enforcement assistance.

3.      While I was driving to the area, I monitored my Computer Aided Dispatch (CAD)

monitor in the cruiser, and I listened to my police-issued radio so that I could hear the

information that was being conveyed regarding the incident from the officers at the Shell gas

station, the Department of Public Safety Communications (DPSC) dispatcher, and the officers

who were responding to the incident in the FCPD helicopter.

1

EXHIBIT

4.      While I was responding to the area of the Shell gas station, I was aware from listening to the helicopter officers that they were operating their Forward-Looking Infrared (FLIR) camera in the area to look for suspicious vehicles that could have been involved in the incident.  I was aware that if a vehicle had been recently operated, which would make it radiate heat, the vehicle would appear white on the FLIR camera.  I was aware that the helicopter officers would refer to those vehicles as being "hot" to indicate that they had recently been operated.  People also radiate heat, and as such, they appear white on the FLIR camera.

5.      While I was responding to the area of the Shell gas station, I gathered the following additional information from listening to my police radio:  officers responded to the Shell gas station and observed a male victim in front of the gas station covered in blood.  The victim had wrapped a makeshift tourniquet around his arm, and had a deep slash wound on his arm.  Based on the helicopter officers' use of the FLIR, there were no "hot cars" in the parking lot of the Shell gas station other than two vehicles that were at the pumps.  One of the officers who was on scene at the Shell gas station asked the helicopter officers whether there were any people walking or running in the area surrounding the Shell gas station.  The helicopter officer did not find any people walking or running but did find a "hot" car in the driveway of 1021 Dranesville Road.

6.      I activated my radio and voiced that I would respond to the location of 1021 Dranesville Road to investigate the vehicle that the helicopter had located to see if it was involved in the stabbing incident.  I heard over the radio that Unit 950A was also responding to the residence.  I knew that Unit 950A was Officer Derek Brown (Officer Brown).

2

**JA070**

7.    Prior to voicing over the radio that I was responding, I heard an instruction over the radio for responding officers to "slow it down." To me, this phrase means that I am to deactivate my emergency lights and siren. I turned off my lights and siren.

8.    1021 Dranesville Road is close to the location of the Shell gas station where the stabbing victim was discovered.

9.    While en route to 1021 Dranesville Road, I received additional information from the helicopter officers who were observing the vehicle on the FLIR. The officers reported on the radio that the headlights were not illuminated, but the taillights were lit and the driver's door was standing open. I heard the helicopter officer state on the radio that it appeared that there could be someone in the driver's seat of the vehicle.

10.    I arrived at 1021 Dranesville Road immediately after Officer Brown pulled into the driveway of the residence, and I pulled to the side of the road to the right rear of Officer Brown's cruiser. Because my cruiser was still in the highway, I activated my rear emergency lights so that vehicles approaching from behind my cruiser could see the vehicle. I exited my vehicle and stood next to Officer Brown's cruiser for my protection.

11.    I could see a vehicle stopped outside of a gate that separated the main portion of the driveway from the residence, and the gate was closed. The vehicle was occupied by the Plaintiff, Anthry Milla (Milla).

12.    Within seconds of our arrival, Milla reached out of the driver's side of the vehicle and pulled the driver's side door shut. Officer Brown informed me that he had seen Milla inside the front seat area of the vehicle ducking down into the seat.

13.    Based upon the information that I had regarding the stabbing investigation occurring nearby, in addition to the position of the vehicle at 1021 Dranesville Road and the behavior of

3

the occupant of the vehicle when I arrived on scene, I determined that I would detain any

individuals in the vehicle to investigate whether they were involved in the incident, and whether

there were any additional victims in the vehicle.

14.     I worked with Officer Brown to provide commands for the driver of the vehicle to exit

the vehicle.

15.     As Officer Brown and I provided commands for Milla to exit the vehicle, he raised his

hands in the air and swung his legs out of the vehicle.  Milla did not have shoes on, and reached

into the driver's side floorboard of the vehicle to retrieve his shoes and put them on.  Milla exited

the vehicle and followed our commands to walk backwards toward us with his hands in the air.

When Milla reached Officer Brown's cruiser, I placed him in handcuffs and placed him in the

rear seat of the cruiser.

16.     I asked Milla whether there was anyone else in the vehicle and he responded, "No, just

me."

17.     I turned my attention back to the vehicle and provided commands for any passengers in

the vehicle to exit the vehicle, but nothing happened.  Officer Brown and I approached the

vehicle to ensure that there were no additional suspects or victims in the vehicle.

18.     Upon approach to the vehicle, Officer Brown told me that he saw front end damage on

the vehicle.  Officer Brown and I made a visual inspection of the outside of the vehicle and

Officer Brown opened the driver's side door to find the trunk latch so that we could clear the

vehicle of any additional suspects or victims.  While Officer Brown looked for the trunk latch, I

stood at the rear of the vehicle off to the right side of the trunk.  I bladed my body and held my

firearm at a "low ready" position, meaning that my firearm was pointed towards the ground.  The

reason that I did this was to prepare for the possibility that when Officer Brown pulled the latch

4

to open the trunk, there could be an individual inside who could harm me. I was also concerned that there could be an additional stabbing victim in the vehicle.

19.    Officer Brown initially had some difficulty finding the trunk release, but we eventually located it and I opened the trunk. I conducted a check to make sure no individuals were in the trunk and immediately closed the trunk. The trunk was open for a total of four seconds. The trunk was filled with items, but neither myself nor Officer Brown touched or searched anything inside the trunk.

20.    Officer Brown opened the passenger side door to the vehicle as I was opening the trunk. Officer Brown communicated to me that he did not see any weapons in the passenger compartment of the vehicle, and he shut the passenger side door.

21.    Officer Brown and I returned to his cruiser and removed Milla from the vehicle. I conducted a pat-down of Milla's outer clothing to ensure that he was not in possession of a knife. I did not find any weapons on Milla during my pat-down. I saw two individuals walk into the driveway, and I made contact with them. Milla informed us that the two individuals were his parents. I confirmed with Milla's parents that he was their son and that he lived in the residence. I asked Milla's parents about the front end damage on the vehicle to confirm that the damage was old damage and not recent. I asked Milla's parents for his exact name and date of birth, and they provided that to me.

22.    As soon as we ascertained Milla's name and confirmed that he lived at the residence, Officer Brown released Milla from the handcuffs.

23.    After releasing Milla from investigative detention, I left the Milla residence and drove to the Shell gas station. As I was leaving the residence, I could hear radio traffic between the

5

helicopter and a canine unit regarding a large pool of blood that the officers had located in the

parking lot across the street from the Shell gas station.

_Sh~ McC~_

Officer Shane McComas

**STATE OF VIRGINIA**          :
                              : **to wit**
**COUNTY OF FAIRFAX**         :

Subscribed and sworn to before me, a Notary Public in and for the county and state
aforesaid, this _2nd_ day of ~~January~~ 2021.
                        _February_

_Deborah Lynn Hammer_
Notary Public

My Commission expires on:   _4/30/2024_      .

6

JA074

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

**ANTHRY RAUL MILLA,**                    :
                                          :
          **Plaintiff,**                  :
                                          :
**v.**                                     :          **Civil Action No. 1:20cv694 (AJT/MSN)**
                                          :
**PFC D. BROWN, et al.,**                 :
                                          :
          **Defendants.**                 :


# EXHIBIT 8

**Courtesy Copy for:**
**The Honorable Anthony J. Trenga**
**Judge, U.S. District Court**



EXHIBIT

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| ANTHRY RAUL MILLA, | : |
| | : |
| **Plaintiff,** | : |
| | : |
| v. | :     Civil Action No. 1:20cv694 (AJT/MSN) |
| | : |
| PFC D. BROWN, et al., | : |
| | : |
| **Defendants.** | : |

### AFFIDAVIT OF MICHAEL HOOD

THIS DAY, I, Michael Hood, personally appeared before the undersigned notary public in the state and county aforesaid and being duly sworn according to law, made oath that:

1.      I am currently employed by the Fairfax County Police Department (FCPD) and I am currently assigned to the Fairfax County Criminal Justice Academy as an Instructor. I have been certified in Virginia as a law enforcement officer since 2000. Prior to 2000, I served eight years' active duty in the United States Army as a Military Police Officer. During those eight years, I worked a combination of garrison duty, which is similar to law enforcement work, and field duty which is a combination of law enforcement and combat operations. In 2000, I was hired as a law enforcement officer by Virginia State Police, and I worked as a Trooper until transferring to the FCPD in 2003. I have remained employed by the FCPD continually since 2003. I have been a Certified Instructor, through the Virginia Department of Criminal Justice Services (DCJS) certification process, since 2001, and have served in that capacity while employed by both the Virginia State Police and the FCPD.

2.      I have been assigned as a full-time Instructor to the Fairfax County Criminal Justice Academy since 2015. In my current position, I am responsible for instructing police

1

EXHIBIT

officer recruits and incumbent officers regarding an array of law enforcement tactics and
ensuring that recruits and officers are aware of the legal requirements for law enforcement
officers' actions. My responsibilities as an Instructor specifically include teaching, evaluating
and testing recruits on investigatory detentions and felony vehicle stops. DCJS, the state
overseeing authority on Law Enforcement Certifications, mandates the training objectives that
are required to be instructed in the classroom and tested as practical exercises or written test for
all law enforcement officers in Virginia. These training objectives are developed in accordance
with current legal requirements for law enforcement officers.

3.      As pertinent to this case, I have reviewed the following materials:
Incident/Investigation Report Case Number 2019-1580035; helicopter video of the stabbing
investigation and the location of the Plaintiff in his vehicle; In-Car Video of the incident and
subject stop of the Plaintiff; map of the area of 12219 Leesburg Pike and 1021 Dranesville Road;
Officer Brown's Fairfax County Criminal Justice Academy Training History; Officer McComas'
Fairfax County Criminal Justice Academy Training History; Fairfax County Police Department
policies related to investigatory detention and use of force; DCJS training objectives related to
investigatory detentions and felony vehicle stops.

4.      The FCPD requires extensive classroom and practical training for its officers,
including training for recruits prior to being sworn as law enforcement officers, to maintain
awareness of the legal and policy requirements of their positions as officers, and to maintain their
DCJS certification as law enforcement officers.

5.      Officers Brown and McComas received this extensive training generally as
officers, as well as specifically in the areas of search and seizure, including detentions, the use of
force to effectuate a detention, and vehicle searches. Both officers are current in their required

2

training hours in order to maintain their DCJS certifications as law enforcement officers in the Commonwealth of Virginia.

6.      The facts that I ascertained to support my expert opinions in this matter are captured in the helicopter video and In-Car Video of the incident, which together captured the entirety of Officers Brown and McComas' interactions with the Plaintiff. Specifically, the following factual predicate exists that informs my expert opinions in this case:

a.  On June 7, 2019, at approximately 4 am, Officers Brown and McComas were involved in the Fairfax County Police Department's emergency response to a stabbing incident that was reported to the Department of Public Safety Communications (DPSC) when the victim was discovered at 12219 Leesburg Pike at a gas station. The victim was suffering from a serious wound and was not cooperative with law enforcement with regard to what had occurred that led to his stabbing.

b.  Officers, including the FCPD helicopter unit and Officers Brown and McComas, worked to identify the location of any possible suspects or witnesses to the stabbing in the vicinity around the gas station where the victim was located.

c.  The helicopter unit recorded its visual scan of the surrounding area on video and sought to identify any possibly involved vehicles by looking at their heat signal utilizing the helicopter's thermal camera to identify any vehicles in the area that had recently been operated, as evidenced by a warmer heat signal.

d.  The helicopter unit identified a vehicle at 1021 Dranesville Road with a heat signal consistent with the vehicle being recently operated. The helicopter unit directed the

3

**JA080**

FCPD's street units, which consisted of Officers Brown and McComas in FCPD cruisers, to the location of that vehicle.

e.  When the helicopter unit initially located the Plaintiff's vehicle, it was stopped in a driveway in front of a closed gate, and the front driver's door was open. When Officers Brown and McComas arrived in their cruisers, the front driver's door closed and an individual can be seen moving around inside the passenger compartment of the vehicle.

f.  Officers Brown and McComas worked together to conduct a felony vehicle stop, which is the detention of individual(s) possibly involved in felony criminal activity who are associated with a vehicle.

g.  Officers Brown and McComas together provided commands for the driver of the vehicle, who was the Plaintiff, to exit the vehicle with his hands up, walk slowly backwards to the officers, who remained at their cruisers, and to get down on both knees. The Plaintiff was handcuffed and placed in a cruiser. The officers were armed with their service weapons during this portion of their encounter with the Plaintiff.

h.  Once the Plaintiff was secured, the officers asked him whether there were any additional individuals in the vehicle and worked together to ascertain whether there were additional individuals or weapons inside the vehicle. The officers provided commands for any passengers to exit the vehicle, and upon receiving no response, they approached the vehicle with their service weapons.

i.  The officers conducted a visual inspection of the exterior and interior of the passenger compartment and a visual inspection of the trunk of the vehicle. The officers noted that there was front end damage to the vehicle. The officers conversed with each

4

other during these visual inspections and communicated between them that they did not see any weapons in the vehicle.

j. The officers then released the Plaintiff from the rear of the cruiser and asked him a series of questions regarding why he is at the location, whether he was involved in the stabbing, and the cause of the damage to the front of his vehicle. After establishing the Plaintiff's identity and confirming that he lived at the location, the officers released the Plaintiff from custody.

7.    Based on my training, experience, and review of the materials noted above, I have developed the following opinions to a reasonable degree of professional certainty as a sworn law enforcement officer who has been involved in training of law enforcement officers for nearly 20 years:

a. Both Officer Brown and Officer McComas conducted a proper felony vehicle stop and detention of the Plaintiff, which was based upon reasonable articulable suspicion that the Plaintiff was involved in the stabbing that had occurred nearby, in accordance with accepted practices for law enforcement officers.

b. Both officers conducted their detention of the Plaintiff, and their visual observation and search of the interior of the vehicle, in accordance with accepted practices for law enforcement officers.

c. Both officers ensured that their detention of the Plaintiff was brief, lasting a total of seven minutes, and at all times was designed to ascertain whether the Plaintiff was involved in the stabbing offense, whether there were additional individuals who might need law enforcement assistance were inside the Plaintiff's vehicle, and whether there was a knife that could have been utilized in the stabbing inside the Plaintiff's vehicle

5

or on the Plaintiff's person.  When the officers concluded that the Plaintiff was not

involved in criminal activity, he was released from custody.

Michael Hood

**STATE OF VIRGINIA**        :
                             :  **to wit**
**COUNTY OF FAIRFAX**        :

    Subscribed and sworn to before me, a Notary Public in and for the county and state aforesaid, this 25 day of January 2021.

Notary Public

My Commission expires on: 02/28/2021      .

6

**JA083**

# Background Event Chronology

Event Number:  E191580276

| Date | Time | Term | Operator | Action |
|------|------|------|----------|--------|
| 06/07/19 | 04:20:32 | tow2 | 329684 | EVENT CREATED: Location= 12219 LEESBURG PIKE HRND : @SHELL , Cross Streets= TOWNCENTER PLZ / LEESBURG PIKE , Name= EMPLOYEE- TIFFANY , Call Source= PHONE , Phone Number= 703-496-6026 , Complainant Contact= Y Agency= FIRE , Group= F1 , Beat= 439 , Status= P , Priority= 1 , ETA= 0 , Hold Type= 0 , Current= F , Open = T , Type Code= STABF - ASSAULT W/WEAPON - STABBING , Talkgroup 1= 4B Agency= POLICE , Group= P5 , Beat= 510 , Status= P , Priority= 1 , ETA= 0 , Hold Type= 0 , Current= F , Open = T , Type Code= STABP - ASSAULT W/WEAPON - STABBING (PD) , SubType Code= I - IN PROGRESS EVENT COMMENT= CLLR ADV MALE THAT WAS STABEBD BANGING ON THE DOORS |
| 06/07/19 | 04:20:33 | tow2 | 329684 | Agency= FIRE , Group= F1 , Beat= 439 , Status= P , Priority= 1 , ETA= 0 , Hold Type= 0 , Current= F , Open = T , Type Code= STABF - ASSAULT W/WEAPON - STABBING , Talkgroup 1= 4B |
| 06/07/19 | 04:20:36 | pd12 | 300558 | Agency= POLICE , Group= P5 , Beat= 510 , Status= A , Priority= 1 , ETA= 0 , Hold Type= 0 , Current= F , Open = T , Type Code= STABP - ASSAULT W/WEAPON - STABBING (PD) , SubType Code= I - IN PROGRESS |
| 06/07/19 | 04:20:45 | tow2 | 329684 | EVENT COMMENT= CLLR ADV HE IS BLEEDING ALOT |
| 06/07/19 | 04:21:02 | fd09 | 327088 | EVENT UPDATED: Location= 12219 LEESBURG PIKE HRND : @SHELL , Cross Streets= TOWNCENTER PLZ / LEESBURG PIKE , Name= EMPLOYEE- TIFFANY , Call Source= PHONE , Phone Number= 703-496-6026 , Complainant Contact= Y Agency= FIRE , Group= F1 , Beat= 439 , Status= P , Priority= 1 , ETA= 0 , Hold Type= 0 , Current= F , Open = T , Type Code= STABF - ASSAULT W/WEAPON - STABBING , Talkgroup 1= 4D Agency= FIRE , Group= F4 , Beat= 439 , Status= P , Priority= 1 , ETA= 0 , Hold Type= 0 , Current= F , Open = T , Type Code= STABF - ASSAULT W/WEAPON - STABBING , Talkgroup 1= 4D EVENT COMMENT= ** Event E191580276 transferred on update by 327088 on fd09 |
| 06/07/19 | 04:21:03 | fd09 | 327088 | Agency= FIRE , Group= F4 , Beat= 439 , Status= P , Priority= 1 , ETA= 0 , Hold Type= 0 , Current= F , Open = T , Type Code= STABF |

7/30/2020 10:32:12 AM                    Event_Chronology                          Page 1

EXHIBIT

| Date | Time | Term | Operator | Action |
|------|------|------|----------|--------|
| 06/07/19 | 04:21:10 | fd09 | 327088 | Agency= FIRE , Group= F4 , Beat= 439 , Status= A , Priority= 1 , ETA= 0 , Hold Type= 0 , |
| | | | |   Primary Unit= E439 , Primary Member= 50425 , Current= F , Open= T , Type Code= STABF - |
| | | | |   ASSAULT W/WEAPON - STABBING , Talkgroup 1= 4D |
| 06/07/19 | 04:21:11 | fd09 | 327088 | Unit= E439 , Status= DP , Location= 12219 LEESBURG PIKE HRND: @SHELL , Employee= 50425 , |
| | | | |   Employee= 50599 , Employee= 50633 , Employee= 51433 , Employee= 80050439 |
| 06/07/19 | 04:21:13 | fd09 | 327088 | Unit= M439 , Status= DP , Location= 12219 LEESBURG PIKE HRND: @SHELL , Employee= 50529 , |
| | | | |   Employee= 51239 , Employee= 80110439 |
| 06/07/19 | 04:21:15 | fd09 | 327088 | Unit= EMS402 , Status= DP , Location= 12219 LEESBURG PIKE HRND: @SHELL , Employee= 47960 , |
| | | | |   Employee= 80051402 |
| 06/07/19 | 04:21:17 | fd09 | 327088 | Unit= BC601 , Status= DP , Location= 12219 LEESBURG PIKE HRND: @SHELL |
| 06/07/19 | 04:21:19 | fd09 | 327088 | Unit= SAF402 , Status= DP , Location= 12219 LEESBURG PIKE HRND: @SHELL , Employee= 47741 , |
| | | | |   Employee= 80160402 |
| 06/07/19 | 04:21:22 | pd10 | 337759 | EVENT COMMENT= SIMU 4/ |
| 06/07/19 | 04:21:24 | pd10 | 337759 | EVENT COMMENT= 7 |
| 06/07/19 | 04:21:29 | fd09 | 327088 | EVENT COMMENT= FD CHANNEL 4D |
| 06/07/19 | 04:21:31 | pd09 | 337773 | EVENT COMMENT= ---NOTE--- S/CAST 2/6 |
| 06/07/19 | 04:21:32 | tow2 | 329684 | EVENT COMMENT= SUBJ HAS SHIRT OFF // LOOKS LIKE HE IS STABBED EVERYWHERE |
| 06/07/19 | 04:21:33 | ffxcomlvps03 | 9999990 | EVENT COMMENT= LOURMS Incident ID: LCFR-20190607-00019811 Units: BC601 |
| 06/07/19 | 04:21:34 | ffxcomlvps03 | 9999990 | Unit= BC601 , Status= AK , Location= 12219 LEESBURG PIKE HRND: @SHELL |
| 06/07/19 | 04:21:48 | pd01 | 305465 | EVENT COMMENT= HELO ALERTED // |
| 06/07/19 | 04:22:01 | fd04 | 308165 | EVENT COMMENT= LOUDOUN DIRECT |
| 06/07/19 | 04:22:09 | ffxcomlvps03 | 9999990 | Unit= BC601 , Status= DP , Location= 12219 LEESBURG PIKE HRND: @SHELL |
| 06/07/19 | 04:22:11 | tow2 | 329684 | EVENT COMMENT= CLLR TRYING TO ASK HIM WHO DID IT BUT HE IS SAYING IT DOESNT MATTER // CLLR IS |
| | | | |   NOT UNLOCKING THE DOOR |
| 06/07/19 | 04:22:16 | ffxcomlvps03 | 9999990 | EVENT COMMENT= LOURMS_LOCATION CHANGED TO: 12219 LEESBURG PIKE HRND @SHELL |
| | | | |   LOURMS_EVENT_TYPE: STABF |
| | | | |   LOURMS_FIREBOX: UNKNOWN |
| | | | |   LOURMS_RADIO CHANNEL: 4D |
| 06/07/19 | 04:22:16 | tow2 | 329684 | SUBJ CURSING AT CLLR |
| 06/07/19 | 04:22:21 | ffxcomlvps03 | 9999990 | Unit= O600 , Status= DP , Comment= USU_RECONCILIATION , Location= 12219 LEESBURG PIKE HRND: |
| | | | |   @SHELL |
| 06/07/19 | 04:22:34 | $M439 | 50529 | Unit= M439 , Status= ER , Location= 12219 LEESBURG PIKE HRND: @SHELL , Employee= 50529 , |
| | | | |   Employee= 51239 , Employee= 80110439 |
| 06/07/19 | 04:22:50 | $E439 | 50425 | Unit= E439 , Status= ER , Location= 12219 LEESBURG PIKE HRND: @SHELL , Employee= 50425 , |

| Date | Time | Term | Operator | Action |
|------|------|------|----------|--------|
| | | | | Employee= 50599 , Employee= 50633 , Employee= 51433 , Employee= 80050439 |
| 06/07/19 | 04:22:55 | tow2 | 329684 | EVENT COMMENT= SUBJ- APPROX 20 YO B/M 508 SOMETHING WRAPPED AROUND HIS ARM |
| 06/07/19 | 04:23:07 | $SAF402 | 47741 | Unit= SAF402 , Status= ER , Location= 12219 LEESBURG PIKE HRND: @SHELL , Employee= 47741 , Employee= 80160402 |
| 06/07/19 | 04:23:11 | op00 | 312392 | Unit= EMS402 , Status= ~ , Location= 12219 LEESBURG PIKE HRND: @SHELL , Employee= 47960 , Employee= 80051402 |
| 06/07/19 | 04:23:32 | tow2 | 329684 | EVENT COMMENT= CORRECTION_*VICTIM DESCRIPTION |
| 06/07/19 | 04:23:58 | fd04 | 308165 | EVENT COMMENT= LOUDOUN SHERIFFS OFFICE NOT WORKING ANYTHING IN THE AREA |
| 06/07/19 | 04:24:21 | op00 | 312392 | Unit= O600 , Status= ~ , Location= 12219 LEESBURG PIKE HRND: @SHELL |
| 06/07/19 | 04:24:25 | $EMS402 | 47960 | Unit= EMS402 , Status= ER , Location= 12219 LEESBURG PIKE HRND: @SHELL , Employee= 47960 , Employee= 80051402 |
| 06/07/19 | 04:24:48 | tow2 | 329684 | EVENT COMMENT= CLLR DOESNT SEE ANYONE AROUND HIM BUT LOOKED LIKE VICTIM CAME FROM ACROSS THE STREET |
| 06/07/19 | 04:24:57 | tow2 | 329684 | EVENT COMMENT= PD ONS / DISCONNECTED |
| 06/07/19 | 04:25:18 | ffxcomlvps03 | 9999990 | Unit= BC601 , Status= ER , Location= 12219 LEESBURG PIKE HRND: @SHELL |
| 06/07/19 | 04:26:16 | fd04 | 308165 | EVENT COMMENT= FD STAGING GEORGTOWN PIKE / RT7 |
| 06/07/19 | 04:26:25 | pd12 | 300558 | EVENT COMMENT= VIC NOT BEING COOPERATIVE NOT WILLING TO SAY WHAT HAPPENED |
| 06/07/19 | 04:26:35 | pd12 | 300558 | EVENT COMMENT= SCENE COLD |
| 06/07/19 | 04:26:45 | fd04 | 308165 | Unit= O600 , Status= CU , Comment= Alarm Timer Extended: 2 , Location= 12219 LEESBURG PIKE HRND: @SHELL |
| 06/07/19 | 04:28:21 | fd04 | 308165 | Unit= O600 , Status= ~ , Location= 12219 LEESBURG PIKE HRND: @SHELL |
| 06/07/19 | 04:28:54 | pd12 | 300558 | EVENT COMMENT= 050A |
| 06/07/19 | 04:28:56 | pd12 | 300558 | EVENT COMMENT= DIR |
| 06/07/19 | 04:29:14 | $E439 | 50425 | Unit= E439 , Status= OS , Location= 12219 LEESBURG PIKE HRND: @SHELL , Employee= 50425 , Employee= 50599 , Employee= 50633 , Employee= 51433 , Employee= 80050439 |
| 06/07/19 | 04:30:03 | $E439 | 0 | Unit= E439 , Status= WP , Comment= With Patient , Location= 12219 LEESBURG PIKE HRND: @SHELL , Employee= 50425 , Employee= 50599 , Employee= 50633 , Employee= 51433 , Employee= 80050439 |
| 06/07/19 | 04:30:12 | fd04 | 308165 | Unit= M439 , Status= OS , Location= 12219 LEESBURG PIKE HRND: @SHELL , Employee= 50529 , Employee= 51239 , Employee= 80110439 |
| 06/07/19 | 04:30:17 | fd04 | 308165 | Unit= O600 , Status= AQ |
| 06/07/19 | 04:30:31 | pd12 | 300558 | EVENT COMMENT= 1021 DRANESVILLE WITH VEH AT GATE WITH DOOR OPEN |
| 06/07/19 | 04:31:38 | $EMS402 | 47960 | Unit= EMS402 , Status= OS , Location= 12219 LEESBURG PIKE HRND: @SHELL , Employee= 47960 , |

| Date | Time | Term | Operator | Action |
|------|------|------|----------|--------|
| | | | | Employee= 80051402 |
| 06/07/19 | 04:33:03 | fd04 | 308165 | EVENT COMMENT= BC601 ONSCENE |
| 06/07/19 | 04:33:21 | ffxcomlvps03 | 9999990 | Unit= BC601 , Status= OS , Location= 12219 LEESBURG PIKE HRND: @SHELL |
| 06/07/19 | 04:33:41 | $SAF402 | 47741 | Unit= SAF402 , Status= AR , Employee= 47741 , Employee= 80160402 |
| 06/07/19 | 04:33:51 | fd04 | 308165 | EVENT COMMENT= HODLING E/M439, ALL OTHERS PLACED IN SERCE |
| 06/07/19 | 04:34:07 | fd04 | 308165 | EVENT COMMENT= **SERVICE ** BC601 DIRECT, IN SERVICE |
| 06/07/19 | 04:34:09 | pd12 | 300558 | EVENT COMMENT= 950A WITH ONE AT 1021 DRANESVILLE HAVE THEM DETAINED |
| 06/07/19 | 04:38:35 | pd12 | 300558 | EVENT COMMENT= DO02 DIR ON SUBJ NOT BEING COOPERATIVE |
| 06/07/19 | 04:39:37 | pd12 | 300558 | EVENT COMMENT= MIGHT HAVE OCC AT PLANET FITNESS BLOOD AT LOC |
| 06/07/19 | 04:41:04 | pd12 | 300558 | EVENT COMMENT= IFO THE GIANT ON LODN SIDE WHERE THERE A LOT OF BLOOD IS |
| 06/07/19 | 04:41:49 | sd01 | 303847 | EVENT COMMENT= LOUDOUN SENDING DEPUTY |
| 06/07/19 | 04:42:24 | $E439 | 50425 | Unit= E439 , Status= TR , Location= 11901 BARON CAMERON AVE RSTN: @ACCESS OF RESTON , Employee= 50425 , Employee= 50599 , Employee= 50633 , Employee= 51433 , Employee= 80050439 |
| 06/07/19 | 04:42:33 | $E439 | 50425 | Unit= E439 , Status= TR , Location= 1850 TOWN CENTER PKWY RSTN: @RESTON HOSPITAL , Employee= 50425 , Employee= 50599 , Employee= 50633 , Employee= 51433 , Employee= 80050439 |
| 06/07/19 | 04:43:09 | $EMS402 | 47960 | Unit= EMS402 , Status= AR , Employee= 47960 , Employee= 80051402 |
| 06/07/19 | 04:43:43 | ffxcomlvps03 | 9999990 | Unit= BC601 , Status= AQ |
| 06/07/19 | 04:45:05 | fd04 | 308165 | EVENT COMMENT= CHANNEL 4D CLEAR |
| 06/07/19 | 04:46:37 | fd06 | 336266 | Unit= M439 , Status= TR , Location= RESTON HOSP , Employee= 50529 , Employee= 51239 , Employee= 80110439 |
| 06/07/19 | 04:46:41 | pd12 | 300558 | EVENT COMMENT= 501A ENR TO HOSP |
| 06/07/19 | 04:47:07 | pd12 | 300558 | EVENT COMMENT= 510A AT THE SHELL STA |
| 06/07/19 | 04:47:25 | fd04 | 308165 | EVENT UPDATED: Location= 12219 LEESBURG PIKE HRND : @SHELL , Cross Streets= TOWNCENTER PLZ / LEESBURG PIKE , Name= EMPLOYEE- TIFFANY , Call Source= PHONE , Phone Number= 703-496-6026 , Complainant Contact= Y    Agency= FIRE , Group= F4 , Beat= 439 , Status= A , Priority= 1 , ETA= 0 , Hold Type= 0 ,    Primary Unit= E439 , Primary Member= 50425 , Current= F , Open = T , Type Code= STABF -    ASSAULT W/WEAPON - STABBING , Talkgroup 1= 4B    Agency= FIRE , Group= F1 , Beat= 439 , Status= A , Priority= 1 , ETA= 0 , Hold Type= 0 ,    Primary Unit= E439 , Primary Member= 50425 , Current= F , Open = T , Type Code= STABF -    ASSAULT W/WEAPON - STABBING , Talkgroup 1= 4B    Agency= FIRE , Group= F1 , Beat= 439 , Status= A , Priority= 1 , ETA= 0 , Hold Type= 0 , |

| Date | Time | Term | Operator | Action |
|------|------|------|----------|--------|
| | | | | Primary Unit= E439 , Primary Member= 50425 , Current= F , Open = T , Type Code= STABF - |
| | | | | ASSAULT W/WEAPON - STABBING , Talkgroup 1= 4B |
| | | | | Unit= M439 , Status= UT , Location= RESTON HOSP , Employee= 50529 , Employee= 51239 , |
| | | | | Employee= 80110439 |
| | | | | Unit= E439 , Status= UT , Location= 1850 TOWN CENTER PKWY RSTN: @RESTON HOSP , Employee= |
| | | | | 50425 , Employee= 50599 , Employee= 50633 , Employee= 51433 , Employee= 80050439 |
| | | | | EVENT COMMENT= ** Event E191580276 transferred on update by 308165 on fd04 |
| 06/07/19 | 04:49:29 | pd12 | 300558 | EVENT COMMENT= [APPEND MESSAGE] FROM: pd12 (300558) – Original message |
| | | | | from terminal pd12 - 06/07/19 04:48:56 - LANDERS, HILARY (300558): CH 5 CLR |
| 06/07/19 | 04:50:03 | $E439 | 50425 | Unit= E439 , Status= TA , Location= 1850 TOWN CENTER PKWY RSTN: @RESTON HOSPITAL , Employee= |
| | | | | 50425 , Employee= 50599 , Employee= 50633 , Employee= 51433 , Employee= 80050439 |
| 06/07/19 | 04:52:34 | pd12 | 300558 | EVENT COMMENT= LODN ONS |
| 06/07/19 | 04:53:39 | fd04 | 308165 | Unit= M439 , Status= TA , Location= RESTON HOSP , Employee= 50529 , Employee= 51239 , |
| | | | | Employee= 80110439 |
| 06/07/19 | 04:56:19 | $501A | 344712 | EVENT COMMENT= VICTIM IN ER ROOM 5 |
| 06/07/19 | 05:00:09 | $501A | 344712 | SUPP INFO CREATED: PERSO: Name= DAWSON,TYQUAN , Race= B , Sex= M , Height= 0 , Weight= 0 , |
| | | | | Age= 0 , DOB= ▓▓▓▓▓ ,OLN= ▓▓▓▓▓▓▓▓ |
| 06/07/19 | 05:02:11 | $E439 | 50425 | Unit= E439 , Status= AR , Employee= 50425 , Employee= 50599 , Employee= 50633 , Employee= |
| | | | | 51433 , Employee= 80050439 |
| 06/07/19 | 05:09:30 | $501A | 344712 | Agency= POLICE , Group= P5 , Beat= 510 , Status= A , Priority= 1 , ETA= 0 , Hold Type= 0 , |
| | | | | Primary Unit= 501A , Primary Member= 344712 , Current= F , Open = T , Type Code= STABP - |
| | | | | ASSAULT W/WEAPON - STABBING (PD) , SubType Code= I - IN PROGRESS |
| 06/07/19 | 05:17:45 | $501A | 344712 | EVENT COMMENT= VICTIM IS TYQUAN DAWSON, DOB ▓▓▓▓▓ VA OLN ▓▓▓▓▓ |
| 06/07/19 | 05:38:50 | $501A | 344712 | EVENT UPDATED: Location= 12219 LEESBURG PIKE HRND : @SHELL , Cross Streets= TOWN CENTER PLZ / |
| | | | | LEESBURG PIKE , Name= EMPLOYEE- TIFFANY , Call Source= PHONE , Phone Number= 703-496-6026 , |
| | | | | Complaintant Contact= Y |
| | | | | Agency= POLICE , Group= P5 , Beat= 510 , Status= A , Priority= 3 , ETA= 0 , Hold Type= 0 , |
| | | | | Primary Unit= 501A , Primary Member= 344712 , Current= F , Open = T , Type Code= PSERVP - |
| | | | | PUBLIC SERVICE (PD) , SubType Code= I - IN PROGRESS |
| 06/07/19 | 05:41:03 | fd10 | 302875 | Agency= FIRE , Group= F1 , Beat= 439 , Status= A , Priority= 1 , ETA= 0 , Hold Type= 0 , |

| Date | Time | Term | Operator | Action |
|------|------|------|----------|--------|
| | | | | Primary Unit= E439 , Primary Member= 50425 , Current= T , Open = F , Type Code= STABF - ASSAULT W/WEAPON - STABBING , Talkgroup 1= 4B EVENT CLOSED: Unit= M439 , Status= AR , Employee= 50529 , Employee= 51239 , Employee= 80110439 |
| 06/07/19 | 06:46:19 | $501A | 344712 | Agency= POLICE , Group= P5 , Beat= 510 , Status= A , Priority= 3 , ETA= 0 , Hold Type= 0 , Primary Unit= 501A , Primary Member= 344712 , Current= T , Open = F , Type Code= PSERV P - PUBLIC SERVICE (PD) , SubType Code= I - IN PROGRESS EVENT CLOSED: |

JA089

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **ANTHRY RAUL MILLA,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No. 1:20cv694 (AJT/MSN)** |
| | : | |
| **PFC D. BROWN, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

<u>**NOTICE OF HEARING DATE**</u>

PLEASE TAKE NOTICE that on Wednesday, March 3, 2021, at 10:00 a.m., Defendants

PFC D. Brown and PFC McComas (Defendants), by counsel, will move this Court for summary

judgment pursuant to Fed. R. Civ. P. 56(b).

Respectfully submitted,

PFC D. BROWN
PFC MCCOMAS
By Counsel

ELIZABETH D. TEARE
COUNTY ATTORNEY

By _____/s/_____
      Kimberly P. Baucom, Senior Assistant County Attorney
      Virginia Bar Number 44419
      Counsel for Defendants
      Office of the County Attorney
      12000 Government Center Parkway, Suite 549
      Fairfax, VA  22035-0064
      Phone: 703-324-2421
      Fax: 703-324-2665
      kimberly.baucom@fairfaxcounty.gov

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 3rd day of February, 2021, the foregoing was sent overnight via Federal Express to the following:

Anthry Milla
1021 Dranesville Road
Herndon, Virginia 20170
Plaintiff

_____/s/_____
Kimberly P. Baucom

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

**ANTHRY RAUL MILLA,**

> **Plaintiff,**

v.                                                    **Civil Action No. 1:20cv694**

**PFC. D. BROWN, et al.,**

> **Defendants.**

### PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY

### JUDGMENT

Plaintiff requests that the court deny defendants' motion for summary judgment and grant summary judgment in favor of plaintiff.

### LIST OF FACTS NOT IN DISPUTE

1.      Fairfax County police responded to a "stabbing" call at a gas station two-tenths of a mile from Milla's house. The stabbing "victim" refused to cooperate with police. The police saw blood on an individual and a slash wound but were unable to determine if the wound was self-inflicted, the result of some kind of accident, or the result of a stabbing. The victim provided no description or identification of a suspect, suspect vehicle, or possible suspect location. The victim did not tell police how many suspects there were. There may have been more than one suspect or no suspects at all. There were no witnesses. The police didn't know whether a crime had occurred or not and didn't know which direction from the scene to start looking.

JA092

2.      With nothing but an adrenaline rush, an impulsive affinity for FLIR technology, and a blind determination to exercise a show of force, a police helicopter unit engaged its FLIR camera to target "*any* nearby" "people or vehicles."

3.      The helicopter unit's FLIR camera detected multiple "hot" vehicles driving through the gas station intersection, any number of which could have been the "suspect" or "suspects." The police did not investigate, detain, or attempt to make contact with any of those vehicles.

4.      The helicopter unit observed Milla sitting in the driver's seat of his vehicle in the vertical upright position with Milla's back flush against the back of the seat and his legs facing forward, perpendicular to the driver's seat. The driver's seat was positioned upward. Defendants refer to this normal sitting position as "slouching," or "crouched down."

5.      Defendant Brown pulled into Milla's driveway with no emergency lights or sirens activated and without identifying himself as a police officer. Defendant McComas parked on the main road, out of Milla's view.

6.      Milla observed headlights pulling into his driveway. Blinded by the headlights, and because Brown didn't make contact with him, Milla believed Brown to be one of several people who either lived at or frequented the residence. Milla closed his car door to allow the vehicle to pass by and through the gate to park.

7.      After Milla closed his car door, Brown detained Milla by yelling various commands at Milla. It was at this point that Milla realized the defendants were police officers and immediately began cooperating.

8.      The defendants frisked Milla and his vehicle for weapons. The defendants didn't find any weapons or evidence of a stabbing. At this point the defendants' suspicions were dispelled.

9.      The defendants continued to detain Milla in an attempt to identify him. Milla invoked his right to refuse to identify himself. The defendants ultimately identified Milla through a third party, released Milla, and left the residence.

## LEGAL ARGUMENT

### Reasonable Suspicion to Detain Milla?

The defendants assert that they had reasonable suspicion to detain Milla based on the following facts:

- The police were called to a "stabbing" and encountered an uncooperative bleeding individual at a gas station.
- Milla was two-tenths of a mile from the scene.
- Milla was "out" at 4:00 a.m. while not very many other people were out.
- Milla's car was parked in a driveway in front of a gate to a residence.
- Milla's vehicle and body emanated heat.
- Milla was sitting in his car for at least three minutes.
- Milla's tail lights were on.
- Milla's car door was open.
- Milla was "crouched down" in the passenger compartment of his car.

- When Brown pulled his vehicle into Milla's driveway, Milla closed his car door.

It must be emphasized that the defendants didn't receive any information that 1021 Dranesville wasn't Milla's address, that Milla wasn't authorized to park on the property, or that Milla was trespassing. However, the defendants could have known 1021 Dranesville *was* Milla's address if they were predetermined to conduct an investigation by running Milla's license plates first instead of predetermined to exercise a show of force at all costs.

It must be emphasized that the defendants assert Milla was "crouched down" in the passenger compartment of his car *before* the defendants arrived and not *because* the defendants arrived. What the defendants characterize as "crouched down" is actually the normal sitting position. The helicopter FLIR camera footage proves that Milla was not crouched down at any point but sitting normally in the driver's seat throughout the entirety of the incident. The helicopter unit, in an attempt to artificially create suspicion, radioed out that Milla was "slouching" in the driver's seat.

(The helicopter unit targeted Milla presumably because Milla was already parked and trapped in a private driveway, providing the police with an easy opportunity to exercise a show of force through a consensual encounter. The police knew they wouldn't need reasonable suspicion to accost Milla like they would need if they wanted to stop and detain the other "hot" vehicles on the road.

The police didn't investigate any other drivers either before or after Milla's detention, proof that the police wanted to quickly exercise a show of force and not solve

a crime. In fact, there were other drivers closer to the scene than Milla, making them more suspicious than Milla, but none of those drivers were investigated).

The defendants cite four cases to support their argument that the factors in this case "are precisely the types of factors that have been found by the court to justify a brief detention so that the officers could confirm or dispel their suspicion."

The first case cited is *United States v. Ruffin* (4th Cir. 2020) (suspect moving in an evasive manner supports reasonable suspicion). *Ruffin* is an unpublished opinion. In *Ruffin*, a police tracking dog searching for a theft suspect late at night led police to Ruffin who was found bent over next to almost a kilo of cocaine. Ruffin exhibited visible nervousness, began edging away from the cocaine and the officers, and made a false statement to the officers. The officers didn't witness anybody else outside that night except Ruffin.

Milla exhibited *none* of the evasive behavior addressed by the court in *Ruffin*. To the extent that Milla was being evasive by closing his car door, Milla closed his car door out of courtesy to the persons frequenting the residence who wouldn't have had enough clearance to pass by Milla's vehicle and through the gate if Milla's car door remained open. However, at this point, Milla now wishes he knew the defendants were police officers and wished he would have closed his car door in their faces for that reason *alone*. So let's assume that when Milla closed his car door it wasn't out of any courtesy to house guests but out of a desire to avoid interacting with the police.

Starting with the defendants' own case law, *United States v. Smith* (4th Cir. 2005), "individuals have a right to avoid encounters with the police." "The authority of police officers to initiate [consensual encounters] is the same as, but no greater than,

the authority of an ordinary citizen to approach another on the street." *United States v. Burton*, 228 F.3d 524 (4th Cir. 2000). "By the same token, the citizen encountered in this manner has the 'right to ignore his interrogator and walk away.' Terry v. Ohio, 392 U.S. 1, 33 (1968) (Harlan, J., concurring); see also id. at 34 (White, J., concurring) ('There is nothing in the constitution which prevents a policeman from addressing questions to anyone on the streets. Absent special circumstances, the person . . . may refuse to cooperate and go on his way'); United States v. Sullivan, 138 F.3d." *Burton.*

In *Burton*, police approached Burton who was standing at a payphone with his hands in his pockets and began questioning him. Burton ignored the police and refused to take his hands out of his pockets when the officers asked him to. The police grabbed and searched Burton, found a gun, and arrested him for illegal firearm possession. The 4th Circuit concluded that the police didn't have reasonable suspicion to detain Burton and vacated his conviction.

"In the language of the Supreme Court, Burton had a 'right to go about his business or to stay put and remain silent in the face of police questioning,' Illinois v. Wardlow, 120 S.Ct. 673, 676 (2000), and an individual's 'refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for detention or seizure,' Florida v. Bostick, 501 U.S. 429, 437 (1991); see also United States v. Flowers, 912 F.2d 707, 712 (4th Cir. 1990) (noting that a defendant has 'the right to refuse to speak with . . . officers, who in turn possess no right to detain citizens who decline to talk or otherwise identify themselves')." *Burton.*

"There was no reason to believe 'that Mr. Burton was involved in any kind of disturbance or any type of illegal activity.' Burton was 'just standing at a telephone

booth,' and the officers were 'just out looking for people.' " *Burton*. (Milla was just parked in his driveway and defendants were just out looking for people).

"In the absence of reasonable suspicion, the officer's alternative was 'to avoid a person he considers dangerous.' Terry, 392 U.S. at 32." *Burton*.

In *United States v. Sprinkle*, 106 F.3d 613 (4th Cir. 1997), police observed Sprinkle and Poindexter inside of a vehicle in a high crime area with their hands huddled together near the center console. Sprinkle was the passenger and Poindexter was the driver. When police approached the car, Poindexter shielded his face with his hands to hide his identity and pulled off as the officers walked by the car. The police got in their cars and followed Poindexter and Sprinkle. The road Poindexter and Sprinkle were driving on became blocked, stopping traffic. The police activated their lights and detained the two for their "suspicious" behavior earlier.

"But for these factors to support reasonable suspicion, there must be (other) particularized evidence that indicates criminal activity is afoot. Thus, the government points to the huddling in the center of the car, the faceshielding move, and the driving away. We have already pointed out some of the shortcomings of these factors." *Sprinkle*.

"Poindexter did try to hide his face. We agree that this appears suspicious. Nevertheless, without some stronger indication of criminal activity, this act cannot tip this case to reasonable suspicion. Nor does the final factor, driving away in a normal, unhurried fashion, lend itself to a finding of reasonable suspicion here." *Sprinkle*.

"Our conclusion is that the five factors cited by the government gain little, if any, strength when put together. Together, they did not give the officers the necessary reasonable, articulable suspicion of criminal activity." *Sprinkle*.

In *United States v. Massenburg*, 654 F.3d 480 (4th Cir. 2011), police responded to a gunshots call in a high crime area. They found Massenburg and three others four blocks from the gunfire. Massenburg stood away from the other three who were shoulder-to-shoulder, refused to consent to a frisk, patted himself down, and avoided making eye contact with the police.

"It cannot be doubted that 'a refusal to cooperate [with a police request], without more, does not furnish the minimal level of objective justification needed for a detention or seizure.' " Florida v. Bostick, 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); see also Mayo, 361 F.3d at 806 ('A suspect's refusal to cooperate with police, without more, does not satisfy Terry stop requirements.')." *Massenburg*.

"Law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street." *United States v. Royer*, 460 U.S. 491 (1983).

"The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. Terry v. Ohio, 392 U. S., at 32-33 (Harlan, J., concurring); id., at 34 (WHITE, J., concurring). He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. United States v. Mendenhall, supra, at 556 (opinion of Stewart, J.)." *Royer*.

"Officers cannot use...departure as the single additional event that ripens their preexisting concerns to the 'founded suspicion' that a *Terry* stop requires. Were the law

otherwise, [it] would present the subject...with a Hobbesian choice. To stay could lead to inculpation; to depart surely would." *United States v. Sterling* 909 F2d 1078 (1990).

If defendants think Milla closing a car door on them during a consensual encounter is reasonably suspicious, Milla did the defendants a courtesy by not completely ignoring the defendants or telling them to leave his property, getting out of his car, securing it, and walking into his house. Defendants should be thanking Milla for *only* closing his car door on them, remaining, and giving them a fair chance to conduct a legal and consensual investigation.

As the case law clearly establishes, non-cooperation is not evasive. Non-cooperation can be expressed silently, verbally, (in Milla's case) by motion, or by any combination of the above.

The second case the defendants cite is *United States v. Foster* (4th Cir. 2016) (finding articulable suspicion when the individual detained was the only person that police encountered near the scene of a crime). In *Foster*, police received a gunshot call in a high crime area. When police arrived, Foster was the only person in the area, did not respond to officers' questions, avoided eye contact, and reached for his pocket after being asked if he was carrying weapons. The *Foster* court gave no weight to any of the factors in that case except Foster reaching for his pocket.

Milla exhibited *none* of the behavior in *Foster* because Milla wasn't the only one in the area when the police arrived. However, assuming Milla was the only one in the area, the *Foster* court, alluding to *Massenburg*, "concluded the government would need to point to further circumstances to meet the reasonable suspicion threshold." Even when being the only one in the area of a crime is considered together with the other

factors in *Foster*, except for Foster reaching for his pocket, the *Foster* court concluded there still wouldn't be reasonable suspicion.

The third case cited is *United States v. Smith* (4th Cir. 2005) (holding that a suspect's presence in a driveway, "more than 200 feet from the public road but still some distance from the residence" led to the reasonable conclusion that the suspect was hiding in the driveway). In *Smith*, police set up a highway checkpoint. When Smith saw the checkpoint he slammed on his brakes, turned into a private driveway, and attempted to evade the checkpoint. Reasonable suspicion didn't derive from Smith being *in* the driveway "200 feet from the public road but still some distance from the residence," but from Smith *fleeing to* the driveway 200 feet from public view but still some distance from the residence.

The fourth case cited is *United States v. Lender* (4th Cir. 1993) (the "lateness of the hour" is a factor that can contribute to articulable suspicion). In *Lender*, police were patrolling a drug-trafficking area and witnessed Lender with his hand out to a group of people looking down at it. The officers approached Lender. Lender turned his back, walked away, began reaching for his waist, and dropped a gun.

Milla exhibited *none* of the behavior in *Lender* except for being out late. It must be emphasized that reasonable suspicion developed at the point Lender reached for his waist, as discussed by the *Lender* court, not because Lender had his hand out and was out late and in a drug-trafficking area and walking away from the police.

The factors in Milla can certainly be considered in a much broader totality-of-the-circumstances analysis, but the Milla factors, together, alone, do not collectively amount to reasonable suspicion without something more. As a matter of

fact, one of the Milla factors, that Milla's tail lights were illuminated, actually demonstrates that Milla's vehicle illumination equipment was in working, operable condition, evidence that Milla was in compliance with the law's safety standards and a law-abiding citizen.

Because the defendants didn't have reasonable suspicion to detain Milla, they didn't have reasonable suspicion to frisk him, search his car, or attempt to forcibly identify him.

### Length of the Detention

Assuming the defendants had reasonable suspicion to detain Milla, Milla concedes that the defendants employed the least intrusive means to quickly verify or dispel their suspicion that Milla was a stabbing suspect.

After dispelling their suspicions, the defendants continued to detain Milla in an effort to identify him. Assuming the defendants had reasonable suspicion, Milla concedes that the defendants were allowed to try to identify him. However, Milla invoked his right to refuse to identify himself and at that point the defendants should have released Milla.

### Frisk of Milla's Person

Assuming the defendants had reasonable suspicion to detain Milla as a stabbing suspect, Milla concedes that the defendants were allowed to frisk him for weapons and that the defendants conducted the frisk within the scope of that authority. The frisk of Milla's person was illegal *solely* because the detention was illegal.

### Frisk of Milla's Car

Assuming the defendants had reasonable suspicion to detain Milla as a stabbing suspect, Milla concedes the defendants were allowed to frisk his car for weapons and that the defendants conducted the frisk within the scope of that authority. The frisk of Milla's car was illegal *solely* because the detention was illegal.

### Qualified Immunity

Milla's right to refuse to cooperate with police, walk away, or close his car door during a consensual encounter is clearly established.

Shutting a "door in the face of the officer" is something citizens engaged in a consensual encounter with police have "every right to do." *United States v. Cephas*, 254 F.3d 488 (4th Cir. 2001).

Submitted by Anthry Raul Milla, *Pro Se*

Andre Milla

02/16/2021

Signature                                    Date

**JA103**

## CERTIFICATE OF SERVICE

A copy of this pleading was emailed to defense counsel at

kimberly.baucom@fairfaxcounty.gov on February 7, 2021.

_____                    _____
Signature                                  Date

## GHOSTWRITING CERTIFICATE

I did not receive help from an attorney preparing these documents.

_____                    _____
Signature                                  Date

**JA104**

# Anthry Raul Milla

1021 Dranesville Road, Herndon, VA 20170
Phone: (571) 455-9248
Email: andremilla7@gmail.com



February 16, 2021

Clerk of Court
United States District Court
Eastern District of Virginia
Alexandria Division
401 Courthouse Square
Alexandria, VA 22314

*Re:* Civil Action No. 1:20cv694

Dear Clerk,

Please find enclosed one copy of plaintiff's Opposition to Defendant's Motion for Summary Judgment. I referenced this document in previously mailed correspondence to the clerk but I forgot to include the document in the contents of the envelope. Thank you for immediately reaching out to me concerning the matter.

Appreciatively,

Anthry Raul Milla                    02/16/2021
Anthry Raul Milla                    Date

**JA105**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **ANTHRY RAUL MILLA,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No. 1:20cv694 (AJT/MSN)** |
| | : | |
| **PFC D. BROWN, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

**DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION**
**TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants PFC D. Brown (Officer Brown) and PFC McComas (Officer McComas), by

counsel, state the following in reply to Plaintiff Anthry Milla's (Milla), Opposition to Defendants

Motion for Summary Judgment (Opposition):

In his Opposition, Milla asks the court to deny the Defendants' Motion for Summary

Judgment.  A review of his Opposition, however, reveals that he has failed to properly support

this request by citing to admissible evidence that would establish the existence of a genuine

dispute as to any of the Defendants' material facts.  For the reasons set forth herein, and in their

Motion for Summary Judgment, Officers Brown and McComas are entitled to summary

judgment, and to a dismissal of the Complaint.

**I.      MILLA DOES NOT DISPUTE THE DEFENDANTS' MATERIAL FACTS,**
**WHICH THEREFORE ARE DEEMED ADMITTED FOR PURPOSES OF**
**SUMMARY JUDGMENT.**

Local Rule 56 provides that "[a] brief in response to [a motion for summary judgment]

shall include a specifically captioned section listing all material facts as to which it is contended

that there exists a genuine issue necessary to be litigated and citing the parts of the record relied

on to support the facts alleged to be in dispute."  The Rule further provides that "[i]n determining

**JA106**

a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." *Id.* In his Opposition, Milla does not contend that any of the Defendants' Material Facts are genuinely in dispute, nor does he contradict any of the Defendants' material facts in his Opposition with citations to the record developed in this case. As such, the Defendants' Material Facts are deemed to be uncontroverted for purposes of establishing the Defendants' entitlement to summary judgment.

## II.   MILLA'S OPPOSITION FAILS TO PROPERLY ESTABLISH A GENUINE DISPUTE OF MATERIAL FACT SUFFICIENT TO DEFEAT SUMMARY JUDGMENT.

Fed. R. Civ. P. 56(c) requires that a party who asserts in opposition to summary judgment that a fact is genuinely disputed must support that assertion by "citing to particular parts of materials in the record" to establish the genuine dispute. Furthermore, the Rules require that "for evidence to be properly considered in a summary judgment motion, it must be admissible at trial." *State of W.Va. ex rel. McGraw on behalf of Bd. of Educ. of Cty. of Greenbrier v. Meadow Gold Dairies, Inc.*, 875 F. Supp. 340, 343 (W.D. Va. 1994). "Inadmissible evidence fails to establish a genuine issue of material fact." *Id.* Similarly, "[u]nsupported arguments . . . in pleadings cannot preclude entry of summary judgment because they 'fail to meet the evidentiary standard necessary to create a genuine issue of material fact.'" *Parkerson v. Fed. Home Life Ins. Co.*, 797 F. Supp. 1308, 1318 (E.D. Va. 1992), quoting *Rountree v. Fairfax Cty. Sch. Bd.*, 933 F.2d 219, 223 (4th Cir. 1991). *See also Hecht v. Am. Bankers Ins. Co.*, No. Civ 304CV00098, 2005 WL 2716373, *3 (W.D. Va. Oct. 21, 2005) ("The Fourth Circuit, however, has generally ruled that a statement in an opposing party's brief does not create an issue of material fact sufficient to defeat summary judgment."); citing *N. Ins. Co. of New York v.*

2

*Baltimore Bus. Commc'ns, Inc.*, 68 F. App'x 414, 421 (4th Cir. 2003).

To properly defeat summary judgment, an asserted fact "must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict." *Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995). "[T]he mere existence of disputed facts does not require that a case go to trial. The disputed facts must be material to an issue necessary for the proper resolution of the case." *Id.* "A fact is material when proof of its existence or nonexistence would affect the outcome of the case, and an issue is genuine if a reasonable jury might return a verdict in favor of the nonmoving party on the basis of such issue." *Nw. Mut. Life Ins. Co. v. Atl. Research Corp.*, 847 F. Supp. 389, 394 (E.D. Va. 1994), *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Milla's Opposition contains nine numbered paragraphs of alleged material facts that are largely consistent with the Defendants' material facts. To the extent that Milla alleges the existence of additional facts that would seem to create a dispute of fact herein, a review of those alleged facts clarifies that they are insufficient as a matter of law to require the denial of the Defendants' Motion for Summary Judgment. For example, in paragraph three of Milla's Opposition, he alleges that "[t]he police did not investigate, detain, or attempt to make contact" with any of the vehicles driving through the gas station intersection. (Opp., p. 2.) Not only does Milla not substantiate this allegation with a citation to the record in this case, the allegation is not a material fact in this litigation. Whether officers detained any individuals in addition to Milla does nothing to add or detract from the central issue in this case; whether Officers Brown and McComas had reasonable, articulable suspicion to detain Milla. As such, it is insufficient to create a genuine issue of material fact.

Similarly, Milla's allegations regarding his physical movements while sitting in his vehicle and shutting his driver's side door upon the officers' arrival do not create a triable issue of fact. Milla alleges in paragraph four of his Opposition that the helicopter unit observed him sitting in his vehicle in an "upright position with [his] back flush against the back of the seat and his legs facing forward." (Opp., p. 2.) Milla further contends in paragraph six that he had a legitimate purpose for closing his driver's side door; that he thought Officer Brown's vehicle was a visitor to the home and he shut his door so that the vehicle could proceed through the driveway gate and park. (Opp., p. 2.) With regard to Milla's assertion that he was not crouched down in the vehicle, as Officer Brown observed, a review of both the helicopter video (Doc. 23-1, SJ Ex. 8) and Officer Brown's In-Car Video (ICV) (Doc. 23-8, SJ Ex. 8) reveals that Officer Brown's conclusion that Milla was crouched inside the passenger compartment is supported by the record, which establishes that this is precisely what occurred as Officer Brown arrived on scene.

The helicopter video did capture Milla sitting in his vehicle prior to the officers' arrival, however, at the 3:43 timestamp on the helicopter video (Doc. 23-1, SJ Ex. 8), the camera moved to the right of Milla's vehicle such that the view of the interior of the vehicle was obstructed. The view of the helicopter camera was thereafter obstructed until the 4:07 timestamp, at which time the driver's side door was already closed. Therefore, the helicopter video did not capture Milla's physical movements as Officers Brown and McComas arrived in the driveway, and it does not support Milla's claim that he was not crouched down in the passenger compartment.

Officer Brown's ICV video (Doc. 23-8, SJ Ex. 8), on the other hand, clearly shows the position of Milla's body within the interior of the vehicle upon the officers' arrival, as the interior of the vehicle appears black on the ICV, and Milla's upper body appears white due to the white shirt that he was wearing. At the 5:14 timestamp of the video, Officer Brown pulls into the

4

driveway and Milla's vehicle is visible.  The driver's door is open, and the portion of the

passenger compartment that is visible through the left side rear window of the vehicle appears

black.  At the 5:21 timestamp, Milla sits up in the seat and leans over to close his driver's side

door.  His white shirt is now visible through the left side rear window.  At the 5:23 timestamp,

Milla pulls the door shut and immediately disappears from view through the left side rear

window, which again appears black as Milla moves back down into the passenger compartment.

Milla remains crouched down in the passenger compartment for 10 seconds, and at the 5:33

timestamp he reappears in the window as Officer Brown shines his spotlight on Milla's vehicle.

At 5:37, Officer Brown's voice is heard over his police radio stating "there is somebody in the

car, he was hiding down."  Milla's contention that the helicopter video establishes that he was

not crouched down in the passenger compartment of the vehicle is directly refuted by Officer

Brown's ICV recording, and it therefore cannot create a dispute of material fact. *Scott v. Harris*,

550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is

blatantly contradicted by the record, so that no reasonable jury could believe it, a court should

not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Nor does Milla's contention that he was simply closing his vehicle's door because he

thought he needed to make room for a visitor to proceed through the driveway gate detract from

whether Officers Brown and McComas reasonably perceived that Milla was acting suspiciously.

Not only does Milla's subjective intent in closing his door not create a material fact in this case,

his assertion is belied by the evasive behavior in which he engaged associated with closing the

door.  In short, Officer Brown's ICV recording clearly establishes the behavior that Officers

Brown and McComas relied upon in making the determination that they would detain Milla.

This behavior led to the officers' reasonable conclusion that Milla was attempting to evade the

officers by shutting his door and hiding in the passenger compartment of his vehicle. As such, Milla's assertion that there was a legitimate reason for closing his door does not create a genuine dispute of material fact.

In total, Milla's assertions of alleged fact contained in his Opposition are insufficient as a matter of law to establish a genuine dispute of material fact that would defeat the Defendants' entitlement to summary judgment. The issue thus becomes whether the Defendants have established their entitlement to summary judgment based upon the record as a whole, and as outlined in the Defendant's Motion for Summary Judgment and related Memorandum.

## III.   OFFICERS BROWN AND MCCOMAS ARE ENTITLED TO SUMMARY JUDGMENT

Milla concedes in his Opposition that if this Court finds that Officers Brown and McComas had reasonable, articulable suspicion to detain him, they properly effectuated that detention, and properly searched both Milla and his vehicle. As such, the only remaining issue for the Court is whether Officers Brown and McComas had reasonable, articulable suspicion to detain Milla, and whether they are entitled to qualified immunity.

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott*, 550 U.S. at 380 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). Here, the record, taken as a whole, conclusively establishes that Officers Brown and McComas had reasonable, articulable suspicion to detain Milla. The officers were responding to a call for a stabbing that had just occurred, with a heavily bleeding and uncooperative victim a mere two-tenths of a mile from Milla's location. It was approximately 4:00 in the morning, and there were no individuals in the area and a limited number of vehicles. Milla's vehicle was stopped outside of the closed gate to a residence that, at the time, was not known to be his. His vehicle appeared "hot" on the FLIR

6

camera, which established that it had recently been driven.  Milla was in the driver's seat for a

sustained period of time, at least for the three minutes that he was observed by the helicopter

officers, with his taillights illuminated and his driver's side door standing wide open.  When

Officers Brown and McComas pulled into the driveway to investigate, Milla appeared to be

crouched down in the passenger compartment, and upon the officers' arrival, Milla immediately

pulled his door shut.

Milla cites to two Fourth Circuit Court of Appeals cases in support of his argument that

the officers did not have reasonable, articulable suspicion to detain him; *United States v. Burton*,

228 F. 3d 524 (4th Cir. 2000) and *United States v. Sprinkle*, 106 F. 3d 613 (4th Cir. 1997).

These cases are factually dissimilar to this case, and neither command the denial of Officers

Brown and McComas' Motion for Summary Judgment.  In *Burton*, officers searched an

individual who was standing at a telephone booth with his hand in his pocket during what the

officers referred to as a consensual encounter.  *Burton*, 228 F. 3d at 526.  When officers

approached, he declined to provide his name, and did not remove his hand from his pocket when

officers asked him to do so.  *Id*.  The Fourth Circuit found that the officers had illegally searched

the individual because at the time of the search, the man was "just standing at a telephone

booth," and as the officers approached, "all he did was to continue standing as he was and refuse

to answer questions."  *Id.* at 528.

In *Sprinkle*, officers detained an individual who was sitting in a vehicle in a high crime

area with another individual whom officers knew to have prior drug convictions.  *Sprinkle*, 106

F. 3d at 615.  The officers observed the individuals "huddling" inside the passenger compartment

but could see both individuals' hands and observed that they were not passing anything back and

forth, such as illegal drugs.  *Id*.  The court declined to find reasonable, articulable suspicion,

stating that as the officers observed the two individuals, they were able to confirm to the contrary that "nothing of a criminal nature was happening in the car." *Id*. at 618.

These two cases do nothing to detract from Officers Brown and McComas' entitlement to summary judgment. Unlike the officers in *Burton* and *Sprinkle*, Officers Brown and McComas knew that a violent crime had taken place nearby, and they were assisting other officers in the effort to locate the suspect, or possibly additional victims. When the helicopter FLIR camera first picked up the heat signal from Milla's vehicle, it was positioned suspiciously; it was on the outside of a privacy gate in a private driveway with the driver's door standing wide open, and for the three minutes that the helicopter officers maintained visual contact with the vehicle, it did not move and the individual inside was seemingly oblivious to the presence of a helicopter directly above. When Officers Brown and McComas arrived on scene, the occupant of the vehicle, Milla, made efforts to conceal himself from the officers by crouching down into the passenger compartment of the vehicle and closing his door. Milla's behavior was not similar to the defendants' behavior in either *Burton* or *Sprinkle* but was of the type that is reasonably investigated through a brief detention.

Milla argues that the officers should have run the vehicle's license plate number, after which they would have discovered that Milla lived at the residence, negating the need to detain him. This assertion is belied by multiple cases that stand for the proposition that a law enforcement officer is not required to rely on the least intrusive method of investigating criminal activity, so long as the manner in which he does investigate is reasonable. *See, e.g.*, *United States v. Sokolow*, 490 U.S. 1, 11 (1989) ("The reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques."); *United States v. Montoya de Hernandez*, 473 U.S. 531, 542 (1985) ("[t]he fact that the protection of the

8

public might, in the abstract, have been accomplished by 'less intrusive' means does not, in itself, render the search unreasonable") *quoting United States v. Sharpe,* 470 U.S. 675, 687 (1985).  As such, Officers Brown and McComas were under no obligation to seek to ascertain Milla's identity prior to making contact with him to investigate whether he was involved in the stabbing, particularly in light of Milla's evasive behavior upon their arrival.  Based upon the foregoing, and their Motion for Summary Judgment, Officers Brown and McComas have established their entitlement to summary judgment in this case.

## IV.    OFFICERS BROWN AND MCCOMAS ARE ENTITLED TO QUALIFIED IMMUNITY

"The individual who brings suit against a public official bears the burden of clearly establishing the law (and corresponding rights) allegedly violated."  *Mitchell v. Rice*, 954 F.2d 187, 190 (4th Cir. 1992).  "A right is clearly established when it has been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state in which the action arose."  *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999).  The clearly established right must be defined "with specificity."  *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019).  "Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts."  *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).  Although "caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.*, *quoting White v. Pauly,* 137 S.Ct., 548, 551 (2017).

In his Opposition, Milla has neither correctly defined the clearly established right, nor has he identified any legal precedent that would have put Officers Brown and McComas on notice

that their actions in detaining Milla could constitute a violation of his Fourth Amendment rights. Milla defines the clearly established right at issue in this litigation as the "right to refuse to cooperate with police, walk away, or close his car door during a consensual encounter." (Opp., p. 12.) Officers Brown and McComas do not contend that their encounter with Milla was consensual; they detained Milla on the basis of reasonable, articulable suspicion. Framed in a manner that reflects the facts of this case, the right at issue in this Court's qualified immunity analysis is more properly stated as the right of an individual who is located near the scene of a violent crime and who acts suspiciously, as detailed above, to avoid a law enforcement detention aimed at ensuring that he is not armed with a deadly weapon or involved in the violent crime.

As explained *supra*, and in the Defendants' Motion for Summary Judgment, the body of U.S. Supreme Court and Fourth Circuit caselaw that exists on this issue reflect that these courts have repeatedly upheld an officer's ability to conduct an investigatory detention under circumstances similar to the case at bar. The two cases that Milla relies upon to argue that his detention was illegal, *Burton* and *Sprinkle* are factually dissimilar to his encounter with Officers Brown and McComas in that both involved officers who were not investigating criminal activity, much less a violent crime that had occurred nearby. *See generally Burton*, 228 F. 3d 524; *Sprinkle*, 106 F. 3d 613. Because factually similar cases have consistently affirmed an officer's ability to conduct an investigatory detention under factual circumstances similar to the case at bar, Officers Brown and McComas are entitled to qualified immunity, and Milla's Complaint must be dismissed.

<u>**CONCLUSION**</u>

In consideration of the foregoing, Officers Brown and McComas request that this Court grant them summary judgment and dismiss the Complaint with prejudice.

10

**JA115**

Respectfully submitted,

PFC D. BROWN
PFC MCCOMAS
By Counsel

ELIZABETH D. TEARE
COUNTY ATTORNEY


By _____/s/_____
    Kimberly P. Baucom, Senior Assistant County Attorney
    Virginia Bar Number 44419
    Counsel for Defendants
    Office of the County Attorney
    12000 Government Center Parkway, Suite 549
    Fairfax, VA  22035-0064
    Phone: 703-324-2421
    Fax: 703-324-2665
    kimberly.baucom@fairfaxcounty.gov

## CERTIFICATE OF SERVICE

    I hereby certify that on the 25th day of February, 2021, the foregoing was sent overnight via Federal Express to the following:

Anthry Milla
1021 Dranesville Road
Herndon, Virginia 20170
Plaintiff


                  _____/s/_____
                  Kimberly P. Baucom

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| ANTHRY RAUL MILLA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-00694 (AJT/MSN) |
| | ) | |
| PFC D. BROWN, *et al.*, | ) | |
| | ) | |
| Defendant, | ) | |
| _____ | ) | |

**<u>ORDER</u>**

Pending before the Court is Defendants' Motion for Summary Judgment [Doc. No. 22]
(the "Motion").  The Motion is currently set for a hearing on Wednesday, March 3, 2021.  Upon
consideration of the Motion, is it hereby

ORDERED that the hearing on Defendants' Motion for Summary Judgment [Doc. No.
22], presently scheduled for Wednesday, March 3, 2021 be, and the same hereby is,
**CANCELLED**, and the Court will consider the Motion upon the briefs without a hearing and
schedule a hearing on the Motion if it deems necessary to the decisional process.

The Clerk is directed to forward a copy of this Order to all counsel of record, and to *pro
se* Plaintiff Anthry Raul Milla.

Anthony J. Trenga
United States District Judge

Alexandria, Virginia
March 1, 2021

**JA117**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| ANTHRY RAUL MILLA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-00694 (AJT/MSN) |
| | ) | |
| PFC D. BROWN, *et al.*, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |

**ORDER**

Plaintiff Anthry Milla (the "Plaintiff" or "Milla"), appearing *pro se*, has filed Fourth

Amendment claims against Defendant Officers Derek Brown and Shane McComas in their

individual capacities, alleging that Defendants committed violations of 42 U.S.C. § 1983 by

detaining and frisking him and searching his vehicle without reasonable, articulable suspicion.

[Doc. No. 1] (the "Complaint" or "Compl.") at ¶ 2-3.[1]  Defendants have filed a Motion for

Summary Judgment [Doc. No. 22] (the "Motion").  There are no genuine issues of material fact;

and for the reasons stated below, Defendants are entitled to judgment as a matter of law on

Plaintiff's claims.  The Motion is therefore **GRANTED**.

**I.    BACKGROUND**

---

[1] In his Complaint, Plaintiff alleges the following facts:

> I exited my residence to retrieve my headphones from my car. While inside my vehicle searching for my headphones, I was accosted by both defendants. One of the defendants ordered me to exit my vehicle with my hands above my head and walk backwards towards the sound of his voice. That defendant placed me in handcuffs and placed me inside of a patrol car. One of the defendants opened the driver's side door of my vehicle and began searching while the other defendant opened my trunk and began searching. Defendants closed my car door and trunk, released me from the handcuffs, and abruptly left my property without incident.

Plaintiff did not allege any particular injuries and seeks $1,000 in nominal damages and $50,000 in punitive damages. [Doc. No. 1].

The following facts are not in dispute, unless otherwise indicated:[2]

On June 7, 2019, at approximately 4:20 a.m., the Fairfax County Department of Public Safety Communications ("DPSC")[3] was contacted through the County's emergency 911 system by a citizen reporting that a man, who had been stabbed and was bleeding heavily, was banging on the doors of a Shell gas station at 12219 Leesburg Pike, Herndon, Virginia, 20170. Kang Aff. ¶¶ 2-8. The DPSC dispatch operator provided that information to officers in the Reston District where the Shell gas station is located. Officer Adam Ater, designated as unit 501A, who was on duty at the Reston District Police Station, responded to the DPSC dispatch. [Doc. No. 23-2] (the "Affidavit of Officer Adam Ater" or "Ater Aff.") ¶ 2. Upon arriving at the Shell gas station, Officer Ater saw blood across the gas station window and a man standing in front of the gas station covered in blood, with a deep slash wound on his arm and a makeshift tourniquet around

---

[2] Local Civil Rule 56(B) provides that plaintiff's opposition brief must "include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and *citing parts of the record relied on* to support the facts alleged to be in dispute." E.D. Va. Local Civ. R. 56(B) (emphasis added). Importantly, "the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." *Id.* Relatedly, Rule 56(e), Fed. R. Civ. P. provides that courts may "consider the fact undisputed for purposes of the motion" or issue "any other appropriate order" if a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)." Fed. R. Civ. P. 56(e); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . ."). Plaintiff has failed to comply with these briefing requirements in his Opposition brief. *See generally* [Doc. No. 27] (the "Opposition" or "Opp'n). Moreover, Plaintiff fails to dispute any facts *material* to the case and any facts he does dispute are not cited to in the record. While the Court is not required to "sift through the record in search of evidence to support a party's opposition to summary judgment," *Smith v. U.S. Cong*., 2015 WL 1011545, at *3 (E.D. Va. Mar. 6, 2015), in determining whether there exists a genuine issue of material fact with respect to the pending Motion, the Court has nevertheless done precisely that and has considered which facts in Defendants' statement of facts ("SOF"), *see* [Doc. No. 23] (the "Memorandum in Support" or "Mem.") at 2-14, Plaintiff has fairly disputed based on the record, including, specifically, that section styled Plaintiff's "List of Facts Not in Dispute." *See* Opp'n at 1-3. Based on that review, the Court finds that the recited facts are undisputed, unless noted otherwise.

[3] DPSC is the County agency responsible for all emergency communications for the Fairfax County Police Department ("FCPD") and the Fairfax County Fire and Rescue Department. All emergency communications within the County that involve DPSC are created and maintained by a computerized system, the Computer Aided Dispatch ("CAD"). At 4:20:32 a.m., and based upon the information provided by the caller, the dispatch operator created the event, Event Number E191580276, as a stabbing incident at the Shell gas station. [Doc. No. 23-1] (the "Affidavit of Angela Kang" or "Kang Aff.") ¶¶ 2-8. Fairfax County police officers communicate with DPSC through their police radio or through a computer terminal in their police cruisers. Officers receive CAD information from DPSC on their in-car computer terminal, and they receive information by listening to their police radio. Kang Aff. ¶ 5.

his arm.  The victim was screaming and cursing at the lone female gas station attendant, who was inside the gas station with the door locked.  *Id.* ¶ 3.  Officer Ater attempted to talk to the victim, who smelled heavily of alcoholic beverages, to ascertain what had happened, but the victim would not speak to him, but rather continued yelling at the gas station attendant.  *Id.* ¶ 4.  A Fire Department medic unit arrived on scene and applied a tourniquet to the victim's arm and placed him in the ambulance.  Officer Ater entered the ambulance and continued to try to speak with the victim to find out what had happened to him, but the victim remained uncooperative and refused to provide any information that would assist police in the investigation of who had harmed him, or what had occurred.  *Id.* ¶ 5.

During this time, additional FCPD officers were in the area searching for suspects, and also searching for the location of the attack, as it appeared that the Shell gas station was not the scene of the crime, but merely the location where the victim went to seek help after the crime occurred.  *Id.* ¶ 6.  A FCPD helicopter unit was also involved in the search for suspects.[4] Officers in the helicopter, including Master Police Officer ("MPO") Tammy Russell ("MPO Russell"), were made aware, via radio communications, that the victim was uncooperative with officers on scene and refused to provide any information regarding what had occurred, or where the stabbing incident had taken place.  Russell Aff. ¶ 4.

In an attempt to identify any nearby suspicious people or vehicles that could have been involved in the incident, the helicopter officers began to utilize the helicopter's Forward-Looking Infrared ("FLIR") camera.[5]  MPO Russell observed a monitor that projected the camera's images

---

[4] The helicopter had initially been contacted while returning to base after assisting with a robbery incident in the event that an aeromedical evacuation was necessary for the victim.  [Doc. No. 23-3] (the "Affidavit of MPO Tammy Russell" or "Russell Aff.") ¶ 3.  After being advised that the victim was stabbed in the arm, not the chest, and was alert and oriented, the helicopter transitioned into the role of law enforcement support.  *Id.* ¶ 4.

[5] A FLIR camera detects infrared radiation and creates an image from that radiation, which typically appears as a light image against a darker, cooler, background.  As such, warmer objects appear distinctly from cooler objects in

while her co-worker in the helicopter manipulated the camera equipment. *Id.* ¶ 5; *see also* [Doc. No. 23-4] (the "Helicopter Video Footage"). After MPO Russell identified for the on-scene officers the vehicles in the Shell gas station parking lot that were warm, the officers asked whether there were any people in the surrounding area. The helicopter officers began to use the FLIR camera in the surrounding area in an attempt to identify any suspicious individuals nearby who may have been involved in the incident. Russell Aff. ¶ 7; *see also* Helicopter Video Footage.

MPO Russell soon observed a "hot" vehicle parked outside of a closed gate at 1021 Dranesville Road close to the Shell gas station. 1021 Dranesville Road is two-tenths of a mile from the Shell gas station where the stabbing victim was discovered. The vehicle was stationary, and the driver's door was standing open; the vehicle's taillights were lit and the headlights off. Upon closer observation, MPO Russell could see that there appeared to be a person inside the vehicle, and the person appeared to the officers to be slouched down in the driver's seat. MPO Russell informed the on-scene officers of what she observed via the police radio. Russell Aff. ¶ 8; *see also* Helicopter Video Footage at 3:43.

On duty FCPD Officers Defendants Brown, designated as unit 950A, and McComas, designated as unit 530A, both from the Reston District Police Station, had become became aware of the incident involving the stabbing victim at approximately 4:20 a.m., and were dispatched to respond to the vehicle location at 1021 Dranesville Road to investigate whether the vehicle, or its occupants, were possibly involved in the stabbing incident. Officers Brown and McComas separately voiced over their radios that they would respond. The helicopter remained on scene and captured and recorded on the helicopter's FLIR camera the Officers' encounter with the

---

video output images. The warmer the object, the more infrared radiation emits from that object, and the whiter the image. Russell Aff. ¶ 6.

vehicle and its occupant. Russell Aff. ¶ 9; *see also* Helicopter Video Footage; Brown Aff. ¶¶ 1-

2; McComas Aff. ¶¶ 1-2. As of June 7, 2019, both Officers Brown and McComas had been

employed by the FCPD as sworn law enforcement officers for six years and five years,

respectively. *Id.*[6]

While they were driving to the area, both officers monitored the CAD information on

their in-car computer monitors, and listened to their police-issued radios so that they would be

aware of the information that was being conveyed from the officers at the Shell gas station, the

DPSC dispatcher, and the FCPD helicopter. Audio of the radio traffic is captured on Officer

Brown's ICV recording. Brown Aff. ¶ 4; McComas Aff. ¶ 3; *see also* ICV Footage. As a result,

Officers Brown and McComas were aware that (1) officers responded to the Shell gas station and

observed a male victim in front of the gas station covered in blood; (2) the victim had wrapped a

makeshift tourniquet around his arm, and had a deep slash wound on his arm; (3) based on the

helicopter officers' use of the FLIR, there were no "hot cars" in the parking lot of the Shell gas

station other than two vehicles that were at the pumps; (4) one of the officers at the Shell gas

station asked the helicopter officers whether there were any people walking or running in the

area surrounding the Shell gas station; (5) the helicopter pilots were operating their FLIR camera

in the area to look for suspicious people or vehicles that could have been involved in the stabbing

incident; and (6) the helicopter officer did not find any people walking or running, but had

---

[6] As Officers Brown and McComas began driving toward the area in their separate FCPD cruisers to provide law enforcement assistance, Officer Brown activated his cruiser's emergency lights and siren, which also caused his cruiser's In-Car Video ("ICV") system to begin recording; and Officer Brown's ICV captured the entirety of the Officers' involvement in responding to the stabbing event, including their interaction with Milla. Brown Aff. ¶ 3; McComas Aff. ¶ 2; *see also* ICV Footage. Prior to voicing over the radio that they were responding, Officers Brown and McComas heard an instruction over the radio for responding officers to "slow it down." To them, this phrase meant that they were to deactivate their emergency lights and sirens. Both officers turned off their lights and sirens. Brown Aff. ¶ 8; McComas Aff. ¶ 7; *see also* ICV Footage. After the helicopter officers first observed the vehicle at 1021 Dranesville Road, the FLIR camera maintained its capture of the vehicle with no interruptions for a total of over three minutes prior to the Officers' arrival, during which time the vehicle did not move and the driver's door remained open. *See* Helicopter Video Footage; [Doc. No. 23-8] (map of the area).

located in the driveway of 1021 Dranesville Road a recently operated, or "hot," vehicle, with the driver's door open and an occupant inside.  Brown Aff. ¶¶ 5-6; McComas Aff. ¶¶ 4-5.

While driving to 1021 Dranesville Road, Officers Brown and McComas received additional information from the helicopter officers observing the vehicle on the FLIR, including that the vehicle's headlights were not illuminated, but the taillights were lit and the driver's door was open.  The helicopter officer also stated on the radio that it appeared that the occupant could be on the driver's seat of the vehicle.  Brown Aff. ¶ 10; McComas Aff. ¶ 9; *see also* ICV Footage.

Officer Brown was the first to arrive at 1021 Dranesville Road and pulled into the driveway.  As Officer Brown pulled into the driveway, his cruiser's headlights illuminated Milla's vehicle.  Officer Brown could see Milla's legs in the driver's seat; however, he could not see the rest of Milla's body, and it appeared to him that Milla was ducked down in the seat.  Within seconds of the officers' arrival, Milla reached out of the driver's side of the vehicle and pulled the driver's side door shut.  Brown Aff. ¶ 12; ICV Footage at 5:21-5:33.  When he arrived, Officer McComas pulled up behind and to the right of Officer Brown's cruiser, still partially in the highway and for that reason, Officer McComas activated his rear emergency lights so that vehicles approaching on the highway could see his cruiser.  As observed by the officers, Milla's vehicle was stopped outside of a closed gate that separated the main portion of the driveway from the residence.  Brown Aff. ¶ 11; McComas Aff. ¶ 10; *see also* ICV Footage at 5:13; Helicopter Video Footage 5:14.

Based on the information they had regarding the stabbing investigation occurring nearby, the position of the vehicle at 1021 Dranesville Road and Milla's behavior when they arrived on scene, Officers Brown and McComas determined that they would detain any individuals in the

vehicle to investigate whether that person was involved in the stabbing incident.  Brown Aff. ¶ 13; McComas Aff. ¶¶ 12-13.  For that purpose, Officer Brown exited his cruiser and stood behind his open driver's side door for protection and, working with Officer McComas, provided commands for Milla to exit the vehicle.  Brown Aff. ¶ 14; McComas Aff. ¶ 14; *see also* ICV Footage 5:23-5:37.

Milla opened the driver's side door, raised his hands in the air, and swung his legs out of the vehicle.  Since Milla did not have shoes on, he reached into the driver's side floorboard of the vehicle to retrieve his shoes and put them on.  Milla exited the vehicle and followed the Officers' commands to walk backwards toward them with his hands in the air.  When Milla reached the Officers, Officer McComas placed him in handcuffs and put him in the rear seat of Officer Brown's cruiser.  Officer McComas asked Milla whether there was anyone else in the vehicle and he responded, "[n]o, just me."  Brown Aff. ¶ 17; McComas Aff. ¶ 16; ICV Footage.

Officer Brown reported over the radio that they had an individual detained.  The DPSC documentation establishes that Milla's detention began at 4:34:09 a.m., which was a total of 14 minutes after the initial 911 call was entered into the DPSC Background Event Chronology.  Background Event Chronology at 4; Brown Aff. ¶¶ 15-16; McComas Aff. ¶ 15; *see also* ICV Footage at 7:04; Helicopter Video Footage.  Officer McComas then provided commands for any passengers in the vehicle to exit the vehicle, and after receiving no response approached the vehicle to ensure that there were no weapons, additional suspects or victims in the vehicle.  Brown Aff. ¶ 18; McComas Aff. ¶ 17; *see also* ICV Footage.  Upon approaching the vehicle, Officer Brown noticed that it had front end damage.  After making a visual inspection of the outside of the vehicle, Officer Brown opened the driver's side door to find the trunk latch so that

they could clear the trunk of any additional suspects or victims.  Brown Aff. ¶ 19; McComas Aff. ¶ 18; *see also* ICV Footage at 8:02.

While Officer Brown looked for the trunk latch, Officer McComas stood at the rear of the vehicle off to the right side of the trunk.  In order to be prepared for the possibility that when Officer Brown pulled the latch to open the trunk there could be an individual inside who could harm him, Officer McComas positioned his body so that only the side of his body was exposed to any potential danger, and held his firearm at a "low ready" position, meaning that his firearm was pointed towards the ground.  Officer McComas was also concerned that there could be an additional stabbing victim in the vehicle.  *Id.*  Officer McComas lifted the trunk of the vehicle, conducted a visual check to make sure no individuals were in the trunk, and closed it four seconds later without touching or searching any of the numerous items inside.  Brown Aff. ¶ 19; McComas Aff. ¶¶ 18-19; *see also* ICV Footage at 9:02-9:04.

As Officer McComas was clearing the trunk, Officer Brown opened the passenger side door to the vehicle and after not seeing any weapons in the passenger compartment of the vehicle, shut the passenger door.  Brown Aff. ¶ 20; McComas Aff. ¶ 20; *see also* ICV Footage (communicating to Officer McComas, "Yeah, no I don't see any weapons or anything."). After confirming that there were no additional people in the vehicle, and that there were neither weapons nor blood in the passenger compartment of the vehicle, Officers Brown and McComas returned to the cruiser and removed Milla from the cruiser.  Brown Aff. ¶ 21; McComas Aff. ¶ 21; *see also* ICV Footage at 9:41.  Officer McComas conducted a pat down of Milla's outer clothing to ensure that he was not in possession of a knife and found no weapons.  McComas Aff. ¶ 21.

Officer Brown asked Milla whether he was involved in the stabbing incident, to which he responded that he was not.  Officer Brown then asked Milla about the front-end damage to his vehicle, to which Milla responded that it was old damage resulting from someone hitting his vehicle.  Officer Brown had a conversation with Milla regarding whether he lived at the location and asked for his name so that he could document the subject stop in an incident report.  Milla repeatedly refused to provide his name to Officer Brown.  Officer Brown explained to Milla why he had been detained.  Brown Aff. ¶ 21; *see also* ICV Footage.

As Officer Brown was speaking with Milla, two individuals walked into the driveway, and Officer McComas made contact with them.  Milla informed the officers that the two individuals were his parents.  Officer McComas confirmed with Milla's parents that Milla was their son and that he lived in the residence.  He then asked Milla's parents about the front end damage on the vehicle to confirm that the damage was not recent.  Additionally, Officer McComas asked Milla's parents for Milla's name and date of birth, which they provided. McComas Aff. ¶ 21.  As soon as the officers ascertained Milla's name and confirmed that he lived at the residence, he was released from the handcuffs.  Brown Aff. ¶ 22; McComas Aff. ¶ 22; *see also* ICV Footage at 12:40. In total, Milla was detained for six minutes. As of the time Milla was released from detention, no other suspects had been located by any of the officers investigating the stabbing incident, and officers had not yet located the scene of the stabbing. Brown Aff. ¶ 22

After releasing Milla from detention, Officers Brown and McComas left the Milla residence and drove to the Shell gas station.  As they were leaving the residence, they could hear radio traffic between the helicopter and a canine unit regarding a large pool of blood they had located in a McDonald's parking lot across the street from the Shell gas station.  Brown Aff.

¶ 23; McComas Aff. ¶ 23; *see also* ICV Footage.  It took Officer Brown less than one minute to travel from the Milla residence to the Shell gas station, including a brief stop at a stoplight. Ultimately, officers concluded that the McDonald's parking lot[7] was the scene of the stabbing.

On June 18, 2012, Plaintiff filed his Complaint against Officers Brown and McComas in their individual capacities, alleging that Defendants committed a Fourth Amendment violation by detaining and frisking him without reasonable articulable suspicion and by searching his vehicle, all in violation of 42 U.S.C. § 1983.  *See* Compl. at ¶ 2-3.  Plaintiff requests compensatory and punitive damages.  *See* Compl.; [Doc. No. 25] ¶ 2-3 (motion to amend damages).  This Court has jurisdiction pursuant to 28 U.S.C. § 1331.  On February 3, 2021, Defendants filed a Motion for Summary Judgment with the required *Roseboro* warning under *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), which has been fully briefed.  *See* Mot. at 1 n.1; [Doc. Nos. 27-28].

## II.    LEGAL STANDARD

Summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996).  The party seeking summary judgment has the initial burden to show the absence of a material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson*, 477 U.S. at 248.

---

[7] The McDonald's parking lot is located in Loudoun County, Virginia.  Because the crime occurred in Loudoun County, the Loudoun County Sheriff's Department took over the investigation into the stabbing.  Ater Aff. ¶ 9; Russell Aff. ¶ 11-12; *see also* Helicopter Video Footage.

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).   Thus, to defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 247-48 ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.").  This requirement equally applies to *pro se* litigants.  *See Blair v. Ravenswood Village Health Ctr.*, 43 F. Supp. 2d 586, 586 (S.D.W. Va. 1998), *aff'd sub nom. Blair v. Ravenswood Vill. Health Ctr.*, 173 F.3d 849 (4th Cir. 1999) ("Despite the rule of liberally construing pro se plaintiff's pleadings, when a defendant moves for summary judgment, plaintiff may not rest on pleadings, but must demonstrate that specific, material facts exist that give rise to genuine issue that must be tried before jury.") (internal citations and quotations omitted).  Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.* at 248.  The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party.  *Id.* at 255; *see also Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007).

### III.   ANALYSIS

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  The "test of reasonableness under the Fourth Amendment is an objective one."  *Los Angeles Cty., California v. Rettele*, 550 U.S. 609, 614 (2007) (citing *Graham v. Connor*, 490 U.S. 386, 397

(1989)).  A police officer may "seize a person for a brief investigatory stop if he 'observes

unusual conduct which leads him reasonably to conclude in light of his experience that criminal

activity may be afoot.'"  *United States v. Slocumb*, 804 F.3d 677, 681 (4th Cir. 2015) (quoting

*Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

      To justify a stop, the officer must "point to specific and articulable facts which, taken

together with rational inferences from those facts, reasonably warrant that intrusion."  *Terry*, 392

U.S. at 21; *see also Reid v. Georgia*, 448 U.S. 438, 440 (1980) (The officer must have "a

reasonable and articulable suspicion that the person seized is engaged in criminal activity.");

*United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("[T]he police can stop and briefly detain a

person for investigative purposes if the officer has a reasonable suspicion supported by

articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause")

(citation omitted).  "The level of suspicion must be a 'particularized and objective basis for

suspecting the particular person stopped of criminal activity.'"  *Slocumb*, 804 F.3d at 682

(quoting *United States v. Black*, 707 F.3d 531, 539 (4th Cir. 2013)).

      Courts consider the totality of the circumstances when deciding whether an officer had

reasonable suspicion to support a *Terry* stop.  *See United States v. Arvizu*, 534 U.S. 266, 273

(2002).  "In reviewing police action, courts must look at whether the evidence as a whole

establishes reasonable suspicion rather than whether each fact has been individually refuted,

remaining mindful of 'the practical experience of officers who observe on a daily basis what

transpires on the street.'"  *United States v. Bowman*, 884 F.3d 200, 213 (4th Cir. 2018) (quoting

*United States v. Branch*, 537 F.3d 328, 336–37 (4th Cir. 2008)).  For that reason, "a court's

review of the facts and inferences produced by a police officer to support a *Terry* stop must be

holistic.  Courts must look at the cumulative information available to the officer, and not find a

stop unjustified based merely on a piecemeal refutation of each individual fact and inference." *Branch*, 537 F.3d at 337 (internal citations omitted).

Nevertheless, "[t]he Government bears the burden of proving that reasonable suspicion justified a warrantless seizure." *United States v. Kehoe*, 893 F.3d 232, 237 (4th Cir. 2018). Evidence that would support only "a mere 'hunch' is insufficient," though a reasonable basis need not establish probable cause and may well "fall[ ] considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 534 U.S. at 274; *see also Ornelas v. United States*, 517 U.S. 690, 695 (1996) ("Articulating precisely what 'reasonable suspicion' and 'probable cause' mean is not possible. They are commonsense, nontechnical conceptions that deal with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'") (collecting cases). In that regard, "where police have been unable to locate a person suspected of involvement in a past crime, the ability to briefly stop that person, ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice." *United States v. Hensley*, 469 U.S. 221, 229 (1985). "The law enforcement interests at stake in these circumstances outweigh the individual's interest to be free of a stop and detention that is no more extensive than permissible in the investigation of imminent or ongoing crimes." *Id.* But "a police officer's decision to stop and detain an individual must be evaluated . . . on an objective assessment of the officer's actions." *Branch*, 537 F.3d at 337 (internal citations omitted).

### A. The *Terry* Stop and Detention of Milla

The Officers assert that objectively reasonable and articulable suspicion existed for them to detain Milla. In support of that position, the Officers cite to the facts that: (1) they were responding to a call relating to a recent stabbing incident with a heavily bleeding and

uncooperative victim; (2) it was after 4:00 a.m.; (3) Milla's vehicle was stopped outside of a closed private gate to a residence two-tenths of a mile away from the stabbing victim, it appeared "hot" from the helicopter's FLIR camera, its taillights were illuminated, and the driver's side door was open with what appeared to be a person slouched in the driver's seat—later identified as Milla; and (4) upon the Officers' arrival, Milla immediately pulled his door shut. *See* Mem. at 19. Milla responds that (1) he was not "slouched" or "crouched down" in the seat, but instead, he was "sitting normally in the driver's seat;" (2) "there were other drivers closer to the scene than Milla, making them more suspicious;" and (3) the Officers could have run Milla's license plate first, which would had shown that he was actually in the driveway of his residence. Opp'n at 4-5.[8]

Based on the undisputed facts in their totality, including the time of the apparent attack on the victim, the location of Milla's vehicle relative to the victim and its apparent recent operation, Milla's presence in the vehicle, the absence of other persons sitting in stopped "hot" vehicles in the area, the temporal proximity between the time of the attack on the victim and the location of Milla's "hot" vehicle, and Milla's conduct upon being approached by the Officers, the Officers had as a matter of law an objectively reasonable suspicion to detain Milla. *See, e.g., United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993) ("The lateness of the hour is another fact that may raise the level of suspicion."); *United States v. Pittman*, 102 F. App'x 315, 320 (4th Cir. 2004) (finding the totality of circumstances justified an investigatory stop when "[o]fficers . . . were responding to a call that shots had been fired in the area where the detention occurred . . . [the officers] thus on the look-out for an armed individual and had some reason to suspect that any of the individuals in the area . . . might be the person who fired the shot.");

---

[8] None of these contentions is supported with citations to the record.

*United States v. Moore,* 817 F.2d 1105, 1108 (4th Cir. 1987) (upholding a *Terry* detention and frisk for weapons when "the hour was late, the street was dark, the officer was alone, and the suspected crime was a burglary, a felony that often involves the use of weapons"); *United States v. Beasley,* 2020 WL 6377211, at *9 (E.D. Va. Oct. 30, 2020) ("Admittedly, the seizure's temporal proximity to the crime's commission weighs in favor of allowing the police to seize [Defendant].") (citing *Hensley*, 469 U.S. at 229 ("Particularly in the context of felonies or crimes involving a threat to public safety, it is in the public interest that the crime be solved and the suspect detained as promptly as possible.")); *United States v. George*, 732 F.3d 296, 299 (4th Cir. 2013) ("A host of factors can contribute to a basis for reasonable suspicion, including the context of the stop, the crime rate in the area, and the nervous or evasive behavior of the suspect. A suspect's suspicious movements can also be taken to suggest that the suspect may have a weapon.") (internal citations omitted); *United States v. Ruffin*, 814 F. App'x 741, 747 (4th Cir. 2020) (suspect moving in an evasive manner supports reasonable suspicion); *United States v. Foster*, 824 F.3d 84, 95 (4th Cir. 2016) (finding articulable suspicion when the individual detained was the only person that police encountered near the scene of a crime); *United States v. Smith*, 396 F.3d 579, 585 (4th Cir. 2005) (holding that a suspect's presence in a driveway, "more than 200 feet from the public road but still some distance from the residence" led to the reasonable conclusion that the suspect was hiding in the driveway).

None of Milla's contentions create a material dispute that precludes summary judgment in Defendants' favor. Whatever his posture, whether sitting in the vehicle upright or slouching, Milla was sitting inside a recently operated vehicle within a short distance from a stabbing; and in any event, his posture was just one of the circumstances that justified his brief detention. *Hecht v. Am. Bankers Ins. Co.*, 2005 WL 2716373, *3 (W.D. Va. Oct. 21, 2005) ("The Fourth

15

**JA132**

Circuit, however, has generally ruled that a statement in an opposing party's brief does not create an issue of material fact sufficient to defeat summary judgment.") (citing *N. Ins. Co. of New York v. Baltimore Bus. Commc'ns, Inc.*, 68 F. App'x 414, 421 (4th Cir. 2003)); *Nw. Mut. Life Ins. Co. v. Atl. Research Corp.*, 847 F. Supp. 389, 394 (E.D. Va. 1994) ("A fact is material when proof of its existence or nonexistence would affect the outcome of the case, and an issue is genuine if a reasonable jury might return a verdict in favor of the nonmoving party on the basis of such issue.") (citing *Anderson*, 477 U.S. at 248). His contention that "there were other drivers closer to the scene than Milla, making them more suspicious" is not supported by any evidence in the record;[9] and his contention that the Officers should have first screened his license plate to identify whether he was a resident of the address where his vehicle was parked is simply a claim that the Officers should have pursued a less intrusive investigatory technique. But as the Supreme Court has recognized, "[t]he reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques." *Sokolow*, 490 U.S. at 11; *see also United States v. Montoya de Hernandez*, 473 U.S. 531, 542 (1985) ("The fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, in itself, render the search unreasonable") (quoting *United States v. Sharpe,* 470 U.S. 675, 687 (1985)). In any event, the quickly unfolding events surrounding the confrontation with Milla effectively limited any opportunity to run a records check and the totality of the circumstances justified the detention, even if the Officers had known that Milla was parked in his driveway.[10]

---

[9] "Although federal courts are charged with liberally construing complaints filed by *pro se* litigants, this does not mean that a court may construct a claim out of whole cloth if the plaintiff fails to supply the necessary facts or a cognizable theory in support of a claim." *Jarvis v. Staples, Inc*., 2010 WL 4942010, at *2 (D. Md. Nov. 30, 2010), *aff'd*, 426 F. App'x 193 (4th Cir. 2011) (internal citations omitted).

[10] In support of his contention that the Officers did not have reasonable and articulable suspicion to detain him, Milla cites *United States v. Burton*, 228 F. 3d 524 (4th Cir. 2000) and *United States v. Sprinkle*, 106 F. 3d 613 (4th Cir. 1997), which had facts strikingly dissimilar to this case. In *Burton,* the Fourth Circuit found the officer had

In *Wingate v. Fulford*, 987 F.3d 299 (4th Cir. 2021), *as amended* (Feb. 5, 2021), the Fourth Circuit recently reviewed whether the totality of the circumstances justified a late night investigatory detention and concluded that the deputy lacked reasonable and particularized suspicion of possible criminal activity to do so. The facts and circumstances here, while similar in some respects, are clearly distinguishable from the facts in *Wingate*. In *Wingate*, police officers observed Wingate's vehicle stopped along the side of the road at approximately 1:30 a.m., next to a car lot with a history of thefts in a county with a history of car thefts. Wingate's lights were on with the hood raised and the engine running; and Wingate exited his vehicle without prompting as the officer exited his cruiser. After Wingate refused to identify himself to police, he was told he was not free to leave without identifying himself. The Fourth Circuit ruled that a detention had occurred once the police told Wingate that he was not free to leave until he identified himself; and none of the other relied upon circumstances were sufficient to justify that detention, since the totality of the circumstances did not create an objectively reasonable and articulable suspicion that Wingate was engaged in criminal activity. *Wingate*, 987 F.3d at 309–10. Specifically, the lateness of the hour under the circumstances had little investigatory value since there is nothing suspicious about driving late at night and in fact the officer stopped and approached Wingate's vehicle without any suspicion of criminal activity but upon the belief that Wingate's car had broken down; and while the used car lot adjacent to where Wingate was stopped had a history of criminal activity, no criminal activity had been reported that evening at that location or anywhere near Wingate's location. As for Wingate's exit from the vehicle, "the

---

illegally searched an individual after he refused to respond to the officer's questions and to remove his hand from inside his coat during a consensual encounter, which made the officer feel "uneasy." *Burton*, 228 F. 3d at 524. And in *Sprinkle*, the Fourth Circuit declined to find reasonable, articulable suspicion based on the officers' claim that they were not able to observe the two detained individuals' hands and thus could not confirm that "nothing of a criminal nature was happening in the car," even though the officers knew that one of the individuals had a prior drug conviction. *Sprinkle*, 106 F. 3d at 613.

notion that the driver of a broken-down vehicle creates suspicion of criminal activity by approaching the officer trying to render him aid, put candidly, defies reason." *Wingate*, 987 F.3d at 307.  Likewise, Wingate's all black clothing,[11] what appeared to the officers as a somewhat inconsistent explanation for why Milla was stopped (that he was having car trouble but the engine appeared to be properly idling), and Milla's refusal to identify himself did not constitute sufficient grounds to detain him under the totality of the facts and circumstances of that case.  *Id.*

Here, a serious crime appeared to have just been committed late at night, that active crime scene was close to the location where Milla was located shortly after the attack, no other individuals in recently operated vehicles were located within the vicinity of the attack, and in response to the Officers' appearance at his location, Milla closed what had been an open car door.  Moreover, Milla was not detained because of his refusal to identify himself and was released less than two minutes after refusing to give his name and identifying information. *Compare Wingate*, 987 F.3d at 310 ("[T]he Officers enforced Stafford County's stop and identify statute outside the context of a valid *Terry* stop, and arrested Mr. Wingate on that basis. The arrest was therefore unconstitutional.") *with* ICV Footage 11:29-13:26.  Nor did the request to identify himself "impermissibly extend the stop, suggesting an effort to obtain an arrest for failure to identify after a *Terry* stop yielded insufficient evidence." *Wingate*, 987 F.3d at 310 (internal quotation marks omitted); *see also* ICV Footage 11:29-13:26.[12]

---

[11] While Wingate's all black dress was "'similar to the suspects identified and apprehended during the recent increase in late-night vehicular larcenies,'" and "might be necessary to successfully engage in larceny," his all black clothing was "far from sufficient," since it is "often as innocuous as following the latest fashion trends" and ". . . when a nondescript style of clothing is commonplace for both criminal suspects and an immeasurable subset of the law-abiding population, it is of little investigatory value."  *Wingate*, 987 F.3d at 307.

[12] The Fourth Circuit in *Wingate* also noted that the officer's conduct was not supported by any testimony that "based on their training and experience, people experiencing engine trouble do not pull off the road unless their cars are completely disabled."  *See Wingate,* 987 F.3d at 307 ("Although we generally defer to officers' claimed training and experience, we withhold that deference when failing to do so would erode necessary safeguards against 'arbitrary and boundless' police prejudgments.").  Here, Fairfax County Criminal Justice Academy Instructor Michael Hood stated that based on his training, experience, and review of the materials in this case, Officers Brown and McComas conducted a proper (1) felony vehicle stop and detention of Milla; and (2) visual observation and

Nor is this case comparable to *United States v. Massenburg*, 654 F.3d 480, 486 (4th Cir.

2011) where the Fourth Circuit held that reasonable suspicion to stop and frisk an individual did

not exist when "officers were responding to 'a vague report of shots fired,' . . . [and the] report

was not only 'vague'—indicating only that eight shots were 'possibly' fired two blocks south of

a certain intersection[]—it was also anonymous." *Massenburg*, 654 F.3d at 486.[13]  In that

regard, the Court concluded that there was a "poor match between the vague tip and the

individuals encountered [which] substantially undermine[d] reliance on the tip for reasonable

particularized suspicion of [the defendant][]" since "[t]he tipster reported hearing shots *two*

*blocks south* of the intersection of Hull and 14th Streets; [however, the defendant] and his friends

were encountered *four blocks west* of that intersection."  *Id.* at 487 (emphasis added).[14]  Unlike

---

search of the interior of the vehicle, in accordance with accepted practices for law enforcement officers.  [Doc. No.
23-9] (the "Affidavit of Michael Hood" or "Hood Aff.") ¶¶ 1-2, 6.

[13] The officers in *Massenburg* argued that reasonable suspicion existed because the individual detained (1) was
found in the vicinity (i.e. four blocks) of several gunshots; (2) responded nervously when approached by the police;
and (3) was reluctant to consent to a pat down.  *Massenburg*, 654 F.3d at 486 (emphasis added).  As the Fourth
Circuit observed in *Wingate*, "[The Fourth Circuit] said [in *Massenberg*] in no uncertain terms: 'The government
cannot simply proffer whatever facts are present, no matter how innocent, as indicia of suspicious activity.'"
*Wingate*, 987 F.3d at 311 (citing *Massenburg*, 654 F.3d at 489) (alterations in original).

[14] The Fourth Circuit in *Massenburg*, 654 F.3d at 487, elaborated as follows on the adequacy of the information that
the officers acted on:

> [T]he poor match between the vague tip and the individuals encountered substantially undermines
> reliance on the tip for reasonable *particularized* suspicion of Massenburg.  The tip contained no
> physical description of the perpetrators or any other outward identifying features; the only link
> between the tip and Massenburg's group was the group's rough proximity to the alleged site of the
> gunfire.  The tipster reported hearing shots two blocks south of the intersection of Hull and 14th
> Streets; Massenburg and his friends were encountered four blocks west of that intersection.  Thus,
> while the district court appears to have heavily relied on the fact that Massenburg and his
> companions were the only people encountered as Officers Fries and Gaines responded to the tip,
> this provides little basis for reasonable, particularized suspicion of Massenburg. As [*Florida v. J.L.*,
> 529 U.S. 266 (2000)] and its progeny indicate, when a tip lacks sufficient indicia of reliability,
> presence in the area identified by the tip does not generate reasonable suspicion.  Here, Massenburg
> was not even present at the site of the alleged gunfire—he was encountered four blocks
> away.  *Cf. United States v. Moore*, 817 F.2d 1105, 1106 (4th Cir. 1987) (finding reasonable
> suspicion where only individual in the vicinity was found '30 to 40 yards' from the entrance to a
> building burglarized two to three minutes before, 'moving away from the scene of the crime').  To
> the extent that the tip, together with Massenburg's location, did identify his group with
> particularity, J.L. and [*United States v. Reaves*, 512 F.3d 123, 127–28 (4th Cir. 2008)] teach that an
> anonymous tip, absent some corroboration or sufficient other indicia of reliability, is not itself a
> reasonable basis for suspicion justifying a nonconsensual frisk.

19

in *Massenberg,* the Officers in this case were not acting on a vague, anonymous tip, but on verified information developed during the period immediately after the stabbing, including the identification of Milla as the only individual located within a stopped, but recently operated vehicle within a short distance from the stabbing victim.  In sum, the Officers acted on objectively reasonable suspicion and Milla was not illegally detained.  *See Harbin v. City of Alexandria*, 712 F. Supp. 67, 71 (E.D. Va. 1989), *aff'd*, 908 F.2d 967 (4th Cir. 1990) (finding that an encounter between officers investigating a brandishing and a suspect was constitutional because it lasted "no more than five minutes" during which time the officers "ask[ed] the plaintiff questions concerning his identity, request some form of identification and inquire whether plaintiff had been" at the scene of the crime).

## B.  The *Terry* Search of Milla and His Vehicle

After handcuffing and securing Milla in the back of the police cruiser, the Officers did a protective sweep and search of his vehicle and a brief pat down of his person (lasting only several seconds).  *See* ICV Footage at 7:04.  Based on the search and the pat down, Milla claims a Fourth Amendment violation.  He concedes, however, that if the Court finds that the Officers had reasonable suspicion to detain him as a stabbing suspect, then (1) the Officers "employed the least intrusive means to quickly verify or dispel their suspicion that Milla was a stabbing suspect," and (2) their frisk of Milla, and search of his vehicle, were within their scope of authority, to include the Officers' attempt to identify him.  Opp'n at 11-12.  Because the Officers had reasonable and articulable suspicion for detaining Milla, the brief pat down of Milla,[15] and

---

[15] *See Moore,* 817 F.2d at 1107 ("An officer making a lawful investigatory stop may protect himself by conducting a search for concealed weapons whenever 'he has reason to believe that the suspect is armed and dangerous.'"); *id.* ("The circumstances surrounding the stop support the officer's belief that a further frisk for weapons was warranted."); *United States v. Spearman*, 254 F. App'x 178, *3 (4th Cir. 2007) (finding reasonable, articulable suspicion to conduct a pat down when "the circumstances evolved to present a more suspicious and dangerous climate when the detectives saw defendant observing them approach his vehicle and ducking his left shoulder, apparently reaching under his driver's seat").

the search of his vehicle,[16] were also reasonable in light of the totality of the circumstances.  And

because their actions during their encounter with Milla did not violate Milla's constitutional

rights, qualified immunity also shields Officers Brown and McComas from liability.  *See*

*Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Cloaninger ex rel. Estate of Cloaninger v.*

*McDevitt*, 555 F.3d 324, 334 (4th Cir. 2009) ("Because Cloaninger's evidence on summary

judgment fails to establish any objectively unreasonable conduct, he cannot prove that the

defendants violated a clearly established constitutional right.  Thus, qualified immunity bars

Cloaninger's suit . . . ."); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (holding that

government officials are immune from suit if  "their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known" at the time of

the conduct); *Meyers v. Baltimore Cty., Md.*, 713 F.3d 723, 731 (4th Cir. 2013) (explaining a

beneficial two-step approach in applying the qualified immunity doctrine: "a court first must

decide whether the facts alleged or shown, taken in the light most favorable to the plaintiff,

establish that the police officer's actions violated a constitutional right"); *Mitchell v. Rice*, 954

F.2d 187, 190 (4th Cir. 1992) ("The individual who brings suit against a public official bears the

burden of clearly establishing the law allegedly violated.").

## IV.    CONCLUSION

---

[16] *See Michigan v. Long*, 463 U.S. 1032, 1049 (1983) ("[T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.") (quoting *Terry*, 392 U.S. at 21); *id.* at 1050 ("'[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'"); *United States v. Calloway*, 2010 WL 445905 (W.D. Va. 2010) (upholding a *Terry* detention, pat down, and vehicle search for weapons in a case involving an officer investigating gunshots that he heard in the high crime area that he was patrolling); *Spearman*, 254 F. App'x at 182 (finding that an officer was justified in conducting a protective sweep of a vehicle for weapons when, among other facts, the suspect "made furtive movements under the driver's seat when he saw the detectives approaching his vehicle"; *United States v. Mobley*, 699 F.2d 172 (4th Cir. 1983) (upholding the constitutionality of a trunk search when officers were "concerned" of accomplice hiding in the trunk of a vehicle after stopping it because passenger was suspected of participating in a multi-person burglary).

Accordingly, for the above reasons, it is hereby

ORDERED that Defendant Officers', Derek Brown and Shane McComas, Motion for Summary Judgment [Doc. No. 22] be, and the same hereby is, **GRANTED**; and this action is **DISMISSED**.

**This is a Final Order for purposes of appeal.**  To appeal, Plaintiff must file a written notice of appeal with the Clerk's Office within thirty (30) days of the date of this Order.  A written notice of appeal is a short statement stating a desire to appeal this Order and noting the date of the Order Plaintiff wants to appeal.  Plaintiff need not explain the grounds for appeal until so directed by the Court.

The Clerk is directed to forward copies of this Order to *pro se* Plaintiff Anthry Milla, at the address listed in the Complaint, and to all counsel of record.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
March 29, 2021

22



**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

**ANTHRY RAUL MILLA,**

     **PLAINTIFF,**

**v.**                        **CASE NO. 1:20cv00694**

**PFC. D. BROWN, *et. al.,***

     **DEFENDANTS.**

### NOTICE OF APPEAL

Milla desires to appeal the court's Order dated March 29, 2021 granting the defendants' motion for summary judgment.

Submitted,

*[signature]*

Anthry Raul Milla                  Date: 03/31/2021

### CERTIFICATE OF SERVICE

I certify that a copy of this document was emailed to defense counsel.

Submitted,

*[signature]*

Anthry Raul Milla                  Date: 03/31/2021

### GHOSTWRITING CERTIFICATE

I certify that I did not receive assistance from an attorney in preparing this document.

Submitted,

**JA140**

Anthry Raul Milla                                    Date: 03/31/2021